FILED IN
COURT OF CRIMINAL APPEALS

February 27, 2015

ABEL ACOSTA, CLERK

ap-77,031
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 2/27/2015 4:01:52 PM
Accepted 2/27/2015 4:06:39 PM
ABEL ACOSTA
CLERK

## NO. AP-77,031

### IN THE
### COURT OF CRIMINAL APPEALS
### OF TEXAS

_____

### FRANKLIN DAVIS
**Appellant**

### VS.

### THE STATE OF TEXAS
**Appellee**

_____

**APPEALING THE TRIAL COURT'S CAPITAL JUDGMENT
ASSESSING THE DEATH SENTENCE BASED ON JURY VERDICT
OF GUILTY AND ANSWERS TO SPECIAL ISSUES
IN CAUSE NUMBER F12-12630-Y FROM THE CRIMINAL
DISTRICT COURT NO. 7 OF DALLAS COUNTY, TEXAS
THE HONORABLE MICHAEL SNIPES, JUDGE PRESIDING**

_____

**BRIEF FOR APPELLANT**

_____

**JOHN  TATUM
990 SOUTH SHERMAN STREET
RICHARDSON, TEXAS 75081
(972) 705-9200
BAR NO. 19672500
ATTORNEY FOR APPELLANT ON APPEAL ONLY**

**ORAL ARGUMENT IS REQUESTED**

# IDENTITIES OF PARTIES AND COUNSEL

HONORABLE MICHAEL SNIPES
    133 N. Riverfront Blvd
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207

JUDGE PRESIDING
CRIMINAL DISTRICT
COURT NO. 7
OF DALLAS COUNTY, TEXAS

NAIM FRANKLIN DAVIS
    TDC#00999585
    Polunsky Unit
    3872 FM 350 South
    Livingston, Texas 77351

APPELLANT

HONORABLE KARO JOHNSON
    3300 Oak Lawn Ave. Suite 600
    Dallas, Texas 75219
    SBOT#10804500

ATTORNEY FOR APPELLANT

HONORABLE DOUG PARKS
    321 Calm Water Lane
    Holly Lake Ranch, Texas
    SBOT# 15520000

ATTORNEY FOR APPELLANT

HONORABLE BRADY WYATT
    3300 Oak Lawn Ave. Suite 600
    Dallas, Texas 75210
    SBOT# 24008313

ATTORNEY FOR APPELLANT

HONORABLE PHILLIP HAYES
    3300 Oak Lawn Ave. Suite 600
    Dallas, Texas 75219
    SBOT# 24012803

ATTORNEY FOR APPELLANT

HONORABLE JOHN TATUM
    990 S. Sherman St.
    Richardson, Texas 75081
    SBOT#19672500

ATTORNEY FOR APPELLANT
ON APPEAL ONLY

i

HONORABLE CRAIG WATKINS                    DISTRICT ATTORNEY
    133 N. Riverfront Blvd                 DALLAS COUNTY, TEXAS
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207

HONORABLE BRANDON BIRMINGHAM    ASSISTANT DISTRICT ATTORNEY
    133 N. Riverfront Blvd.                DALLAS COUNTY, TEXAS
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207
    SBOT# 24034330

HONORABLE RUSSELL WILSON            ASSISTANT DISTRICT ATTORNEY
    133 N. Riverfront Blvd.                DALLAS COUNTY, TEXAS
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207
    SBOT# 00794870

HONORABLE GLEN FITZMARTIN          ASSISTANT DISTRICT ATTORNEY
    133 N. Riverfront Blvd.                DALLAS COUNTY, TEXAS
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207
    SBOT# 90001438

HONORABLE HECTOR GARZA              ASSISTANT DISTRICT ATTORNEY
    133 N. Riverfront Blvd.                DALLAS COUNTY, TEXAS
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207
    SBOT# 24044190

# TABLE OF CONTENTS

PAGE

IDENTITIES OF PARTIES AND COUNSEL.. . . . . . . . . . . . . . . . . . . . . . . . . . . .  i-ii

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii-vii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  viii-xvi

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xviii

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xxiv-xxvi

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-50

**A. Trial on the Merits**

**The State on Guilt/Innocence**

1) Testimony of Sherrie Gray-James **.** . . . . . . . . . . . . . . . . .  1-4
2) Testimony of Julie Cone. . . . . . . . . . . . . . . . . . . . . . . . .  4
3) Testimony of Forest Langston. . . . . . . . . . . . . . . . . . . . .  4-5
4) Testimony of Cory Cook. . . . . . . . . . . . . . . . . . . . . . . . .  5
5) Testimony of Jeff Shaffer. . . . . . . . . . . . . . . . . . . . . . . .  5-7
6) Testimony of Jim Alcott. . . . . . . . . . . . . . . . . . . . . . . . .  7
7) Testimony of James Snyder. . . . . . . . . . . . . . . . . . . . . . .  7
8) Testimony of Jim Shaffer.. . . . . . . . . . . . . . . . . . . . . . . .  7
9) Testimony of Austin Tapp. . . . . . . . . . . . . . . . . . . . . . . .  7-8
10) Testimony of Andrew Hoog. . . . . . . . . . . . . . . . . . . . .  10-11
11) Testimony of Susan Johnson. . . . . . . . . . . . . . . . . . . . .  9
12) Testimony of Pete Evans. . . . . . . . . . . . . . . . . . . . . . . .  9
13) Testimony of Dena Williams. . . . . . . . . . . . . . . . . . . . .  9-10
14) Testimony of Jeremy Chevallier. . . . . . . . . . . . . . . . . . .  10-11
15) Testimony of Christopher Allen. . . . . . . . . . . . . . . . . . .  11
16) Testimony of Charles Clow. . . . . . . . . . . . . . . . . . . . . .  11
18) Testimony of Dena Williams. . . . . . . . . . . . . . . . . . . . .  12-13
19) Testimony of Craig Allen. . . . . . . . . . . . . . . . . . . . . . .  13-14
20) Testimony of Dustin Bartram. . . . . . . . . . . . . . . . . . . .  14

21) Testimony of Carolyn VanWinkle.. . . . . . . . . . . . . . . . . 14-15

22) Testimony of  Dr. Jill Urban. . . . . . . . . . . . . . . . . . . . 15

## Defense on Guilt/Innocence

23) Testimony of Brandon Snyder.. . . . . . . . . . . . . . . . . . . 15-18

24) Testimony of Franklin Davis.. . . . . . . . . . . . . . . . . . . 18-28

25) Testimony of Lynne Corsi.. . . . . . . . . . . . . . . . . . . . . 28-29

26) Testimony of Arty Hayes.. . . . . . . . . . . . . . . . . . . . . 29-30

27) Testimony of Lamar Leggiton.. . . . . . . . . . . . . . . . . . . 30

## State on Rebuttal

28) Testimony of Shirley Brown. . . . . . . . . . . . . . . . . . . . 30-31

29) Testimony of Julia Adams.. . . . . . . . . . . . . . . . . . . . . 31

30) Testimony of Jazmine Adams. . . . . . . . . . . . . . . . . . . . 31-32

31) Testimony of Jennifer Dibrell. . . . . . . . . . . . . . . . . . . 32

32) Testimony of Jawanna Arrington. . . . . . . . . . . . . . . . . . 33-34

## B. Punishment

## State on Punishment

33) Testimony of Linda Crawford.. . . . . . . . . . . . . . . . . . . 34-35

34) Testimony of Labrena Henderson. . . . . . . . . . . . . . . . . . 35

35) Testimony of Margaret Brown-Lewis.. . . . . . . . . . . . . . . 35-36

36) Testimony of Steven Underwood. . . . . . . . . . . . . . . . . . 36-37

37) Testimony of Mary Cassio.. . . . . . . . . . . . . . . . . . . . . 37-38

38) Testimony of Jawanna Arrington. . . . . . . . . . . . . . . . . . 38

39) Testimony of Matthew Randall.. . . . . . . . . . . . . . . . . . 38-39

40) Testimony of Christian Dalesandro.. . . . . . . . . . . . . . . . 39

41) Testimony of Jennifer Dibrell. . . . . . . . . . . . . . . . . . . 39-40

42) Testimony of Melodye Nelson.. . . . . . . . . . . . . . . . . . . 40-41

## Defense on Punishment

43) Testimony of Clifford Harper. . . . . . . . . . . . . . . . . . . 41-42

44) Testimony of Ed Chattaway.. . . . . . . . . . . . . . . . . . . . 42-43

45) Testimony of Rose McGill.. . . . . . . . . . . . . . . . . . . . . . 43-44
46) Testimony of Dorothy Elkins.. . . . . . . . . . . . . . . . . . . 44-46
47) Testimony of Linda Hayes.. . . . . . . . . . . . . . . . . . . . . 46
48) Testimony of Brenda Griffin. . . . . . . . . . . . . . . . . . . . 46
49) Testimony of Pat Gill . . . . . . . . . . . . . . . . . . . . . . . . 47
50) Testimony of James Aiken.. . . . . . . . . . . . . . . . . . . . . 47-48
51) Testimony of Frank Au Buchon. . . . . . . . . . . . . . . . . 48-49
52) Testimony of Latrice Brown:.. . . . . . . . . . . . . . . . . . . 49
53) Testimony of Kurstyne Bailey.. . . . . . . . . . . . . . . . . . 49-50

**The State on Rebuttal in Punishment**

54) Testimony Sherry Gray-James . . . . . . . . . . . . . . . . . . 50

**SUMMARY OF ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51-53

**ISSUES ON VOIR DIRE**
    **'BATSON ISSUE'**

ISSUE NO. 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53-56
ISSUE NO. 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56-58
ISSUE NO. 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58-61
ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61-65

**PRETRIAL ISSUES**

ISSUE NO. 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66-70
ISSUE NO. 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70-72
ISSUE NO. 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73-74
ISSUE NO. 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74-80
ISSUE NO. 8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74-80
ISSUE NO. 9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74-80
ISSUE NO. 10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74-80

## GUILT/ INNOCENCE TRIAL ISSUES

ISSUE NO. 11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81-91
ISSUE NO. 12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91-94
ISSUE NO. 13. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95-103
ISSUE NO. 14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95-103
ISSUE NO. 15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95-103
ISSUE NO. 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95-103
ISSUE NO. 17. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95-103
ISSUE NO. 18. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95-103
ISSUE NO. 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103-107
ISSUE NO. 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104-107
ISSUE NO. 21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104-107
ISSUE NO. 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107-109
ISSUE NO. 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109-112

## TRIAL PUNISHMENT ISSUES

ISSUE NO. 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113-116
ISSUE NO. 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117-126
ISSUE NO. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126-127
ISSUE NO. 27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127
ISSUE NO. 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128-131
ISSUE NO. 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131
ISSUE NO. 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132-133
ISSUE NO. 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133-134
ISSUE NO. 32. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134-138
ISSUE NO. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138-140
ISSUE NO. 34. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
ISSUE NO. 35. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140-141
ISSUE NO. 36. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141-142
ISSUE NO. 37. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141-142

## FEDERAL ISSUES

ISSUE NO. 38. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143
ISSUE NO. 39. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
ISSUE NO. 40. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

ISSUE NO. 41. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
ISSUE NO. 42. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
ISSUE NO. 43. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
ISSUE NO. 44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
ISSUE NO. 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
ISSUE NO. 46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
ISSUE NO. 47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
ISSUE NO. 48. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146
PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146
CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . 147
CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . 147
CERTIFICATE OF WORD COUNT. . . . . . . . . . . . . . . . . 148

# INDEX OF AUTHORITIES

FEDERAL CASES

***Apprendi v. New Jersey***
530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125,127,135

***Batson v. Kentucky***
476 U. S. 79, 106 S. C. 1712, 90 L. Ed. 2d 69 (1988).. . . . . . . . . . . . . . . . . 62,63,139

***Blakely v. Washington***
124 S.Ct. 2783 (2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125,127,135

***Caldwell v. Mississippi***
472 U.S. 320 (1985).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

***Cooper v. Oklahoma***
517 U.S. 348, 354 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

***Eddings v. Oklahoma***
455 U.S. 104, 112, 102 S. Ct. 869, 71 L.Ed.2d 1 (1982). . . . . . . . . . . . . . . . . . 125

***Furman v. Georgia***
408 U.S. 238 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

***Gates***
462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527.. . . . . . . . . . . . . . . . . . . . . . . . 80

***Hayes v. Thaler***
361, Fed App. 563 (C.A.5 (Tex.)) 2010 WL 183395 . . . . . . . . . . . . . . . . . . . . . . 65

***Hitchcock v. Dugger***
481 U.S. 393 (1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

***Jackson v. Virginia***
443 U.S.307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). . . . . . . . . . . . . . . . 86

***Jurek v. Texas***
428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).. . . . . . . . . . . . . . . . . . . . 114

***Lockett v. Ohio***
438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 ( 1978). . . . . . . . . . . . . . . . . . . . . . . 125

***Miller-El v. Cockrell***
537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62,64,65

***Miller-El v. Drekte***
545 U.S. 231 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

***Penry v. Lynaugh***
492 U.S. 302 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

***Penry v. Johnson***
532 U.S. 782, 796-797 (2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73,138,139

***Purkett v. Elem***
 514 U.S. 765 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

***Reed v. Quaterman***
555 F3d 304 (45th Cir.2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .65

***Ring v. Arizona***
536 U.S.,122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002).. . . . . . . . . . . . 125,127,134

***Simmons v. South Carolina***
512 U.S. 154 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

***Snyder v. Louisiana***
128 S.Ct. 1203 (2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

***Tennard v. Dreke***
124 S.Ct. 2562 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125,142

***Tome v. United States***
513 U.S. 150, 156-58, 115 S.Cyt. 696, 130 L.Ed.2d 574 (1995).. . . . . . . . . . . . . 105

***Wiggins v. Smith***
123 S.Ct. -252,7 (2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

STATE CASES

***Ables v. State***
519 S.W.2d 464, 465 (Tex. Cr. App. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

***Adams v. State***
707 S.W.2d 900 (Tex. Crim. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

***Angulo v. State***
727 S.W.2d 276 (Tex.Crim.App.1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

***Beltran v. State of Texas***
728 S.W.2d 382 (Tex. Crim. App.987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

***Benz v. State***
233 S.W.3d 847 (Tex. Crim. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 114,116

***Brooks v. State***
990 S.W.2d 278, 286 (Tex. Crim. App. 1999), cert. denied,
528 U.S. 956, 120 S.Ct. 384, 145 L.Ed.2d 300 (1999). . . . . . . . . . . . . . . . . . . . . . 67

***Butler v. State***
769 S.W.2d 234, 239 (Tex. Crim.App. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

***Cada v. State***
334 S.W.3d 766, 770 (Tex. Crim. App. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . 71

***Cannady v. State***
11 S.W.3d 205, 213 (Tex. Crim. App.) *cert denied* 531 U.S. 850, 121 S.Ct. 12148
L.Ed.2d 80 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

***Coble v. State***
330 S.W.3d 253 (Tex. Crim.App. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

***Coe v. State***
683 S.W.2d 431, 438 (Tex. Crim App. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

***Davis v. State***
329 S.W.3d 798, 821 (Tex. Crim. App. 2010, *cert denied*
- - U.S. - - , 132 S.Ct. 128, 181 L.Ed.2d 50 (2011).. . . . . . . . . . . . . . . . . . . . . . . 110

***Ellason v. State***
815 S.W. 656 (Tex. Crim. App. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

***Escamilla v. State***
143 S.W.3d 814 (Tex. Crim.App.-2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

***Espada v. State***
2008 WL 4809235 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

***Esquivel v. State***
506 S.W.2d 613, 615 (Tex. Cr. App. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . 108

***Esteves v. State***
859 S. W. 2d 613 (Tex. App. – Houston [1ˢᵗ Dist.] 1993, pet. ref'd). . . . . . . . . . . . 62

***Everson v. State***
851 S. W. 2d 269 (Tex. Crim. App. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 62

***Freeman v. State***
838 S.W. 2d 772 (Tex. App.  Corpus Christi 1992).. . . . . . . . . . . . . . . . . . . . . . . 68

***Fuentes v. State***
664 S.W. 2d 333, 335 (Tex. Crim. App. 1984).. . . . . . . . . . . . . . . . . . . 110,111,112

***Haecker v. State***
571 S.W.2d 920 (Tex. Crim.App 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

***Hammons v. State***
239 S.W.3d 798 (Tex. Crim. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 106,107

***Holberg v. State***
 38 S.W.3d 137, 139 (Tex. Crim. App. 2000). . . . . . . . . . . . . . . . . . . . . . . . . 114

***Hooper***
214 S.W.3d 9 (Texas Crim. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

***Houston v. State***
663 S.W.2d 455, 456 (Tex. Crim.App.1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

***Huffman v. State***
746 S.W.2d 212 (Tex. Crim. App. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

***Hughes v. State***
787 S.W.2d 193, 195 (Tex. App.-Corpus Christi 190, pet. ref'd). . . . . . . . . . . . . . 68

***Gallo v. State***
239 S.W.3d 757, 767 (Tex. Crim. App. 2007), *cert filed,* #07-9590,
February 29, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

***Gomez v. State***
704 S.W.2d 770, 771-72 (Tex. Crim. App. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 112

***Greer v. State***
No. 05-08-00146 (Tex. App.-Dallas June 9, 2009). . . . . . . . . . . . . . . . . . . . . . . . . 64

***Jackson v. State***
33 S.W.2d 8 (Tex. Crim.App.2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

***Johnson v. State***
673 S.W.2d 190, 197 (Tex. Crim. App.1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

***Jones v. State***
944 S.W.2d 644, 651 (Tex. Crim. App.1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

***Jurek v. State***
522 S.W.2d 934 (Tex. Cr. App. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

***Keeton v. State***
724 S. W. 2d 58, 65 n. 5 (Tex. Crim. App. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . 62

***King v. State***
254 S.W.3d 579 (Tex. App.-Amarillo, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

***Klien v. State***
273 S.W.3d 297) Tex. Crim. App. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

***Landrum v. State***
788 S.W.2d 577, 579 (Tex. Crim. App. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . 68

***Lopez v. State***
940 S. W. 2d 388 (Tex. App.-Austin, 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

***Mayes v. State***
318 S.W.3d 368 (Tex. Crim.App. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

***McCarthy v. State***
 2006 WL 1096924. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

***Mendoza v. State***
2008WL4803471. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127,146

***Montgomery v. State***
810 S.W.2d 372, 376 (Tex. Crim. App.1990). . . . . . . . . . . . . . . . . . . . . . . . . 92,93

***Mosley v. State***
983 S.W.2d 249, 259 (Tex. Crim.App. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . 111

***Musick v. State***
862 S.W. 2d 794 (Tex. App. – El Paso 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 62

***Norris v. State***
902 S.W.2d 428, 443 (Tex. Rim. Ap. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

***O'Bryan v. State***
591 S.W.2s 464, 480 (Tex. Cr. Ap. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

***Paulson v. State***
28 S.W.3d 570 (Tex. Crim. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

***Phillips v. State***
130 S.W.3d 343, 355 (Tex. App.-Houston [14th Dist.] 2004, pet. ref'd)
(op. on reh'g), *aff'd at* 193 S.W.3d 904 (Tex. Crim. App. 2006).. . . . . . . . . . . . . . 110

***Ramirez v. State***
862 S. W. 2d 648 (Tex. App. – Dallas 1993). . . . . . . . . . . . . . . . . . . . . . . . . 62,64

***Rayme v. State***
178 S.W.3d 222(Tex.Crim.App. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

***Reese v. State***
33 S.W.3d 238 (Tex. Crim. App. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

***Reese v. State***
653 S.W.2d 550 (Tex. App.-Beaumont-1983). . . . . . . . . . . . . . . . . . . . . . . . . . 108

***Reeves v. State***
806 S.W.2d 540, 543 (Tex. Crim.App.1990), cert. denied, –U.S.–, 111 S.Ct. 641,
113 L.Ed.2d 736 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

***Roberts v. State***
220 S.W.3d 521 (Tex. Crim. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

***Roderick Harris v. State***
2014 WL 2155395.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

***Rojas v. State***
986 S.W.2d 241, 249 (Tex. Crim. App.1998).. . . . . . . . . . . . . . . . . . . . . . . . . . 80

***Roney v. State***
 632 S.W.2d 598,603 (Tex. Cr. App. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

***Russeau v. State***
291 S.W.3d 426 (Tex. Crim.App. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

***Saldano v. State***
*232 S.W.3d 77 (Tex. Crim.App. 2007)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143,146

***Sanders v. State***
687 S.W.2d 60 (Tex. App.-Dallas, 1985) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

***Thomas v. State***
2006 WL 2022404 Tex. App. Dallas, 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

***Threadgill v. State***
146 S.W.3d 654 (Tex. Crim.App. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

***Whitsey v. State***
796 S. W. 2d 707, 713 (Tex. Crim. App. 1989). . . . . . . . . . . . . . . . . . . . . . . . . 63

***Will v. State***
2004 WL 3093238 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

***Williams v. State***
692 S.W.2d 671,676 (Tex. Crim. App. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . 87

***Wyatt v. State***
23 S.W.3d 18, 29 (Tex. Crim. App.2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93,94

***Young v. State***
826 S. W. 2d 141, 145 (Tex. Crim. App. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . 64

**STATE STATUTES**:

TEX. CODE CRIM. PROC. ANN. art. 37.071.. . . . . . . . . . . . . . . . . . . . . 118,121,124

TEX.CODE CRIM. PROC. ANN. art. 37.071 § 2 (d) (1). . . . . . . . . . . . . . . . . . . 122

TEX.CODE CRIM. PROC.ANN art. 37.071 § 2 (f)(4). . . . . . . . . . . . . . . . . . . . 141

V.T. C. A., Penal Code § 19.03  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Article 36.29 of the Texas Code of Criminal Procedure. . . . . . . . . . . . . . . . . . . 66

Tex. Code Crim. Proc. Ann. Art. 36.29(a) (Vernon Supp. 1999) . . . . . . . . . . . . . 67

TEX. Penal Code § 36.06(a)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Art. 21.11 C.C.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Art. 1, Sec. 10 of the Constitution of the State of Texas. . . . . . . . . . . . . . . . . . . . . . 71

Article 38.36 Texas Code of Criminal Procedure.. . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Rule 801.(e)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104-107

Tex.P.C.§,12.31. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119,122

V.T.P.C. 36.06. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71,72

Tex. P.C. 36.02(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87,89

Rule 403 Texas Rules of Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92,93

Art. 44.2 (a) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Art. 36. 14 C.C.P.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

## STATEMENT OF THE CASE

By an indictment filed on the 3rd day of October, 2012, Appellant was charged in trial court cause number F12-12630 with one count of capital murder. (C.R. Vol. 1 p. 44) The indictment alleged that on September 6, 2012 Appellant intentionally or knowingly caused the death of Shania Gray by shooting her with a firearm and by asphyxiating her in the course of committing or attempting to commit the offense of obstruction.

The testimony in the trial on the merits began on November 4, 2013.On November 12, 2013 Appellant was convicted of the offense of capital murder. (Reporter's Record Volume 66 p. 77)   On  the jury answered "Yes" to Special Issue No. 1 and "No" to Special Issue No. 2. (Reporter's Record Volume 70 p. 19-20)  In accordance with the previous verdict of guilty and answers to the special issues, the trial court entered a judgment and assessed Appellant's punishment at death. (Reporter's Record Volume 70 p. 20)

On December 16, 2013, Appellant timely filed a Motion for New Trial that was subsequently denied by the court. (Clerk's Record Vol.  p. ).   Appeal is automatic gto give this Court jurisdiction. *See* Tex. Code Crim.Proc.Ann. art. 37.071,§ 2(g)(Vernon Supp. 2001).

# ISSUES PRESENTED

## VOIR DIRE ISSUES

## 'BATSON' ISSUES NOS. 1-3

### APPELLANT'S ISSUE NO. 1

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, SYRENE MITCHELL, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN <u>BATSON V. KENTUCKY</u>**

### APPELLANT'S ISSUE NO. 2

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, LOUISE HORSLEY, IN VIOLATION OF THE DOCTRINE ESTABLISHED  IN <u>BATSON V. KENTUCKY</u>**

### APPELLANT'S ISSUE NO. 3

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, FREDDIE WATSON, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN <u>BATSON V. KENTUCKY</u>**

# PRETRIAL ISSUES

**APPELLANT'S ISSUE NO. 4**

**THE TRIAL COURT ERRED IN DISMISSING JUROR NUMBER 4, JOHN BIGLEY, FROM THE JURY PANEL**

**APPELLANT'S ISSUE NO. 5**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO QUASH THE INDICTMENT**

**APPELLANT'S ISSUE NO. 6**

**THE TRIAL COURT ERRED AND ABUSED IT'S DISCRETION IN DENYING APPELLANT'S MOTION FOR CONTINUANCE FILED ON NOVEMBER 1, 2013**

**APPELLANT'S ISSUE NO. 7**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF A SEARCH WARRANT SEEKING BUCCAL SWAB CONSTITUTING DNA EVIDENCE AND PHOTOGRAPHS**

**APPELLANT'S ISSUE NO. 8**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF A SEARCH WARRANT SEEKING ITEMS FROM A 2005 DODGE STRATUS BELONGING TO THE COMPLAINANT AND OR DEFENDANT**

**APPELLANT'S ISSUE NO. 9**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF A SEARCH WARRANT SEEKING ITEMS FROM THE PREMISES LOCATED AT 10223 NORTH MACARTHUR BLVD. #254 CITY OF IRVING, TEXAS**

**APPELLANT'S ISSUE NO. 10**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF A SEARCH WARRANT SEEKING DIGITAL INFORMATION FROM A BLACK T-MOBILE MY TOUCH LG-E739 PHONE**

### TRIAL ISSUES ON GUILT/INNOCENCE

**APPELLANT'S ISSUE NO. 11**

**THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S VERDICT THAT APPELLANT WAS GUILTY OF THE OFFENSE OF CAPITAL MURDER**

**APPELLANT'S ISSUE NO. 12**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO STATE'S EXHIBIT NUMBERS 40 AN 41, PHOTOGRAPHS**

**APPELLANT'S ISSUE NOS. 13, 14, 15, 16, 17, AND 18**

**THE TRIAL COURT ERRED IN SUSTAINING THE STATE'S OBJECTIONS TO DEFENSE EXHIBIT A, B, C, D, E, F, & G WHICH ARE RECORDINGS OF THE VICTIM**

**APPELLANT'S ISSUE NO. 19**

**THE TRIAL COURT ERRED IN SUSTAINING THE STATE'S OBJECTION TO THE DEFENSE'S PROFFERED TESTIMONY OF PASTOR ARTY HAYES, THE BROTHER -IN-LAW OF THE DEFENDANT**

**APPELLANT'S ISSUE NO. 20**

**THE TRIAL COURT ERRED IN SUSTAINING THE STATE'S OBJECTION TO WITNESS, ASHLEY SIMS, PROFFERED TESTIMONY**

**APPELLANT'S ISSUE NO. 21**

**THE TRIAL COURT ERRED IN SUSTAINING THE STATE'S OBJECTION TO WITNESS, LAMAR LEGGITON, PROFFERED TESTIMONY**

**APPELLANT'S ISSUE NO. 22**

**THE TRIAL COURT ERRED IN DENYING APPELLANT REQUEST FOR A CHARGE ON ANTI-SPECULATION DURING THE GUILT/INNOCENCE STAGE OF THE TRIAL**

**APPELLANT'S ISSUE NO. 23**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO STATE COUNSEL'S JURY ARGUMENT CLAIMING IT IMPROPERLY STRIKING AT THE DEFENDANT OVER COUNSEL'S SHOULDER AND SHIFTS THE BURDEN**

**PUNISHMENT ISSUES**

**APPELLANT'S ISSUE NO. 24**

**THE EVIDENCE IS LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT THE JURY'S ANSWER TO SPECIAL ISSUE NO. 1 IN THE PUNISHMENT STAGE OF THE TRIAL**

**APPELLANT'S ISSUE NO. 25 (1) - 25(18)**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S OBJECTION TO CERTAIN LANGUAGE IN THE BODY OF THE COURT'S INSTRUCTIONS TO THE JURY IN THE PUNISHMENT STAGE**

**APPELLANT'S ISSUE NOS. 26-36**

**THE TRIAL COURT ERRED IN DENYING THE ENUMERATED DEFENDANT'S OBJECTION TO THE PUNISHMENT VERDICT FORM**

**APPELLANT'S ISSUE NO. 27**

**"FUTURE DANGER"**

**APPELLANT'S ISSUE NO. 28 (1)- 28(11)**

**"PROBABILITY"**

**APPELLANT'S ISSUE NO. 29 (1)-29(2)**

**"CRIMINAL ACTS OF VIOLENCE"**

**APPELLANT'S ISSUE NO. 30 (1)- 30 (4)**

**"CONTINUING THREAT" TO SOCIETY"**

**APPELLANT'S ISSUE NO. 31 (1)- 31(4)**

**"VICTIM IMPACT EVIDENCE"**

**APPELLANT'S ISSUE NO. 32 (1)-32(9)**

**"MITIGATION ISSUE"**

**APPELLANT'S ISSUE NO. 33(1)-33 (2)**

**"MISLEADING JURORS"**

**APPELLANT'S ISSUE NO. 34(1)-34(2)**

*JONES, APPRENDI, RING AND BLAKELY*

**APPELLANT'S ISSUE NO. 35**

**"PRESUMPTION OF LIFE"**

**APPELLANT'S ISSUE NO. 36 AND 37**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUESTED INSTRUCTION DEFINING EVIDENCE THAT REDUCES "MORAL BLAMEWORTHINESS"**


**FEDERAL ISSUES**

**APPELLANT'S ISSUE NO. 38**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION REQUESTING THE COURT TO FIND TEX. CODE. CRIM. PROC. ART. 37.071 SECTION 2(f)(4) TO BE UNCONSTITUTIONAL"**

**APPELLANT'S ISSUE NO. 39**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO DECLARE THE "10-12 RULE" UNCONSTITUTIONAL"**

**APPELLANT'S ISSUE NO. 40**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION FOR COURT TO FIND ART. 37.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE UNCONSTITUTIONAL AS APPLIED TO THIS DEFENDANT"**

**APPELLANT'S ISSUE NO. 41**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO DECLARE THE CAPITAL SENTENCING STATUTE UNCONSTITUTIONAL BECAUSE IT ALLOWS JURIES TO DECIDE FUTURE DANGEROUSNESS BASED SOLELY ON THE FACTORS OF THE CASE"**

**APPELLANT'S ISSUE NO. 42**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO PRECLUDE DEATH AS A SENTENCING OPTION AND TO DECLARE TEXAS DEATH PENALTY STATUTE UNCONSTITUTIONAL BECAUSE OF JUROR'S INABILITY TO PREDICT FUTURE DANGEROUSNESS"**

**APPELLANT'S ISSUE NO. 43**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO DECLARE THE CAPITAL SENTENCING STATUTE UNCONSTITUTIONAL BECAUSE IT HAS BECOME A *DE FACTO* MANDATORY DEATH PENALTY STATUTE"**

**APPELLANT'S ISSUE NO. 44**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO FIND THAT THE DEATH PENALTY IN THE STATE OF TEXAS IS UNCONSTITUTIONAL ON THE GROUND THAT ITS CAPITAL SENTENCING PROCEDURE FAILS TO MEET MINIMUM REQUIREMENTS SET FORTH IN *FURMAN V. GEORGIA* AND ITS PROGENY, AS EVINCED BY THE FINDINGS OF THE CAPITAL JURY PROJECT AND OTHER RESEARCH"

**APPELLANT'S ISSUE NO. 45**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO DECLARE ARTICLE 37.071, §2 (a) OF THE CODE OF CRIMINAL PROCEDURE UNCONSTITUTIONAL ON ITS FACE UNDER DUE COURSE OF LAW AND DUE PROCESS"

**APPELLANT'S ISSUE NO. 46**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO DECLARE ARTICLE 37.071 § 2(a) OF THE CODE OF CRIMINAL PROCEDURE UNCONSTITUTIONAL ON ITS FACE FOR LACK OF STANDARDS"

**APPELLANT'S ISSUE NO. 47**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO HOLD STATUTORY DEFINITION OF MITIGATING EVIDENCE UNCONSTITUTIONAL, AS APPLIED TO IMPOSE A "NEXUS" LIMITATION, AND TO GRANT DEFENDANT'S REQUESTED CLARIFYING VOIR DIRE, INSTRUCTION, ARGUMENT AND MOTION IN LIMINE"

**APPELLANT'S ISSUE NO. 48**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO PRECLUDE THE DEATH PENALTY AS SENTENCING OPTION (DENIAL OF EQUAL PROTECTION )**

**STATEMENT OF FACTS**

*This case involves the shooting and asphyxiation death of Shania Gray by Franklin Davis who had accused Franklin Davis of sexual assault.*

*TRIAL ON THE MERITS*

*The State on Guilt/Innocence*

*1)Testimony of Sherri Gray-James:* Ms. James testified that she was the mother of the deceased Complainant, Shania Gray. (RR: Vol. 60 p. 74) She stated that her daughter was 16 at the time of her death and had been babysitting for Dezire, the child of Jennifer Dibrell. (RR: Vol. 60 p. 75) Shania started babysitting for Ms. Dibrell in the fall of 2010 when she was a freshman in high school. (RR: Vol. 60 p. 77) On December 25, 2012 she went to pick up Shania at Ms. Dibrell's house in the morning and met the children's father, Franklin Davis. (RR: Vol. 60 p. 79)

The witness testified that Shania was given a white blackberry cell phone by Ms. Dibrell and Mr. Davis as partial payment for babysitting for them. (RR: Vol. 60 p. 80-81) Shania stopped babysitting for them in March, 2011.  In March of 2011 she saw a text on Shania's cell phone from "Wish" a.k.a. Franklin Davis and she took the cell phone to the Mesquite Police Department where the information was downloaded. (RR: Vol. 60 p. 82) She identified State's Exhibit No. 1 as the text message conversations between Shania and Mr. Davis. (RR: Vol. 60 p. 83) She said

1

that the first text she saw asked why Shania hadn't been babysitting. (RR: Vol. 60 p. 87) The second message she saw said "I want you. I just can't have you right now." (RR: Vol. 60 p. 87) She said they then went to Jennifer Dibrell's house where she told her that the children's father was sending inappropriate text messages to her daughter. (RR: Vol. 60 p. 88) Ms. Dibrell called Mr. Davis who told her to call her tomorrow after work. (RR: Vol. 60 p. 90)

Shania confided in Jasmine Adams and then spoke with Jasmine's mother, Shirley Brown. (RR: Vol. 60 p. 100) She met with the three woman and Shania told her that Franklin Davis had sexually assaulted her multiple times while she was baby-sitting multiple times. The witness testified that she then contacted the school's resource officer, Officer Johnny Ivy and within a few hours, a Mesquite police officer came to their house. (RR: Vol. 60 p. 96-97,105) They went to the Mesquite Police Station and then to the Dallas Advocacy Center. (RR: Vol. 60 p. 106)

On the second day of school Shania attended, September 6th, 2012, she dropped Shania off in front of the school and later that day Shania sent her a text telling her that she was going to stay after school for tutoring. (RR: Vol. 60 p. 117) When she arrived at school she spoke with Shania on the phone and was told "Okay, Mom, I'm wrapping up. I'll be down in a little bit." At approximately 4:20 she called her but didn't get an answer. (RR: Vol. 60 p. 118)

2

A student showed her the physics room where Shania was having tutoring, but she was not there. (RR: Vol. 60 p. 121) She spoke to a teacher who called the physic's teacher who confirmed that Shania had been in tutoring until 4:15 p.m. that day. (RR: Vol. 60 p. 122) The Principal of the school was called and an announcement was made over the PA system. (RR: Vol. 60 p. 123) They searched the school while she continued to call Shania's cell phone, but she did not get a response. (RR: Vol.60 p. 123)

She and her husband drove around and when a football game ended and they were still in the parking lot, a Carrollton police officer approached them and they told him that their daughter was missing. (RR: Vol. 60 p. 128) She said the Officer wanted them to leave and wait for Shania at home and come back the next morning. (RR: Vol. 60 p. 128-129) The next day they talked to a police officer at the school who categorized her as a runaway. (RR: Vol. 60 p. 131) She said they went to the Carrollton Police Department where she gave Shania's phone number to Detective Williams. (RR: Vol. 60 p. 133) She was shown a phone log of Shania's phone and did not recognize a number that began with 903. (RR: Vol. 60 p. 135)

The witness testified that the Carrollton Police Department learned of Franklin Davis when they called the Mesquite Police Department to inquire if there had been any previous runaway calls on Shania. (RR: Vol. 60 p. 136) The State introduced

3

Exhibits Nos. 9-12, indictments for sexual assault that were pending against Franklin Davis. (RR: Vol. 60 p. 138) On Saturday, Detective Williams called them and they went to the police station where they learned Shania had been killed. (RR: Vol. 60 p. 146-148)

**2) Testimony of Julie Cone:** Julie Cone, a physics teacher at Hebron High School, testified that while she was tutoring Shania, she was texting someone. (RR: Vol. 60 p. 154) At 4:00 p.m. Shania told her that "I have to hurry and go; my mom's waiting on me." (RR: Vol. 60 p. 155)

**3) Testimony of Forest Langston:** Officer Forest Langston of the Carrollton Police Department testified that he is the school resource officer at Hebron High School. (RR: Vol. 60 p. 173) He spoke with Sherry Gray-James on September 7th, 2012 at his office and pulled the phone records of her daughter's cell phone. (RR: Vol. 60 p. 175) He said that the records showed a 903 area code number had been called before and after Shania spoke with her mother the afternoon of her disappearance. (RR: Vol. 60 p. 176) He had AT&T to ping Shania's phone but when they tried, they said the phone appeared to be turned off. (RR: Vol. 60 p. 176) He learned the phone with the 903 area code was a prepaid phone with no subscriber information. (RR:Vol. 60 p. 177)

When Mesquite Police Department was contacted, he learned that Shania was a victim of four counts of sexual assault out of Mesquite with the suspect name of Franklin Davis. (RR: Vol. 60 p. 180) He reviewed the video footage and found a still shot of a vehicle that possibly matched the vehicle, a gray Dodge Stratus, driven by Franklin Davis. (RR: Vol. 60 p. 186-188) He said the photo shows Shania holding a cell phone exiting the south side of the school while her mother was parked on the north side of the school. (RR: Vol. 60 p. 189)

**3) Testimony of Cory Cook:** Cory Cook, a Carrollton Police Officer, testified that he first started to look for Mr. Davis's car and spoke with the Mesquite Police Department where the vehicle had been reported stolen. (RR: Vol. 60 p. 214) He traced the ownership of the car to Thomas R. Cox and learned that Mr. Cox had been Mr. Davis' attorney in the sexual assault cases that were pending. (RR: Vol. 60 p. 217) He received some information that led him Mr. Davis exiting an apartment and he detained him. (RR: Vol. 60 p. 222) Mr. Davis voluntarily went to the police station for an interview. (RR: Vol. 60 p. 225) He said Mr. Davis' phone was seized. (RR: Vol. 60 p. 227)

**4) Testimony of Jeff Shaffer:** Jeff Shaffer, a Secret Service Special Agent in the Dallas field office, testified that he manages the digital forensics lab and examined a black T-Mobile cell phone in connection with this case. (RR: Vol. 60 p. 231) He said

5

he found that on August 28th, at 5:26 p.m. there were searches done on the phone for the gun show in Dallas, Texas. (RR: Vol. 60 p. 252) He said on August 30th, 2012 there was a search for a Diamondback .380, a handgun. (RR: Vol. 60 p. 255) He stated that he found a search for Hebron High School at 1:53 p.m. on September 6, 2012. (RR: Vol. 60 p. 259) He found that on that phone, from 2:00 p.m. to 6:00 p.m. on September 6, 2014 there were no calls or searches. (RR: Vol. 60 p. 261)

The witness testified that there was a map search on the cell phone for the intersection of Sam Houston Trail Park located at I-635 and Highway 161, the location where Shania Gray's body was found. (RR: Vol. 60 p. 264) He said there was an incoming text message from the phone number (214) 709-6861 saying "Are you still mad at me?" (RR: Vol. 60 p. 266) The next text message said " Sorry I lied on you, but my mama made me do it. If we go to court, I'm going to tell them you never touched me. My mama going to be mad at me, but fuck that bitch. I can't stand her no ways. Please forgive me." (RR: Vol. 60 p. 267) The third text said "Is this Mr. Wish?" and "Mr. Wish for the fourth text. (RR: Vol. 60 p. 267) He said the fifth text said "I believe if I tell the truth, she will punish me for a long time and I won't be able to play basketball." (RR: Vol. 60 p. 267) The final text was "Please respond back if this is still your number." (RR: Vol. 60 p. 267) These texts were sent on August 27th and August 28th. (RR: Vol. 60 p. 268) The witness stated that these

text messages came after the installation of a fake call and SMS application. (RR: Vol. 60 p. 270)

**5)Testimony of Jim Alcott:** Jim Alcott, a recovery engineer forensic investigator, testified received a water damaged cell phone, an iPHone 4, from the Carrollton Police Department and that once he repaired the phone, he turned it over to the forensic lab of his company. (RR: Vol. 61 p.31-36)

**7) Testimony of James Snyder:** James Snyder of the Carrollton Police Department testified that he is a tactical analyst and assists investigators with researching cell phones. (RR: Vol. 61 p. 54) On September 7th, 2012 requested the phone records from the telephone provider and learned that Shania's cell phone had two numbers that her mother didn't recognize. (RR: Vol. 61 p. 55) One of the numbers belonged to Mr. King and learned that the other number was for a "throw down" phone. (RR: Vol. 61 p. 58) They called the numbers on this phone and spoke with Shakeema Morsely and did a Cellebrite extraction on her phone. (RR: Vol. 61 p. 60)

**8) Testimony of Jim Shaffer:** Agent Jim Shaffer was recalled and a recorded conversation from the phone he examined was played for the jury. (RR: Vol. 61 p. 90-92)

**9) Testimony of Austin Tapp:** Officer Austin Tapp of the Farmers Branch Police Department testified that on September 7th while on bicycle patrol he received a call

that someone had seen someone in the Trinity River.  (RR: Vol. 61 p. 110)  He rode down to the embankment and saw the body of a black female wearing a red shirt and black yoga pants.  (RR: Vol. 61 p. 111-112)

*10) Testimony of Andrew Hoog:* Andrew Hoog testified that he owns a mobile forensics security company, Via Forensics, which specializes in the recovery of forensic data from smartphones.  (RR:Vol. 61 p. 130) He learned in his investigation of the cell phone given to him that certain text messages were created by a fake text message application.  (RR: Vol. 61 p. 135) He stated that it was his opinion that these texts were faked text messages created from the application.  (RR: Vol. 61 p. 150) He stated that he recovered Google searches for "Can you record a person without them knowing in Texas?" and Can you record a person without them knowing in Texas?" made on July 18, 2012.  (RR: Vol. 61 p. 153) He said also on July 18[th], 2012 a search was made for "best way to get off of a sexual assault" and "with no proof that you did the murder, can you still be held in jail?" (RR: Vol. 61 p.154) The next day there was a Google search of "Can you voice-record a minor over the phone in Texas? Can tape-record conversation with a person story changing and get you off a charge?  Can tape-recorded conversation be used in court?" (RR: Vol. 61 p. 154-155) He said the last search was on July 23, 2012 "can tape-recorded conversations be used in court?" (RR: Vol. 61 p. 155)

*11) Testimony of Susan Johnson:* Susan Johnson, a senior specialist with T-Mobile, testified that the cell phone records show that on September 6th, 2012 at 4:01 the Defendant's cell phone received at call which hit off the cell tower located near Hebron High School and other cell calls and the towers the call came from.

*12)Testimony of Pete Evans:* Pete Evans, a senior radio access network (RAN) engineer for AT&T Mobility, testified that he examined and mapped out the cell phone locations for the cell phones of Sherry Gray, the throw-down phone, and the phone of Shania Grey. (RR: Vol. 61 p. 191) Using a power point presentation, the witness described the location of the cell towers and stated that they showed that some of the text messages sent on September 5th, 2012 between the throw-down phone with the 903 area code and Shania's phone hit off the same tower and the same sector. (RR: Vol. 61 p. 198)

*13) Testimony of Dena Williams:* Dena Williams, a detective for the Carrollton Police Department, testified that the phone records were reviewed and two numbers were suspicious and not recognized by Shania's mother. (RR: Vol. 61 p. 219) After obtaining phone records she learned that the 903 number had called Shania and had been texting her throughout the day. (RR: Vol. 61 p. 221) She learned that the 903 number had called only four numbers so she began calling those numbers. (RR: Vol. 61 p. 221) She left messages and received a call back from Shakeema Morsely who

gave her the name of Franklin Davis and the phone number of his wife, Jawanna Arrington. (RR: Vol. 61 p. 222-223) She called the number and spoke with Franklin Davis and told him that she was investigating a missing child. (RR: Vol. 61 p. 224) She said Mr. Franklin was very concerned and told her that they did not know anything about the 903 (8786) phone number. (RR: Vol. 61 p. 224-225)

They confirmed that Shania was not at the apartment and there was no evidence of a crime. (RR: Vol. 61 p. 226) Mr. Davis and his wife came voluntarily to the police station. (RR: Vol. 61 p. 226) The videotaped interview was played for the jury. (RR: Vol. 61 p. 231)

The witness testified that Mr. Davis told her about the text messages which she did not know at the time were faked. (RR: Vol. 62 p. 26) The throw-away phone with the 903 area code was never recovered. (RR: Vol. 62 p. 26) Mr. Davis gave her his cell phone, a T-Mobile with the phone number of 1976 which contained the text messages. (RR: Vol. 62 p 27)

*14) Testimony of Jeremy Chevallier:* Jeremy Chevallier, a detective with the Carrollton Police Department, testified that he came in as a backup and interviewed Mr. Davis after he had been arrested for outstanding traffic warrants. (RR: Vol. 62 p. 40-41) He witnessed the scent search by the track dogs who hit on the Defendant's vehicle parked in the police station parking lot. (RR: Vol. 62 p. 43) He knew that

10

Jawanna Arrington had allowed the vehicle to stay in the parking lot and consented for it to be processed. (RR: Vol. 62 p. 44) The DVD of his interview with Mr. Davis was played for the jury and he explained his interviewing techniques. (RR: Vol. 62 p. 51-60) He said Mr. Davis' nickname was "Wish." (RR: Vol. 62 p. 60)

He said after the end of this interview, Mr. Davis agreed to take him to the crime scene location. (RR: Vol. 62 p. 75) When they arrived at the location, there were people present who were recovering Shania's body. (RR: Vol. 62 p. 78) He said Mr. Davis took them to the pond where he threw the gun away and to another pond where he threw away Shania's phone. (RR: Vol. 62 p. 79)

*15) Testimony of Christopher Allen:* Christopher Allen testified that he met Franklin Davis at I-30 and Broadway where Franklin paid him cash for the Diamondback .380 handgun. (RR: Vol. 62 p. 91)

*16) Testimony of Charles Clow:* Charles Clow, a firearm and tool mark examiner at the Tarrant County Medical Examiner's Crime Lab, testified that Jaime Becker examined a Diamondback .380, shell casings and a bullet that was recovered in this case. (RR: Vol. 62 p. 96) He said Ms. Becker found that both cartridge cases and bullets were identified as having been fired by the Diamondback .380 caliber semi-automatic pistol. (RR: Vol. 62 p. 104)

11

*17)Testimony of Dena Williams:* Dena Williams was recalled and testified that she returned to work on the afternoon of September 8th after she learned that the body had been found. (RR: Vol. 62 p. 111) She said that an arrangement was made to allow Franklin Davis to talk to Jawanna, which was recorded. (RR: Vol. 62 p. 111) She said an arrest warrant was then issued for Franklin Davis. (RR: Vol. 62 p. 112)

She said that she and Detective Grigg were told that Mr. Davis wanted to speak with them, so they went to the jail where he was interviewed. (RR: Vol. 62 p. 118) This fourth interview was also recorded and was played for the jury. (RR: Vol. 63 p. 20) She stated that a gun was recovered from a pond located at the intersection of Las Colinas Boulevard and Royal Lane. (RR: Vol. 63 p. 24) She said that Mr. Davis spoke of the sexual assault charges against him in Mesquite, Texas and his attempt to contact her to get evidence to use against her. (RR: Vol. 63 p.28)

On cross examination the witness testified that being falsely accused of a child sex offense is at the top of the list of things to be falsely accused of. (RR: Vol. 63 p. 42) She said that occasionally in these types of cases, false allegations are made. (RR: Vol. 63 p. 50) She listened to seven phone conversations between Mr. Davis and Shania. (RR: Vol. 63 p. 53) She said Shania's mother, Sherry James, voiced her frustration with the prosecutor, Marc Moffitt, in the sexual assault case. (RR: Vol. 63 p.56) She said she listened to taped conversations between Shania and Mr. Davis

12

when Mr. Davis was pretending to be someone named "D". (RR: Vol. 63 p. 58) She said Mr. Davis told her that the things Shania was telling him didn't match up with the police report. (RR: Vol. 63 p. 58) She said he repeatedly told her that he did not do the sex offenses. (RR: Vol. 63 p. 59) She said Mr. Davis commented about his court date "Yeah. I was trying and trying and trying to get it to court. They finally scheduled a court date. I felt that was the only way I was going to get my life back was to go ahead and go into court, but sitting around was driving me crazy." (RR: Vol. 63 p. 60 She said his attorney told him that the phone recordings were going to help his case. (RR: Vol. 63 p. 660)

The witness testified that Mr. Davis admitted to killing Shania and spoke of how he committed the murder, but he continued to deny the sexual assault. (RR: Vol. 63 p. 119)

**18) Testimony of Craig Allen:** Craig Allen, a crime scene investigator for the City of Carrollton, testified that he searched Mr. Davis's apartment and was present when the body was recovered. (RR: Vol. 63 p. 127) There was a back pack found at the scene which contained papers identifying the victim as Shania Gray. (RR: Vol. 63 p. 130) He and Detective David Taylor went to the intersection of Las Colinas Boulevard and Royal Lane where they recovered a gun on the water's edge. (RR: Vol. 63 p. 131) They then went to the 9600 block of Windy Hollow Lane where

13

another pond was searched and an iPhone was recovered the next day. (RR: Vol. 63 p. 133)

20)*Testimony of Dustin Bartram:* Detective Dustin Bartram with the Carrollton Police Department testified he learned that items were discarded at various locations and was involved in the recovery of a handgun, cell phone and shoes. (RR: Vol. 63 p. 179-180) Using State's Exhibits 140 through 197 the witness described the search of the Defendant's apartment. (RR: Vol. 63 p. 182-184) He said a notebook was recovered at the Defendant's home, State's Exhibit No. 200, in which it was found written "Shania Average Height Gray" along with the phone number (214) 709-6861. (RR: Vol. 63 p, 195) He said State's Exhibit No. 177 depicted the area near the river where he said the Defendant told them he shot Shania. (RR: Vol. 63 p. 202)  He recovered two shell casings and a bullet which had ricocheted off a tree.  (RR: Vol. 63 p. 207)

21) *Testimony of Carolyn VanWinkle:* Carolyn VanWinkle, a forensic DNA analyst with the Tarrant County Medical Examiner's Office, testified that a bullet recovered at the crime scene was submitted to their office and serology and DNA analysis was done on this bullet. (RR: Vol. 63 p. 234) The bullet was then sent to the firearms examiner. (RR: Vol. 63 p. 234) She said the first DNA comparison found that Shania Gray could not be excluded as a source of the partial DNA profile that was obtained

from the bullet. (RR: Vol. 63 p. 237) She stated that no sperm was detected in the vaginal, anal and oral smears from the rape kit. (RR: Vol. 63 p. 242)

*22) Testimony of Dr. Jill Urban:* Dr. Jill Urban, a medical examiner with the Southwest Institute of Forensic Sciences, testified that she conducted the autopsy of Shania Gray on September 9th, 2012. (RR: Vol. 63 p. 261) She said the visible injuries to the body were two gunshot wounds. (RR: Vol. 63 p. 263) She said gunshot wound no. l was an entrance wound on the back of the right shoulder and exited the right side of the neck. (RR: Vol. 63 p. 264) Gunshot wound No. 2 was the on the lower side of the back of the back on the left side in which the bullet stopped in the muscles of the right hip. (RR: Vol. 63 p. 264) She stated that she was able to identify an injury which was consistent with asphyxia. (RR: Vol. 63 p. 265) She said it was hard to see the injuries to the skin or muscles on her neck because of decomposition, but the thyroid cartilage had a fracture in it. (RR: Vol. 63 p. 266) She ruled the death was due to homicidal violence including gunshot wound and asphyxia. (RR: Vol. 63 p. 278)

*The Defense on Guilt/Innocence*

*23) Testimony of Brandon Snyder:* Detective Brandon Snyder of the Mesquite Police Department, testified he was the detective that investigated the sexual allegation regarding Franklin Davis. (RR: Vol. 64 p. 28) He said that Shania's

mother became aware of some text messages between Shania and the Defendant which started the investigation. (RR: Vol. 64 p. 30) He said Mr. Davis called the police on April 11th ,spoke with Detective Aronburger and eventually called him. (RR: Vol. 64 p. 31) On April 14th, he was contacted by Shania's family and a report was made. (RR: Vol. 64 p. 31) Shania was interviewed on September 21st at the Advocacy Center and he was present to witness the interview. (RR: Vol. 64 p. 32;36) He received consent from Ms. James to process Shania's phone and get the text messages. (RR: Vol. 64 p. 32) He stated that there was a period of time in which he tried to identify the suspect. (RR: Vol. 64 p. 33) He scheduled an exam for Shania at Children's Hospital and she was examined on May 2nd. (RR: Vol. 64 p. 36-37) On June 9th Shania was shown a photo lineup and she identified Mr. Davis as the person in question. (RR: Vol. 64 p. 37) On July 14th Mr. Davis came to the police station at his request and he was arrested and interviewed. (RR: Vol. 64 p. 37-38)

He testified that he did not speak to the outcry witness until after Mr. Davis was arrested. (RR: Vol. 64 p. 39) He said the witnesses confirmed that Shania went to stay with her grandmother the night before. (RR: Vol. 64 p. 40) One of the outcry witnesses said in their statement that Shania changed her story. (RR: Vol. 64 p. 40) He never asked what occurred to cause Shania to go to her grandmother's house and

16

didn't think it was any of his business how her mother chose to punish her daughter. (RR: Vol. 64 p. 41)

The detective testified that he became aware that there were other people present when the supposed sexual assaults occurred but he did not interview these people. (RR: Vol. 64 p. 43) He said Mr. Davis adamantly denied the allegations. (RR: Vol. 64 p. 44) He said he did not tell Mr. Davis that his interview was being recorded. (RR: Vol. 64 p. 44) The DVD of the interview was played for the jury. (RR: Vol. 64 p. 47) He stated that he did not look at any other boys or men in connection with this case. (RR: Vol. 64 p. 52) He said that the other boys may have been the cause of her making a false allegation. (RR: Vol. 64 p. 52) He said that after speaking to the outcry witnesses who told him that Shania had been kicked out of the house and had switched her story, he did not do any further investigation. (RR: Vol. 64 p. 53) He never spoke with the children she was babysitting when the alleged assaults occurred. (RR: Vol. 64 p. 55) He did not talk to the children's mother, Jennifer. (RR: Vol. 64 p. 55) He never went to the home or apartment where the alleged assaults occurred. (RR: Vol. 64 p. 57)

The State played the DVD of the forensic interview of Shania Gray by Caitlin Clevenger. (RR: Vol. 64 p. 90)

17

On redirect examination the witness testified that he never spoke to Dezire, the daughter of the Defendant and the child that Shania was babysitting, to ask if she ever saw anything unusual between her father and Shania. (RR: Vol. 64 p. 103) He said Shania was not very emotional in the forensic interview until she talks about something that happened to someone else. (RR: Vol. 64 p. 108) He said she said in the interview that she has been kicked out of the house without any clothes. (RR: Vol. 64 p. 109) He said Shania had told her friends at school that she didn't have anywhere to go. (RR: Vol. 64 p, 110) He stated that it was possible that Shania had a crush on Franklin Davis. (RR: Vol. 64 p. 114)

*24) Testimony of Franklin Davis:* Franklin Davis testified that he killed Shania Gray because she ruined his life, making him lose everything because she lied about the sexual assaults. (RR: Vol. 64 p. 136)

He testified that he grew up in St. Louis, Missouri and lived with his mother, grandfather and siblings in a three bedroom apartment in Cabanne Court, which was in a very violent part of the city. (RR: Vol. 64 p. 137) The family eventually moved to Texarkana, Texas. (RR: Vol. 64 p. 140) Before he moved to Dallas, he lived in numerous cities, searching for happiness. (RR: Vol. 64 p. 140) He said he finally found happiness with his wife, Jawanna Davis. (RR: Vol. 64 p. 141) One month after they were married, Shania Gray made allegations of sexual assault against him.

(RR: Vol. 64 p. 141) He said at the time of the allegations, he was working for Dr. Pepper and was promoted for his hard work to loader and picker in the Monster department. (RR: Vol. 64 p. 142-143) He said his life was very happy until the allegations were made. (RR: Vol. 64 p. 144-145)

Mr. Davis testified that Shania's lies changed his life and he lost his job when he was arrested. (RR: Vol. 64 p. 145) He said he was in jail for 30 days after which he could not pass the background check at Dr. Pepper to be rehired because of the four sexual assault charges pending against him. (RR: Vol. 64 p. 146) He said the Mesquite police never wanted his phone in their investigation. (RR: Vol. 64 p. 147) His relationship with Jawanna went downhill because of the allegations and the loss of his job. (RR: Vol. 64 p. 148) He stated that he could not find another job because of the background checks. (RR: Vol. 64 p. 14) He filed for unemployment. (RR: Vol. 64 p. 149) He said Jawanna started looking at him like he was less than a man. (RR: Vol. 64 p. 151) He said when they argued, she would throw it in his face that he wasn't working and not contributing. (RR: Vol. 64 p. 152) He said he had to sell his car to a lawyer to bond out of jail. (RR: Vol. 64 p. 152-153)

Mr. Davis testified that his brother loaned him $5,000 and paid an attorney, Mr. Trumpler, but he eventually hired Tom Cox to represent him. (RR: Vol. 64 p. 154) He said Mr. Trumpler talked like he was guilty and was only interested in

19

making a plea deal.  (RR: Vol. 64 p. 154) He stated that he was innocent and did not want to take any deal. (RR: Vol. 64 p.  154) While in jail, he talked to an inmate who knew an attorney who would take his car to bond him out.  (RR: Vol. 64 p. 155) He called Mr. Cox and when he learned that he had a very nice Ford Mustang convertible, he was willing to make the deal to get him out of jail and agreed to represent him. (RR: Vol. 64 p. 156)   He said he loved his car and had nicknamed it "Wish."  (RR: Vol. 64 p. 157)

Mr. Davis testified that he had counted on having his job with Dr. Pepper to pay for his attorney but had to pay with his unemployment check. (RR: Vol. 64 p. 158) He said he had a deal with Mr. Cox to represent him for $15,000.  (RR: Vol. 64 p. 160) He said he paid Mr. Cox $4,600 in cash and the car was $6,000.  (RR: Vol. 64 p.161) He said Mr. Cox stayed on his case until his unemployment ran out.  (RR: Vol. 64 p. 162) Mr. Cox never set the case for trial.  (RR: Vol.  64 p. 163) When he told Mr. Cox that his unemployment had run out, Mr. Cox went in front of a judge and told him that he wanted off the case. (RR: Vol. 64 p. 164) He said he met with Tom Cox once at his office in the eleven and half months that he was on his case in order for him to sign a contract and the title for the car.  (RR: Vol. 64 p. 164) He said every other meeting took place in the court house.  (RR: Vol. 64 p. 166)

20

The Defendant testified that a month before Mr. Cox withdrew from his case, he told him that Shania had a STD and asked him if he and his wife had an STD. (RR: Vol. 64 p. 166) He told him that they did not have an STD. (RR: Vol. 64 p. 166) He said the judge let Mr. Cox off his case and appointed him a court-appointed attorney. (RR: Vol. 64 p. 169)

He said Mr. Cox never filed any motions, never had him meet with an investigator or talk to him about the State's file. (RR: Vol. 64 p. 169) He told him that he wanted to take a polygraph test but was told that he would have to pay $800 or $900 to take it. (RR: Vol. 64 p. 169) Mr. Hugo Aguilar was appointed to take his case but he never saw him at his office and his calls were never returned. (RR: Vol. 64 p. 172) He played the seven recordings that he made when Shania thought he was someone else. (RR: Vol. 64 p. 174)

Mr. Davis first met Shania Gray on Christmas morning, 2010 when he came to Jennifer Dibrell's apartment with presents for their daughter and her two other children. (RR: Vol. 64 p.178) He later learned that Jennifer had been leaving the children in the house alone and CPS became involved, which led to Shania being hired to babysit. (RR: Vol. 64 p. 180) He would see Shania when he went to see the children and they formed a bond and thought of her as a sister. (RR: Vol. 64 p. 183) He stated that he never had sex with Shania or grabbed her inappropriately. (RR:

21

Vol. 64 p. 183) He said he went over to Jennifer's apartment four or five times a week to see the kids. (RR: Vol. 64 p. 186) He said Shania would confide in him the things she was going through and they were close. (RR: Vol. 64 p. 190) He estimated they spent six or seven hours a week together with the children. (RR: Vol. 64 p. 191) He said he was never alone with Shania and the kids were always with them. (RR: Vol. 64 p. 193) His wife would go with him to visit the kids and Jennifer would often be present. (RR: Vol. 64 p. 194) He said on one occasion Shania had left her grandmother's house and was in a vacant apartment when the police were called. (RR: Vol. 64 p. 196) He said part of her punishment was that she had to babysit. (RR: Vol. 64 p. 196)

Mr. Davis testified that for Shania's birthday he and his wife gave her a cell phone he never used that someone had given him for payment because he knew she had lost her cell phone. (RR: Vol. 64 p. 199) He said he had never had the phone turned on. (RR: Vol. 64 p. 200) Shania would call him when she had problems with the boys and he would talk to them for her. (RR: Vol. 64 p. 204) He last saw Shania before the allegations when they gave his daughter a birthday party at the skating rink in Mesquite. (RR: Vol. 64 p. 204 ) He said the allegations came three weeks after he gave her the phone. (RR: Vol. 64 p. 205) He did not activate the phone or pay for the service. (RR: Vol. 64 p. 206) At the beginning of April, he received text

22

messages from Shania and she told him that her parents turned it on for her. (RR: Vol. 64 p. 207) He said Shania text him asked him if he loved "J", his name for his wife. (RR: Vol. 64 p. 209) He text her that he did love "J" and that he was about to marry her. (RR: Vol. 64 p. 209) He said she replied that "she wished she wouldn't have got her feelings so involved in this." (RR: Vol. 64 p. 210) He said they continued to text back and forth and Shania eventually said "I want you." (RR: Vol. 64 p. 212) He sent back a text telling her "I told you I can't have you like that. You are too young." (RR: Vol. 64 p. 212) He said he knew she had a crush on him because she had flirted with him many times before. (RR: Vol. 64 p. 212) He didn't think he flirted back with her. (RR: Vol. 64 p. 213)

The Defendant testified that Shania sent him the text "No, now you get mad for what? You got two for the price of one. What you complaining for . . . Trying to have your cake and eat it too." (RR: Vol. 64 p. 214) He stated that this was a reference to the fact that he had sexual relations with Jennifer on one occasion and Jennifer told Shania about the encounter. (RR: Vol. 64 p. 215-216) He said he sent a text to Shania saying "Just want you but can't have you yet." (RR: Vol. 64 p,. 218) He said he had not had sex with Shania and this was the text that Shania's mother saw. (RR: Vol. 64 p. 218)

23

Mr. Davis testified that he learned of Shania's accusation that he had swatted her butt with his hand when Sherry and Shania were at Jennifer's apartment and they had a conversation on the speaker phone. (RR: Vol. 64 p. 221) The allegations continued to evolve over the next few days. (RR: Vol. 64 p. 221) He had a conversation with Shania's father concerning the butt swat but the next day he accused him of trying to have sex with Shania. (RR: Vol. 64 p. 228) He said the story then changed from trying to have sex with Shania to having sex with her on four occasions. (RR: Vol. 64 p. 230) He went to the police station the next day after the last conversation with Shania's parents, but was told Detective Aronburger would call him. (RR: Vol. 64 p. 232) The detective told him that no case had been filed against him. (RR: Vol. 64 p. 233)

Several weeks later, he was called by Detective Synder, who told him that he needed to come and talk to the Mesquite police. (RR: Vol. 64 p. 234) He was hesitant to go to the police station because earlier that day he had a wisdom tooth removed and had just taken hydrocodone for the pain. (RR: Vol. 64 p. 234) However, he immediately went to the police station where he was arrested for four sexual assault charges against him. (RR: Vol. 64 p. 238) He said he let the police know that he had taken hydrocodone. (RR: Vol. 64 p. 239) He voluntarily gave the police a statement after he was arrested. (RR: Vol. 64 p. 240) The alleged sexual

24

assaults were supposed to have occurred three times at Jennifer's apartment and once at his apartment. (RR: Vol. 64 p. 243) He learned that Detective Snyder did not interview Jennifer's children or his wife Jawanna and did not forensically examine his cell phone. (RR: Vol. 64 p. 243)

The Defendant testified that when his attorney wouldn't help him on his case, he began his own investigation by looking online about Shania's reputation. (RR: Vol. 65 p. 21-22) He bought a throw away phone for his investigation and sent a text to Shania, telling her he was someone else and that he wanted to get to know her. (RR: Vol. 65 p. 27) He said his wife, his family and friends knew he was texting Shania. (RR: Vol. 65 p. 29) He made seven recordings of their conversations. (RR: Vol. 65 p. 30) He said that she spoke of the sexual assaults but her stories conflicted with the account she gave to CPS and the police. (RR: Vol. 65 p. 32) He said that these proved she kept changing her story. (RR: Vol. 65 p. 32) He played the recordings to his family to prove his innocence to them. (RR: Vol. 65 p. 33) He made up a story to tell Shania that he couldn't talk to her anymore and stopped talking to her. (RR: Vol. 65 p. 34)

The Defendant testified that the took the recordings to Shania's parents but didn't contact them because he recalled her mother told him that it didn't matter if he had done it or not, she would make sure he would go to jail and not see his kids

25

anymore. (RR: Vol. 65 p. 36) He said he was very angry and thought his life was ruined. (RR: Vol. 65 p. 38) He learned of an application for his phone that would allow him to send fake text messages and thought that this would help him be cleared of the charges. (RR: Vol. 65 p. 39) He said he sent the fake text messages and later told the detectives what he had done. (RR: Vol. 65 p. 40) He purchased a gun because he wanted to use it on himself. (RR: Vol. 65 p. 41) He said he began thinking about hurting Shania because his life was ruined. (RR: Vol. 65 p. 47) He said he went to Shania's house and thought about killing everyone in the house. (RR: Vol. 65 p. 47) He said he thought all of them had taken his happiness away from him. (RR: Vol. 65 p. 48) He said he stopped because he didn't want to hurt the little boy who was innocent. (RR: Vol. 65 p. 48)

The Defendant testified that he put more time on the throw away phone and sent a text to Shania. (RR: Vol. 65 p. 49-50) On the morning of the offense Shania sent him a text, telling him that he was at Hebron High School. (RR: Vol. 65 p. 54) He went to the high school because he wanted to tell Shania how she had ruined his life with her lie. (RR: Vol. 65 p. 55) He said Shania was going to meet with "D", the person the Defendant was pretending to be at that time. (RR: Vol. 65 p. 56) They were going to meet in the parking lot by the tennis courts. (RR: Vol. 65 p. 57) When Shania saw him, he said she froze and said "Oh, shit." (RR: Vol. 65 p. 59) He told

26

her that he needed to talk to her and she walked with him to his car. (RR: Vol. 65 p. 61) They got into the car, started it and began to drive away. (RR: Vol. 65 p. 62) Shania told him that her mother was on the other side of the school, waiting for her. (RR: Vol. 65 p. 63) He said he drove off with her because he wanted to kill her. (RR: Vol. 65 p. 64) She never tried to get out of the car and never told him that she wanted to get out of the car. (RR: Vol. 65 p. 65) He told her how she had ruined her life, lost everything and couldn't provide for his children. (RR: Vol. 65 p. 66) He said she reached over, placed her hand on his hand and told him that she was sorry . (RR: Vol. 65 p. 67) When she saw the gun, she asked him not to hurt her. (RR: Vol. 65 p. 67) He drove to Sam Houston Trail Park because he was familiar with it, and parked. (RR: Vol. 65 p. 71) He saw on her Facebook page that she was traveling and enjoying life, while her lies had ruined his life. (RR: Vol. 65 p. 71) He said he sat there and thought about all the things that were going wrong in his life, including his young daughter having to wear shoes with holes in them and he started crying. (RR: Vol. 65 p. 72) He said Shania told him that her life was not perfect, that she had an abortion. (RR: Vol. 65 p. 73) He said they got out of the car and he told her to walk down the slope. (RR: Vol. 65 p. 75) When she got halfway down the slope, he shot her. (RR: Vol. 65 p. 75-76) She lost her balance and fell into the water. (RR: Vol. 65 p. 76) When she fell into the water, he said he shot her again. (RR: Vol. 65 p. 76)

27

He went down the embankment, told her that he wouldn't shoot her again and that she needed to get out of the water. (RR: Vol. 65 p. 77) He threw her jacket which she grabbed and he pulled her out of the water. (RR: Vol. 65 p. 78-79) He told her to lay down and he put his foot on her neck to kill her. (RR: Vol. 65 p. 80) After she died, he told her he was sorry and rolled her into the water. (RR: Vol. 65 p. 82) The Defendant testified that he then got rid of the throw away phone, Shania's iPhone, his muddy shoes, the gun and clip. (RR: Vol. 65 p. 85-89)

The next day the police came to his apartment and he went to the police station with his wife. (RR: Vol. 65 p. 90-91) He said he lied to the police because he was trying to cover it up. (RR: Vol. 65 p. 91) He said he eventually had to tell the truth and asked to speak with the detectives again. (RR: Vol. 65 p. 95) He then helped the police by showing them where he had thrown the evidence. (RR: Vol. 65 p. 98-100) He told detectives "My demons were weighing on me, the devil was on my back." (RR: Vol. 65 p. 102) He said that he meant the hatred he had for Shania because she had ruined his life by lying about him. (RR: Vol. 65 p. 102)

*25) Testimony of Lynne Corsi:* Lynne Corsi, an attorney and social worker, stated that she was testifying as a expert in the prosecution of sexual assault cases. (RR: Vol. 65 p. 194) She reviewed the files, police reports related to the sex abuse case Shania made against the Defendant. (RR: Vol. 65 p. 196) She stated that police

investigators investigating a child abuse case needs to look beyond what the child is saying by talking to potential witnesses and potential eyewitnesses who could corroborate the statement of the alleged victim. (RR: Vol. 65 p. 200) She said the three other children in the house with Shania should have been interviewed. (RR: Vol. 65 p. 201) She reviewed the file made by Tom Cox on Mr. Davis' sexual assault cases and found that there was nothing substantiative on the defense of Mr. Davis. (RR: Vol. 65 p. 203) There were no motions filed and no investigation. (RR: Vol. 65 p. 204) She looked at the file of the subsequent attorney, Jugo Aguilar and found there were no discovery motions or interview notes. (RR: Vol. 65 p. 205) The file contained pass slips but no notes indicating that Mr. Aguilar had met with the Defendant. (RR: Vol. 65 p. 206) No private investigator was hired by either Mr. Cox or Mr. Aguilar. (RR: Vol. 65 p. 206-207) She said that Detective Synder's testimony showed that after he filed the case, he did no further investigation. (RR: Vol. 65 p. 207)

Ms. Corsi testified that the defense needed to look at the inconsistencies of the statements of Shania Gray. (RR: Vol. 65 p. 214) She said there was a sexually transmitted disease, trichomoniasis, which needed to be investigated. (RR: Vol. 65 p. 214)

*26) Testimony of Arty Hayes:* Arty Hayes, a pastor for a church in Texarkana, Arkansas and brother in law to Franklin Davis, testified that Frank came to see him about the allegations Shania made against him. (RR: Vol. 65 p. 265)   He said Jawanna and Frank consulted and prayed with him and the senior pastor, William Cooper.  (RR: Vol. 65 p. 266) He said Frank was very disturbed about the situation and told him that he was an innocent man. (RR: Vol. 65 p. 267) He said Frank was worried and depressed because of the allegations.  (RR: Vol. 65 p. 268)

*27) Testimony of Lamar Leggiton:* DVDs of interviews that the Defendant gave to television stations were played for the jury.  (RR: Vol. 65 p. 288)

*State on Rebuttal*

*28) Shirley Brown:* Shirley Brown testified that Shania Gray went to school with her daughter, Jazmine Adams.  (RR: Vol. 65 p. 289) In 2011 Shania and her daughter attended Horn High School in Mesquite, Texas. (RR: Vol. 65 p. 289) She stated that one day in the spring of 2011 Shania came to her house and was very afraid and shaken.  (RR: Vol. 65 p. 290) As Shania cried, she made her tell her what was wrong. (RR: Vol. 65 p. 290) Shania asked her not to tell anyone because she thought someone would be hurt. (RR: Vol. 65 p. 291) Shania told her that a man had been raping her, putting a sword against her neck.  (RR: Vol. 65 p. 292) She said Shania told her that the man would show up every time she went to babysit. (RR: Vol. 65 p.

30

293) She told her that the man was older and would hurt her if she didn't have sex with him. (RR: Vol. 65 p. 293) When Shania finished telling her, she called her mother and they went to tell her about the assaults. (RR: Vol. 65 p. 294) She told Shania's mother, Sherry, to tell the assistant principal and officer at school. (RR: Vol. 65 p. 296)

On cross examination the witness testified that Shania told her that her mother put her out of the house without any clothes. (RR: Vol.65 p. 298) She said Sherry had Shania's phone but Shania had another phone her mother didn't know about. (RR: Vol. 65 p. 300-301)

**29) Testimony of Julia Adams:** Julia Adams testified that she had been friends with Shania Gray and in April, 2011 Shania came to her and her sister at school and was crying. (RR: Vol. 65 p. 304) Shania told her that she was babysitting and every time the mother left the house, a man would come over and would touch her. (RR: Vol.. 65 p. 305) Shania told her that the man told her "If you tell, I'm going to hurt you and your family." (RR: Vol. 65 p. 305) Shania told her that the man became rough with her. (RR: Vol. 65 p. 306) They took her to their house where Shania talked to their mother. (RR: Vol. 65 p. 307) She said Shania told them that she had sexual intercourse with Frank Davis. (RR: Vol. 65 p. 307-308)

The witness testified that Shania told her she didn't worry about it, that it started out as a habit, but when he got rough with her, she didn't want to have sex with him anymore. (RR: Vol. 65 p. 309)

**30) *Testimony of Jazmine Adams:*** Jazmine Adams, a friend of the deceased, testified that Shania was crying at school and told her "My mom caught me texting a 20-year-old dude." (RR: Vol. 65 p. 319) Shania told her that her mom threw her out of the house so she took Shania home to talk with her mother. (RR: Vol. 65 p. 320) Shania told them that Frank Davis had sexually assaulted her. (RR: Vol. 65 p. 320)

On cross examination the witness testified that Shania never told her the name of the 20 year old man she was texting. (RR: Vol. 65 p. 322) She didn't mention anything about a sword in her police statement. (RR: Vol. 65 p. 326

**31) *Testimony of Jennifer Dibrell:*** Jennifer Dibrell testified that Shania Grey baby sat for her children and she had a child with Franklin Davis. (RR: Vol. 65 p. 332-333) She stated that she never discussed a sexual encounter she had with Frank Davis with Shania Grey. (RR: Vol. 65 p. 333) She said she asked Frank not to go to her apartment when Shania was babysitting and she was not present. (RR: Vol. 65 p. 336) She didn't think he needed to be at the apartment when she was paying a babysitter. (RR: Vol. 65 p. 337)

On cross examination the witness testified that she never paid Shania but would braid her hair and do her make up. (RR: Vol. 65 p. 342) She knew that Dezire would call Frank and ask him to come over because she loved her dad very much. (RR: Vol. 65 p 342-343) She said he treated her other children very well, bringing them presents. (RR: Vol. 65 p. 343) She said that after the allegations were made, Frank came to her and wanted her to listen to some audio evidence but she told him that she didn't want to hear it. (RR: Vol. 65 p. 346)

*32) Testimony of Jawanna Arrington:* Jawanna Arrington, the wife of the Defendant, testified that married in June, 2011 after they had known each other for three years. (RR: Vol. 65 p. 350) She said they lived next door to Jennifer Dibrell and her children. (RR: Vol. 65 p. 350) She said Frank went over to her apartment to see the kids when Jennifer was not present because Jennifer and Frank did not get along. (RR: Vol. 65 p. 351) She said they had a volatile relationship. (RR: Vol. 65 p. 351)

On September 6th, 2012, Frank picked her up from work and she noticed that he had sprayed cologne in the car. (RR: Vol. 65 p. 351) She thought he had a female in the car. (RR: Vol. 65 p. 352) They stopped at the hospital because he had hurt his arm at the gym, but then left and went home. (RR: Vol. 65 p. 353) She said he was very affectionate that night. (RR: Vol. 65 p. 353) She said he told her of text

33

messages but did not tell her the version what they actually said.  (RR: Vol. 65 p. 354-355) She said that after the arrest, she gave Frank's belongings to his sister, including his swords. (RR: Vol. 65 p. 356)

On cross examination, the witness testified that she married Frank because she loved him.  (RR: Vol. 65 p. 357) She said her mother, Mildred Arrington, was like a mother to Frank. (RR: Vol. 65 p. 358) She said Shania came to their apartment with the children on one occasion. (RR: Vol. 65 p. 360) She said Shania acted normally when she was around Frank and she did not suspect anything was going on between the two of them. (RR: Vol. 65 p. 361)

***The jury found Franklin Davis guilty of Capital Murder as charged in the indictment.  (RR: Vol. 66 p. 78)***

***The State on Punishment***

***33) Testimony of Linda Crawford:*** Linda Crawford testified that Franklin Davis was the father of the 12 year old son, Deon Trey Davis, and they met when she was 16 years old and he was 18 years old.  (RR: Vol. 66 p. 80-81) They lived in Texarkana, Texas when they started a relationship.  (RR: Vol. 66 p. 82) After she became pregnant, they broke off their relationship.  (RR: Vol. 66 p. 84) She stated that there were a couple of episodes of domestic violence, one being when she found him with another woman.  (RR: Vol. 66 p. 85) She said he tried to push her out of the house

34

and told her to "get going and don't come around here." (RR: Vol. 66 p. 86) She said on another occasion, they argued and Frank hit her with a clothes hanger, cutting her arm.  (RR: Vol. 66 p. 88) Her father called the police and Frank was arrested for assault.  (RR: Vol. 66 p. 88) She said that Frank gives their son things and comes to see him when he is in town. (RR: Vol. 66 p. 93-94)

On cross examination the witness testified that when she and Frank fought, she threw a bottle and hit Frank in the face.  (RR: Vol. 66 p. 110) She said he bought things for their son, including a bicycle.  (RR: Vol. 66 p. 111) She recalled telling detectives investigating the capital murder case that Frank had never been violent toward her. (RR: Vol. 66 p. 113) She stated that she threw the bottle at Frank before he hit her with a clothes hanger. (RR: Vol. 66 p. 119)

*34) Testimony of Labrena Henderson:* Labrena Henderson testified that she met Frank at the McDonalds in Texarkana where they both worked. (RR: Vol. 66 p. 122) They lived together for six months and had a son born on September 24, 2001.  (RR: Vol. 66 p.123-124) She said Frank would stop and see their son, Ahmed, whenever he was in Texarkana. (RR: Vol. 66 p. 125) She received regular child support until the charges were filed. (RR: Vol. 66 p. 125-126)

On cross examination the witness stated that her mother thought the world of Frank.  (RR: Vol. 66 p. 130) She described Frank as being slow to anger and told

defense counsel in an interview that "He was pretty easy going and never really saw him get mad." (RR: Vol. 66 p. 131) She said Frank would come to Texarkana to see his children once a month. (RR: Vol. 66 p. 133)

**34) Testimony of Margaret Brown-Lewis:** Margaret Brown-Lewis, a detective with the Dallas County Sheriff's Department in the identification section identified State's Exhibit No. 245, a 1999 judgement for theft $1,500 but less than $2,000, revoked on the offense of burglary of a motor vehicle, failure to report, failure to pay probation fees, failure to pay court costs and failure to complete community service hours and punishment set at 15 months in State jail; State's Exhibit No. 246, evading arrest February 26, 2001; State's Exhibit No. 247 February 26, 2001, failure to identify and State's Exhibit No. 248, misdemeanor offense of fleeing or attempting to elude a police officer on October 1, 2007.

**35) Testimony of Steven Underwood:** Steven Underwood, a deputy with the Dallas County Sheriff's Department, testified that in 2012 he was assigned to Parkland Hospital to watch Franklin Davis while he was in the hospital. (RR: Vol. 66 p. 146-147) He said Mr. Davis asked to take a shower before he was released and returned to jail. (RR: Vol. 66 p. 148) He agreed, and took off Mr. Davis' handcuffs and leg-irons. (RR: Vol. 66 p. 148) He said Mr. Davis then told him "Sorry, man." and grabbed him and threw him into the wall. (RR: Vol. 66 p. 149) He said Mr. Davis had

a sharp object in his hand and threatened to cut him if he moved. (RR: Vol. 66 p. 150) He grabbed Mr. Davis and backed him into a corner in the room while Mr. Davis reached for his gun. (RR: Vol. 66 p. 151) His holster broke and Mr. Davis took his gun off his belt. (RR: Vol. 66 p. 152) He said he didn't know if the holster was still on the gun, but he just kept trying to hold it and keep it pointed away from him. (RR: Vol. 66 p. 153) He said they continued to struggle until Mr. Davis separated from him, got the gun out of the holster and pointed it at him. (RR: Vol. 66 p. 153) Mr. Davis told him to get on the ground and he complied, telling him that he didn't want to do this. (RR: Vol. 66 p 155) Mr. Davis then ran out of the room. (RR: Vol. 66 p. 157)

The witness testified that he then grabbed his phone, ran down the stairwell, called his supervisor and then told a nurse to contact the Parkland police. (RR: Vol. 66 p. 158) An employee told him that he saw a man running across the street. (RR: Vol. 66 p. 160) He never caught Mr. Davis. (RR: Vol. 66 p. 160)

*36) Testimony of Mary Cassio:* Mary Cassio testified that on December 4, 2012 she lived at 2239 Wycliff in Dallas, Texas. (RR: Vol. 66 p. 184) At approximately 8:30 p.m. a man knocked on her door and told her he needed help because someone was shooting at him and had stolen his car. (RR: Vol. 66 p. 185) Her son opened the door and she saw a man wearing hospital pants with no shoes. (RR: Vol. 66 p. 186) She

did not let him in the house, but told him that she would call 911. (RR: Vol. 66 p. 187) He told her not to call because he had some warrants and he then left, going toward the Market Center Station. (RR: Vol. 66 p. 187)

She said her son spoke with a neighbor, came back to the house and then they went outside to see if the man had put a gun somewhere. (RR: Vol. 66 p. 188) She found a gun inside a yellow Parkland Hospital sock on the ground. (RR: Vol. 66 p. 189) She called 911 and told them about the gun. (RR: Vol. 66 p. 192)

On cross examination the witness testified that the man never threatened her or showed her a gun. (RR: Vol. 66 p. 195) He never forced his way into her house. (RR: Vol. 66 p. 196)

*37) Testimony of Jawanna Arrington:* Jawanna Arrington was recalled and testified that Frank would get angry and they would tussle. (RR: Vol. 66 p. 202) She said he choked her at times, grab knives occasionally and twice grabbed a gun. (RR: Vol. 66 p. 202) She never called the police because she loved him and didn't want to get him into trouble. (RR: Vol. 66 p. 203) She said she didn't want to be another person who abandoned him. (RR: Vol. 66 p. 207)

The witness testified that she knew Frank had been in foster care and that his mother had been murdered in St. Louis. (RR: Vol. 66 p. 216-217) She said he had a big family in Texarkana but was sent to a youth home in Little Rock instead. (RR:

38

Vol. 66 p. 217) She said he lived with Dorothy, a sister, who kicked him out after she stopped getting support for him. (RR: Vol. 66 p. 218)

**39) *Testimony of Matthew Randall:*** Detective Matthew Randall was recalled and testified that on December 4, 2012 he responded to the escape of a prisoner at Parkland Hospital. (RR: Vol. 67 p. 29) He said by the time he responded, the prisoner had been taken back into custody. (RR: Vol. 67 p. 30)

On cross examination the witness testified that one of the letters he recovered from room 711 was from the Defendant stating he wasn't sure whether or not he would survive the escape. (RR: Vol. 67 p. 46)

**40) *Testimony of Christian Dalesandro:*** Christian Dalesandro of the Dallas Police Department assign to the SWAT unit, testified that on December 4th, 2012 he was called to a location on Harry Hines, near Parkland Hospital. (RR: Vol. 67 p. 52-53) He said the escaped prisoner was located between two buildings and everything was surrounded when he arrived. (RR: Vol. 67 p. 54) He said the Defendant eventually showed him his hands, exited the vehicle and was put into custody. (RR: Vol. 67 p. 61)

On cross examination the witness stated that the Defendant did not have a weapon on him when he was arrested and was compliant when he exited the vehicle. (RR: Vol. 67 p. 68). (RR: Vol. 67 p. 68-70)

**41) Testimony of Jennifer Dibrell:** Jennifer Dibrell was recalled and testified that she met Frank Davis in May, 2003 in Texarkana, Texas. (RR: Vol. 67 p. 72-73) Their daughter, Dezire, was born in March 2004 and was now nine years old. (RR: Vol. 67 p. 73) She said they had an altercation when she was pregnant with Dezire and the Defendant grabbed her and told her he hoped she lost the baby. (RR: Vol. 67 p. 75) She said when they lived in Bryan Irving, Texas they had an argument when she found Frank and a woman having sex in their home. (RR: Vol. 67 p. 77) She said during an argument when they lived in Chicago, Frank pulled a knife on her and she grabbed her daughter so he didn't do anything. (RR: Vol. 67 p. 77) They again argued over another woman when they lived in Mesquite and Frank grabbed his BB gun and shot her in the leg. (RR: Vol. 67 p. 78) She grabbed the gun but didn't shoot him. (RR: Vol. 67 p. 78) She said that on one occasion after Shania came to babysit for her, she said she and Frank had sex but she had to tell him not to continue because the anal sex hurt. (RR: Vol. 67 p. 80)

On cross examination the witness testified that their daughter, Dezire, appeared to be Frank's favorite child. (RR: Vol. 67 p. 83) She said he has never missed her birthday and loves her very much. (RR: Vol. 67 p. 83) She said Dezire was a flower girl at Frank's wedding to Jawanna. (RR: Vol. 67 p. 85) She said her other two children also called Frank "Daddy." (RR: Vol. 67 p. 86) The witness testified that

Frank tried to get custody of his daughter, Kurstyne, when her mother was in jail. (RR: Vol. 67 p. 91)

*42)Testimony of Melodye Nelson:* Melodye Nelson, a warden with the Texas Department of Criminal Justice, described the Texas prison system and the classification system of offenders. (RR: Vol. 67 p. 98- 108) She stated that prisoner who had a violent episode where they took a gun off the person guarding him and escaped would most likely be classified as a G4. (RR: Vol. 67 p. 108-109) Ms. Nelson described the restrictions placed on G4 and G5 inmates. (RR: Vol. 67 p. 109-114) She described the levels of administrative segregation. (RR: Vol. 67 p. 114-115) She said that there are maximum security facilities that are understaffed. (RR: Vol. 67 p. 116) Ms. Nelson described how the G2 and G3 offenders live and work within the system. (RR: Vol. 67 p. 117-119) She described the violence that occurs in the system including assaults, weapon possessions, gang activity and murder. (RR: Vol. 67 p. 120-121) She described how contraband comes into the prisons. (RR: Vol. 67 p. 121) She described State's Exhibit No. 296, four items, weapons, that were confiscated from inmates. (RR: Vol. 67 p. 125-128)

### Defense on Punishment

*43) Testimony of Clifford Harper:* Detective Clifford Harper of the St. Louis Metropolitan Police Department, testified that he had been a homicide detective and

was familiar with the area named Cabanne Courts. (RR: Vol. 67 p. 165) Cabanne Courts was a high crime area and was a neighborhood riddled with gang activity, drugs and violent crime. (RR: Vol. 67 p. 166) He said most of the housing complexes are condemned and run down. (RR: Vol. 67 p. 167) The only heat in the units would be the stove and electricity was usually stolen from the utility poles and run to the houses by electrical cords. (RR: Vol. 67 p. 167)

The detective testified that in the late 1990's he worked the homicide of Brenda Elkins in the area in which she was shot in the head point blank with a 12-gauge shotgun after she had been raped and sodomized. (RR: Vol. 67 p. 168) He said the rape and murder occurred in front of other people in the room. (RR: Vol. 67 p. 177) He said that this was one of the worst crime scenes he had ever seen. (RR: Vol. 67 p. 177) He said the living conditions were horrible, the refrigerator had no food, only beer and there was a lot of drug paraphernalia. (RR: Vol. 67 p. 177)

**44) Testimony of Ed Chattaway:** Ed Chattaway, an officer with the Texarkana Police Department in Texarkana, Arkansas, testified that when he was a detective he received a tip from crime stoppers which led to the arrest of Robert Elkins. (RR: Vol. 67 p. 185-187) As a result of the tip, he met with Frank Davis, the Defendant, at the Hobo Jungle Park, an area next to the railroad. (RR: Vol. 67 p. 187) He said Mr. Davis told them that he overheard his uncle or his uncle told him that he committed a

42

couple of robberies and raped an E-Z Mart store clerk. (RR: Vol. 67 p. 188) Mr. Davis told him that Robert was planning on robbing Advance Auto Parts if certain employees were on the scene at the store. (RR: Vol. 67 p. 189) As a result of the Defendant's information, they set up around the store and when Robert arrived, but then left. (RR: Vol. 67 p. 190-192) He said Mr. Davis called him again, telling him that the robbery might happen that night and again they set up around the store. (RR: Vol. 67 p. 192) He said Robert Elkins did not approach the store but was nearby and they decided to arrest him. (RR: Vol. 67 p. 195) He said Robert Elkins had a silver handgun, a hat and gloves on him. (RR: Vol. 67 p. 196) He was charged with two counts of aggravated robbery, rape, possession of a firearm by a felon and was now in prison serving two life sentences. (RR: Vol. 67 p. 196) He said Frank Davis helped take this man off the streets, even though it was his uncle. (RR: Vol. 67 p. 197)

*45) Testimony of Rose McGill:* Rose McGill, the foster mother of Frank Davis when he was 15 or 16 and lived in Texarkana. (RR: Vol. 67 p. 218) She was trained by the State and over the years she has cared for over 250 children in her home. (RR: Vol. 67 p. 218) She said Frank and his brother, Samuel, were brought to her when they were 15 and 16 years old. (RR: Vol. 67 p. 221) She said she was very strict and would spank the children, but never asked them to leave. (RR: Vol. 67 p. 222) She said her house was across the street from the high school and children knew they

43

could hang out there. (RR: Vol. 67 p. 224) She thought Frank finally thought he had found a home and was always smiling, telling jokes and joyful. (RR:VOl. 67 p. 224) She said Frank had a lot of anger because he thought someone in his family could have stepped up and taken him and his brother out of foster care. (RR: Vol. 67 p. 225) She said the boys stayed with her for just over a year. (RR: Vol. 67 p. 226) She said Frank's family had a home just down the street from her house, but would not take them into their home. (RR: Vol. 67 p. 226) She said Frank did everything she asked him to do and was never a disruption. (RR: Vol. 67 p. 227) She tried to keep them longer, until their 18th birthdays, but their sister, Dorothy, became of legal age and took them into her home. (RR: Vol. 67 p. 227) She thought Frank needed more structure than his sister could give him. (RR: Vol. 67 p. 227) She thought Frank had too much free time and this would cause him to get into trouble. (RR: Vol. 67 p. 230) She has kept in touch with Frank since her left her home and have always been there for him. (RR: Vol. 67 p. 231) She said she knew how Frank's mother had died and knew that his father died when he was one year old. (RR: Vol. 67 p. 235)

*46) Testimony of Dorothy Elkins:* Dorothy Elkins, the older sister of the Defendant, testified their oldest brother, Tony, lives in assisted living because he has always had a mental disability. (RR: Vol. 67 p. 246) She said she was a child, their mother didn't take care of her and Tony and after CPS got involved, the family stepped in and took

44

them to California. (RR: Vol. 67 p. 247-248) Five or six years later, they came back to St. Louis, Missouri and lived with the five other children of their mother had, including Frank, who was the youngest. (RR: Vol. 67 p. 248-249) They lived in Cabanne Court which she described as a very violent area with drug dealing and murders. (RR: Vol. 67 p. 249) She said they rarely played outside because it was such a rough neighborhood. (RR: Vol. 67 p. 250) They lived with their grandfather, Lawrence in a three bedroom apartment. (RR: Vol. 67 p. 251) They lived there for five or six years until their mother was arrested for shooting someone during a fight with another family. (RR: Vol. 67 p. 251) She said their Uncle Dennis came ot deal some drugs on another person's territory and was shot. (RR: Vol. 67 p. 253) After their mother's arrest, they went to foster care. (RR: Vol. 67 p. 257) She said Frank had been in at least four foster homes. (RR: Vol. 67 p. 257) She said their Uncle James and Aunt Rose came and got them in St. Louis and took them to Texarkana. (RR: Vol. 67 p. 259) When their mother got out of prison two and a half years later, she came to Texarkana but was rearrested and sent back to St. Louis. (RR: Vol. 67 p. 259) She said Frank and Sammy went back into foster care. (RR: Vol. 67 p. 260)

The witness testified that when she was in her early 20's, Frank and Sammy moved in with her. (RR: Vol. 67 p. 262) When Frank turned 17, he moved in with his

girlfriend, Kenzie Monroe. (RR: Vol. 67 p. 263) She said Frank moved around a lot in his 20's but when he met Jawanna, he settled down. (RR: Vol.67 p. 264)

The witness testified that their grandfather molested everyone in the household. (RR: Vol. 67 p. 265) She said there was also incest and their mother, Brenda's father was also her brother Tony's father. (RR: Vol. 67 p. 265) She said she didn't know the father's of some of her siblings but knew Frank's dad died when he was young. (RR: Vol. 67 p. 266) She said Frank never had a father figure in his life. (RR: Vol. 67 p. 266)

*47) Testimony of Linda Hayes:* Linda Hayes testified that she lives in Texarkana, is married to Arty Hayes, a pastor, and was the older sister of Frank Davis. (RR: Vol. 67 p.287) She said she was concerned about her brother and loved him very much. (RR: Vol. 67 p. 288)

*48) Testimony of Brenda Griffin:* Brenda Griffin testified that Frank Davis was an adolescent who was in the Youth Home where she worked in Little Rock, Arkansas. (RR: Vol. 68 p. 22) She said he was there for three and a half months when he was fifteen years old. (RR: Vol. 68 p. 23) She said his life was so fractured by all the tragedies that happened to him that he was very bonded with his family and he was very motivated to get back to his family. (RR: Vol. 68 p. 24) She said she was his therapist and knew he was frustrated that his case worker didn't seem to participate in

46

placement options. (RR: Vol. 68 p. 24) She facilitated his brother Sammy coming to see Frank so he would have some family contact. (RR: Vol. 68 p. 26) She said that she was aware of the murders of Frank's mother and his uncle which occurred within a month. (RR: Vol. 68 p. 26) She arranged with Rose Warfield-McGill to take both Frank and Sammy in the same home . (RR: Vol. 68 p. 28) She said that Frank was never a discipline problem while he was in her facility. (RR: Vol. 68 p. 28)

**49) Testimony of Pat Gill:** Pat Gill testified that he worked at the Youth Home with Ms. Griffin as a counselor. (RR: Vol. 68 p. 32) He recalled that Frank was always respectful, polite and got along with everybody. (RR: Vol.68 p. 34) He said Frank was having problems dealing with the fact that his mother was murdered. (RR: Vol. 68 p. 35)

**50) Testimony of James Aiken:** James Aiken testified that he an expert in the prison system and the classification system. (RR: Vol. 68 p. 51-55) He said his experience and studies have shown that as a person gets older, they become more compliant, especially in a prison system. (RR: Vol. 68 p. 57) He studied Mr. Davis' records and knew he had escaped while custody of the Dallas County Sheriff's Department. (RR: Vol. 68 p. 57) He said an escape is not necessarily a predictive factor that the person will escape again. (RR: Vol. 68 p. 58) He said there will always be contraband and drugs smuggled into prisons, but not every inmate is involved in illegal activity.

47

(RR: Vol. 68 p. 60) He said that some inmates have what he calls "juice" and are the inmates have the power and control and intimidate other inmates. (RR: Vol. 68 p. 61) He said others, irregardless of their crimes, do not have "juice" and are more vulnerable. (RR: Vol. 68 p. 61) He said the only reason they stay alive and well is because of the professionalism of the staff and the systems that are employed. (RR: Vol. 68 p. 61)

He said that because of the underlying factors and as well as the offense he was convicted of, the Defendant would be at the bottom of the list of having "juice" or having power. (RR: Vol. 68 p. 62) He said that inmates also hate anything that has to do with children, as in this case. (RR: Vol. 68 p. 62) He said that the Defendant will not be an influence and his major issue with him would be keeping him alive if he was ever exposed to the general population. (RR: Vol. 68 p. 63) He stated that the fact the Defendant escaped would cause him to have more of a security envelope as necessary to ensure that he never escaped again. (RR: Vol. 68 p. 79)

*50) Testimony of Frank Au Buchon:* Frank Au Buchon testified that he is retired from the Department of Criminal Justice of the State of Texas and now is a consultant for attorneys. (RR: Vol. 68 p. 82) He said a prisoner always goes into the system as a G3, never lower. (RR: Vol. 68 p. 87) He thought the Defendant would go in as a G4 which was fairly restrictive and would have an escape designation. (RR: Vol. 68 p.

89) He said at the very best the Defendant would remain in this designation for a minimum of ten years. (RR: Vol. 68 p. 89) He said if he had a serious, violent incident against a staff member, the inmate is place in G5 which is the most restrictive general population.(RR: Vol. 68 p. 89) He said that because of the premeditation of the act of assaulting the officer and escaping, the Defendant should be placed in administrative segregation for a long time. (RR: Vol. 68 p. 89) He thought this is what the TDCJ officials would do with the Defendant based on the conversations he recently had with them. (RR: Vol. 68 p. 90)

*51) Testimony of Latrice Brown:* Latrice Brown testified that the Defendant was the father of her thirteen year old second child, Kurstyne. (RR: Vol. 68 p. 107) She said their daughter was three years old, she was arrested and Frank stepped in and took care of Kurstyne for three years. (RR: Vol. 68 p. 109-110) She said he was dating Jennifer at the time and they moved from state to state, taking Kurstyne with them. (RR: Vol. 68 p.111) She said when she was released from prison, she wanted Kurstyne back, but Frank wanted to keep her. (RR: Vol. 68 p. 111-112) She said they worked it out and she got custody, but Frank could visit as regularly as he wanted. (RR: Vol. 68 p. 112) She said Frank was an excellent father who took care of Kurstyne needs and even her other children. (RR: Vol. 68 p. 112) She said her other daughter, Skyler, also called him "Dad." (RR: Vol. 68 p. 112) She said Frank

49

always came to Kurstyne's birthday parties and was always there for her. (RR: Vol. 68 p. 113) She said Kurstyne loved her father very much. (RR: Vol. 68 p. 114)

**52) Testimony of Kurstyne Bailey:** Kurstyne Bailey, the daughter of the Defendant, testified she was 13 years old and had good memories of being with her father. (RR: Vol. 68 p. 125) She said she knew her father was locked up for doing something bad and she hadn't seen him in about a year and a half. (RR: Vol. 68 p. 128) She said she wanted to come to court to see him and let the jury know that she loved him very much. (RR: Vol. 68 p. 128)

**The State on Rebuttal in Punishment**

**53) Testimony of Sherry Gray-James:** Sherry Gray-James, mother of the deceased, testified that on December 5th she received a phone call from Detective Dena Williams of the Carrollton Police Department telling her that Frank Davis had escaped from custody. (RR: Vol. 68 p. 20-21) She said she was frightened and Detective Williams stayed on the phone with her. (RR: Vol. 68 p. 21)

***The jury answered "yes" to Special Issue No. 1 and "no" to Special Issue No. 2. (RR: Vol. 70 p. 19-20) The trial court decreed that a sentence of death be imposed in accordance with the laws of the State of Texas and the Code of Criminal Procedure. (RR: Vol. 70 p. 20)***

## SUMMARY OF ISSUES

Appellant raises issues in this brief that are categorized into the following groups: I. Voir Dire Issues. Three issues on voir dire involving Appellant's *Batson* challenge. II. Pretrial Issues. In the fourth issue, Appellant argues that the trial court erred in dismissing Juror John Bigley, finding that he was disabled due to an emotional problem involving employment which conclusion was not supported by the statement of facts. In the fifth issue Appellant argues that the trial court erred in denying his motion to quash the indictment because the indictment failed to specify the manner and means by which he allegedly committed the offense of obstruction with sufficient specificity to allow Appellant to defend himself. Issue six is concerned with the trial court's error and abuse of discretion in denying Appellant's motion for continuance in order to develop information that defense counsel had just received about an extensive history of sexual abuse perpetrated on the Defendant. In Issues Nos. 7, 8, 9, and 10 Appellant argues that the trial court erred in denying his motion to suppress evidence which was obtained as a result of search warrants. III. Guilt/Innocence Issues. In the eleventh issue, Appellant argues the evidence presented at trial was insufficient to support the conviction for capital murder. In issue no. 12, Appellant argues that the trial court erred in overruling his objection two photographs as being more prejudicial than probative. Appellant argues in Issue Nos.

13-19 that the trial court erred in sustaining Defense Exhibits A-G which were recordings made of the victim. Appellant sought to introduce these compilation of recordings of the victim to support his defense that he did not commit the aggravating offense of obstruction which elevates this murder case to the potential death penalty punishment option. In issues nos. 20, 21, and 22 Appellant argues that the trial court erred in sustaining the State's objection to the witness Arty Hayes, Ashley Sims and Lamar Leggiton who were called by the defense. Appellant argues that the statements made by Appellant to any of these three witnesses that the proffered evidence was admissible as non hearsay prior consistent statements. In Issue 23 Appellant argues that the trial court erred in denying Appellant's request for a charge on anti-speculation during the guilt/innocence stage of the trial. Appellant's requested charge to the jury not to base their verdict on speculation was a correct statement of the law and should have been given to accurately guide the jury in its deliberations. Appellant argues in Issue No. 24 the trial court erred in overruling Appellant's objection to the State's counsel's jury argument when he struck at Appellant over defense counsel's shoulders and shifted the burden to Appellant. IV. Punishment Issues. Appellant has 18 objections to the language in the body of the Court's instructions to the jury in the punishment stage of the trial. In issues nos. 26 through 35 involve Appellant's objections to the punishment verdict form. V. Issues

involving constitutional challenges that have been previously raised and denied by

this Court in order to preserve these issues for possible future review in federal court.

## VOIR DIRE ISSUES

## BATSON' ISSUES NOS. 1-3

## APPELLANT'S ISSUE NO. 1

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, SYRENE MITCHELL, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN <u>BATSON V. KENTUCKY</u>**

**(Appellant's Issues Nos. 1-3 are grouped as each involves the same or similar issue of law. In each issue Nos. 1-3 Appellant argues that Appellant established a 'prima facie' case for a 'Batson' objection. The Defendant is an African-American. An objection by Appellant was made concerning the racially discriminatory manner in which the State exercised its peremptory challenges.)**

Appellant directs this Honorable Court's attention to Reporter's Record

Volume 53 page 26 at which the trial court conducted a 'Batson' Hearing. Appellant

objected to the State's strike against Syrene Mitchell, an African-American (RR: Vol.

53 p. 26) . The trial court denied Appellant's Batson Challenge. (RR: Vol. 53 p.29)

In reviewing the qualification stage of voir dire, the record shows that the State

challenged this juror; however, the trial court denied their challenge and the juror was

qualified. (RR: Vol. 22 p. 157) Mr. Mitchell had previously been a grand juror on a

grand jury and stated that his grand jury had true billed two capital murder cases.  Mr.

53

Mitchell testified that his nephew was a police officer in New Orleans. (RR: Vol. 22 p. 94) He further testified that, as he wrote on his questionnaire, he would follow the law. (RR: Vol. 22 p. 96) When explaining why he circled number 3 on the second question of the questionnaire he stated (RR: Vol. 22 p. 99) :

A. Well, that's a - - It's sort of a - - The was I feel about the death penalty, in some cases I thing the death penalty should be imposed. In other cases, I do not. My decision would be based on the type of trial and the type - - the type of murder, if murder occurred and there was evidence to support that murder. The evidence has to be there.

Q. Yeah, that make sense. We're going to talk about the burden of proof that we have as prosecutors on this case because you know that we are - - it's our job to prove the case. The State of Texas has the burden of proof in this.

Mr. Mitchell stated that there were some cases that were worthy of the death penalty, for example, "an innocence child being molested and killed, for whatever reason, by an older person. Those are the kind I would draw the line on." (RR: Vol. 22 p. 105-106) Appellant submits that this should have been the type of juror the State would want on the jury given the young age of the victim and the underlying offense of sexual assault. Concerning his religious beliefs, Mr. Mitchell stated (RR: Vol. 22 p. 118):

A. I certainly don't have any religious beliefs against capital - - capital murder. I'm not one of those types of individuals. I look at everything that's involved, the evidence, but my religious affiliations with my particular church has nothing to do with it.

54

When asked to explain his answer of "uncertain" to the statement "The death penalty should be abolished" the following occurred (RR: Vol. 22 p. 127):

A. It's kind of like middle of the road.  It's kind of, like, middle of the road. I don't necessarily agree the death penalty should be abolished.  Here, again, it depends on whatever situation that occurs.  As I stated earlier, certain situations, in my opinion, warrant the death penalty, and other situations do not.
Q. And those situations that warrant the death penalty, are you - - are you the type of person that could give the death penalty?
A. Yes.

When asked on the questionnaire if he had " any moral, religious or personal beliefs that would prevent you from sitting in judgement of another human being", Mr. Mitchell checked the answer "no."  (Questionnaire p. 2) He also checked  the answer "no" when asked in the following question "Do you have any moral, religious or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human being?" Appellant submits that 21 of the jurors accepted by the State answered these two questions with the same answer.  Ms. Karen Coyne, No. 141A, who was seated on the jury, answered Question No. 3 as "yes" and commented that it was a very serious position to be in and the evidence would need to be very compelling to convict any individual of murder.  Furthermore, Mr. Mitchell agreed that the intentional murder of an individual during the course of committing or attempting to commit the offense of obstruction should be a capital

55

offense, as did all jurors accepted by the State.  He had not heard about the case as did sixteen jurors accepted by the State.   When asked to rank how strongly he believed in using the death penalty, he ranked himself a 6. (Questionnaire P. 5) Appellant submits that Daniel Rudnisky, Brenda Morgan, Josh Stephens, Donald Reeves and Kelly Cook, all jurors accepted by the State, ranked themselves a six or lower. Mr. Mitchell was a qualified juror who supported the death penalty.  Appellant argues that the record supports his claim that this juror was qualified as to imposition of the death penalty and had answers similar to other jurors who were qualified as jurors.

## APPELLANT'S ISSUE NO. 2

### THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, LOUISE HORSLEY, IN VIOLATION OF THE DOCTRINE ESTABLISHED  IN BATSON V. KENTUCKY

Appellant directs this Honorable Court's attention to Reporter's Record Volume 43 page 19 at which the trial court conducted a 'Batson Hearing'. Appellant objected to the State's strike against Louise Horsley (RR: Vol. 53 p. 26) . The trial court denied Appellant's Batson Challenge.  (RR: Vol. 53 p.29)

The State did not challenge Ms. Horsely during the qualification voir dire. (RR: Vol. 33 p. 73) The State argued that the reason they struck Ms. Horsely was

56

because she circled a three on question number two on the juror questionnaire. (RR: Vol. 53 p. 29) During the qualification stage of voir dire the testimony of Ms. Horsely showed that she was a qualified juror who could assess the death penalty. When the State explained the process of putting a person to death, she stated (RR: Vol. 33 p. 28):

A. I could be a part of that decision and I did put some of the instances where I thought that the death penalty was justified. So it would have to based upon the facts and information that I heard as to whether or not I would decide for the death penalty or not.
Q. And I understand that.
A. But I could make that decision under the right circumstances and depending on the evidence. I could make that decision.

Ms. Horsely spent twenty years in the United States Air Force before retiring. She taught students in DISD the game of chess and some of her students won championships. (RR: Vol. 33 p. 48) Ms. Horsely agreed with the punishment range for the intentional murder of person during the course of committing or attempting to commit the offense of obstruction. (Questionnaire p. 4) All jurors accepted by the State also agreed with question number 12 of the questionnaire. Ms. Horsely thought that the death penalty had not been applied fairly and had been misused. (Questionnaire p. 5-6) Appellant submits that jurors Eric Hoy, Beth Cummings and William Dawson who were accepted by the State had similar answers to Ms. Horsely.

57

Appellant submits that Ms. Horsely was an intelligent, articulate woman who would have been able to assess the death penalty. Appellant argues that the record supports his claim that this juror was qualified as to imposition of the death penalty and had answers similar to other jurors who were qualified as jurors.

**APPELLANT'S ISSUE NO. 3**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR, FREDDIE WATSON, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 43 page 19 at which the trial court conducted a 'Batson Hearing'. Appellant specifically objected to the State's strike against Freddie Watson (RR: Vol. 53 p.26) . The trial court denied Appellant's Batson Challenge. (RR: Vol. 53 p. 31) The State stated that they struck Mr. Watson because he had heard about the case and wrote on his questionnaire that "life with parole would be better for me." (RR: Vol. 53 p. 29-30) The State also argued that Mr. Watson wanted people charged with crimes to go free while the case was ongoing. (RR: Vol. 53 p. 30)

Concerning the State's assertion that they struck Mr. Watson in part because he wrote on his questionnaire "life with parole would be better for me" after answering

58

the question on punishment range on killing a witness, Appellant submits the answers

given by Mr. Watson when asked about killing a witness as rising to the level of

capital murder, Mr. Watson stated (RR: Vol. 38 p. 21):

> Q. . . ..But if you're saying killing a witness, that doesn't rise to the level, to me, of what a capital murder is that has that punishment range of the death sentence. How do you feel about that?
> A. I think it does.
> Q. It does?
> A. I think it does. If you kill a witness or some potential witness testifying against somebody, and it's proven that they're responsible for it, yeah, I think that could be classified as a capital murder.
> Q. Classified as a capital murder that could have one of those two punishment ranges if everyone lines up where it's life without the possibility of parole or the death sentence if the facts fit that?
> A. Right.
> Q. Why do you think that?
> A. Well, because there's you know, just other avenues that a person can take. It would seem like to me that to get rid of somebody for the sole case of not being able to testify against you, like I say, to me it just rises to the standard of a capital murder.

When Mr. Watson asked the prosecutor about a person being locked up until

their trial, the State explained how a person could post bond and the reasoning for

requiring a bond. (RR: Vol. 38 p. 48-49) Mr. Watson repeatedly agreed the State,

replying "right" when it was explained to him.

Mr. Watson circled 2 on the second question concerning which statement

represents his feelings on the death penalty. The second statement is "I believe that

the death penalty is appropriate in some murder cases, and I could return a verdict in

59

a proper case which assessed the death penalty. (Questionnaire p. 1) All Twenty-two jurors accepted by the State also circled 2 on the second question of the questionnaire. When asked on the questionnaire if he had " any moral, religious or personal beliefs that would prevent you from sitting in judgement of another human being", Mr. Watson checked the answer "no." (Questionnaire p. 2) He also checked the answer "no" when asked in the following question "Do you have any moral, religious or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human being?"

Appellant submits that 21 of the jurors accepted by the State answered these two questions with the same answer. Ms. Karen Coyne, No. 141A, who was seated on the jury, answered Question No. 3 as "yes" and commented that it was a very serious position to be in and the evidence would need to be very compelling to convict any individual of murder. Appellant argues that this shows that Mr. Watson was a stronger supporter of the death penalty than Ms. Coyne, a white woman. Mr. Watson checked "yes" when asked if he was in favor of the death penalty and further stated "Some crimes are so bad that whoever committed it, man or woman, deserve to die." (Questionnaire p. 1) Appellant submits that Mr. Watson was a strong proponent for the death penalty. Mr. Watson had not heard about the case. (Questionnaire p. 4) Six of the jurors accepted by the State had heard about the case and one, Jose Vega,

60

wrote that he had heard about the case on television and had discussed it with friends. (Questionnaire p. 4) On question number 15, a scale from 1 to 10 with 1 being the least and 10 being most, Mr. Watson circled 8 as how strongly he believed in the death penalty. (Questionnaire p. 5) Nine jurors accepted by the State circled No. 8 and six jurors accepted by the State circled numbers lower than 8 as to how strongly they supported the death penalty.

In reviewing the qualification stage of voir dire, the record shows that the State did not challenge Mr. Watson for cause. (RR: Vol. 38 p. 92) Appellant argues that the record supports his claim that this juror was qualified as to imposition of the death penalty and had answers similar to other jurors who were qualified as jurors.

## ARGUMENT AS TO ALL IMPROPERLY STRUCK JURORS BY THE STATE

Appellant submits that three of the six "qualified" minority members were struck by the State. Defense counsel made the following argument (RR: Vol. 53 p. 26):

MR. PARKS: We object to the composition of the jury, Your Honor, for the following reasons. There were six potential African-American jurors within the strike range that we reached, Of those, the defense struck one, the very first juror, that being Johnson.

Two jurors, African-American jurors are actually seated. And the State struck three African-American jurors, 50 percent of the available panel. That would be Number 15, Syrene Mitchell, Number 27, Louise Horsely, and Number 34, Freddie Watson.

Fifty percent of the panel, we would suggest to the Court, shows a prima facie case of a Batson violation. And we would ask that these three jurors be seated.

Appellant submits that the record supports the claim that the State violated the equal protection clause of the United States Constitution when it used its peremptory strikes against potential jurors Syrene Mitchell, Louise Horsley and Freddie Watson in a racially discriminatory manner contrary to the holding of *Batson v. Kentucky*, 476 U. S. 79, 106 S. C. 1712, 90 L. Ed. 2d 69 (1988). The State's proffered reasons for being neutral were in fact a pretext. *See Lopez v. State*, 940 S. W. 2d 388 (Tex. App.-Austin, 1997); *Musick v. State*, 862 S.W. 2d 794 (Tex. App. – El Paso 1999); *Ramirez v. State*, 862 S. W. 2d 648 (Tex. App. – Dallas 1993); *Esteves v. State*, 859 S. W. 2d 613 (Tex. App. – Houston [1ˢᵗ Dist.] 1993, pet. ref'd) and *Everson v. State*, 851 S. W. 2d 269 (Tex. Crim. App. 1993)

The answers given by these three prospective jurors were similar to answers given by the non minority jurors as described in the three previous issues.

The Defendant has shown purposeful discrimination pursuant to *Miller-El v. Cockrell*, 537 U.S. 322 (2003) The exercise of even <u>one</u> peremptory challenge for racial reasons invalidates the entire jury selection and mandates a new trial. See. *Linscomb v. State*, 829 S. W. 2d 164, 166 (Tex. Crim. App. 1992); *Keeton v. State*, 724 S. W. 2d 58, 65 n. 5 (Tex. Crim. App. 1987) The aggrieved party need not show

multiple instances of racial prejudice in jury selection to prove a constitutional violation. *Linscomb* at 166. Either of the three strikes by the State, or all together, invalidate the jury selection process and mandate a new trial based on Appellant's 'Batson' objections.

Under *Batson*, one should be concerned with the question of whether the State was racially motivated in the exercise of its peremptory challenges against even one juror of discernable race. *Linscomb*, at 167. Each of the prosecutor's explanations should be examined to determine whether the evidence supports the so-called "neutral" reasons for the strike or whether they are merely a pretext for a racially motivated peremptory challenge. *Whitsey v. State*, 796 S. W. 2d 707, 713 (Tex. Crim. App. 1989)

## COMPARATIVE ANALYSIS—DISPARATE TREATMENT

The trial judge's decision on whether the Appellant proves a <u>Batson</u> claim turns, in part, on the trial court's observations during voir dire examination. As the voir dire supervisor, the trial judge can readily perceive discrepancies during jury selection process. These discrepancies may include:

(1) the prosecutor failing to question any of the minority jurors yet striking them anyway;
(2) the prosecutor striking minority jurors who gave answers similar to those of majority jurors whom the prosecutor did not strike; and

(3) the prosecutor striking minority jurors who had the same characteristics professionally, socially, religiously, etc. as majority jurors whom the prosecutor did not strike.

These factors may show disparate treatment of prospective jurors. These factors should enter into the trial judge's assessment of the prosecutor's credibility and eventually the trial judge's determination of the racial neutrality of the prosecutor's peremptory challenges. See *Young v. State*, 826 S. W. 2d 141, 145 (Tex. Crim. App. 1999).

In *Young v. State*, it was held that where the record shows there exists a disparate treatment in the use of a valid reason for the use of peremptory strikes, as in this case, then the trial court erred in its denial of the <u>Batson</u> challenge as the clearly erroneous standard is satisfied, as in this case where the only distinguishable factor, after a careful reading of the voir dire of all the jurors, between the jurors is race. The evidence in this case indicates that the trial judge erred in allowing the prosecution to strike three jurors on the basis of race, despite the rationale offered by the State to cover its true motivation. See *Ramirez v. State*, 862 S. W. 2d 648 (Tex. App. – Dallas 1993). The State used 3 of its 12 peremptory strikes to eliminate 50% of the African-Americans on the qualified prospective jury panel. (RR: Vol. 43 p. 19)

The Court in *Greer v. State,* No. 05-08-00146 (Tex. App.-Dallas June 9, 2009) found it significant that the State in that case struck 100% of the African-American

jurors. That Court referenced *Miller-El* in stating, "This remarkable disproportionate use of peremptory strikes weighs heavily in our analysis." The Supreme Court in *Miller-El* stated that striking 10 of 11 available African-Americans were "remarkable" and not likely caused by "[h]appenstance." The fact that the State's reasons for striking these minority veniremembers were, in large part, applied to other panel members who were not struck is evidence of pretext. *See Miller-El, supra* and *Snyder v. Louisiana*, 128 S.Ct. 1203 (2008). The disparate-treatment evidence in this case is strongly reinforced by the State's disproportionate use of peremptory strikes against African- Americans, just as it was in *Greer*.

In this case the trial court unreasonably failed to apply clearly established law to the facts by failing to examine not just the validity of the reason but the credibility of the prosecutor. See *Hayes v. Thaler*, 361, Fed App. 563 (C.A.5 (Tex.)) 2010 WL 183395 citing *Miller-El v. Drekte*, 545 U.S. 231 (2005) and *Reed v. Quaterman*, 555 F3d 304 (45th Cir.2009) .

In *Reed v.Quarterman,* ibid, there is relevant discussion concerning the third step in evaluating a 'Batson Claim' for purposeful discrimination. The Fifth Circuit Court of Appeals stated that:

"implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination" citing *Purkett v. Elem,* 514 U.S. 765 (1995).

65

For these reasons Appellant submits reversible error is present based on a constitutional violation that requires reversal.

## PRETRIAL ISSUES

## APPELLANT'S ISSUE NO. 4

## THE TRIAL COURT ERRED IN DISMISSING JUROR NUMBER 4, JOHN BIGLEY, FROM THE JURY PANEL

Appellant directs this Honorable Court's attention to RR: Vol. 56 page 5 at which hearing was held to determine under article 36.29(b) C.C.P. whether juror No. 4, John Bigley, had become disabled. The Court stated that the juror was adamant that because of his work situation he simply did not feel like he would be able to be fair and impartial to both sides and to carefully weigh the evidence because his mind would be elsewhere.

The juror was examined by State's counsel and defense counsel. (RR: Vol. 56 p.12)

The Texas Constitution requires a jury in a felony criminal trial to be composed of twelve members.  TEX. CONST. Art. V, sec. 13.  The Texas Constitution further provides, however, that "when, pending the trial of any case, one or more jurors not exceeding three, may die or be disabled from sitting, the remainder of the jury shall have the power to render the verdict; provided, that the Legislature

66

may change or modify the rule authorizing less than the whole number of the jury to render a verdict." Id. Article 36.29 of the Texas Code of Criminal Procedure tracks the language of the Constitution and provides that " not less than twelve jurors can render and return a verdict in a felony case." Tex. Code Crim. Proc. Ann. Art. 36.29(a) (Vernon Supp. 1999) However, the legislature has limited the number of jurors who can be excused due to death or disability during the pendency of a trial in a felony case to one. *Id.*

A juror is disabled only when the juror is <u>physically</u>, <u>emotionally</u> or <u>mentally</u> <u>impaired</u> in some way which hinders his ability to perform his duty as a juror. See *Brooks v. State*, 990 S.W.2d 278, 286 (Tex. Crim. App. 1999), cert. denied, 528 U.S. 956, 120 S.Ct. 384, 145 L.Ed.2d 300 (1999). The determination as to whether a juror is disabled is within the discretion of the trial court. See id. whether a juror is disabled is within the discretion of the trial court. See id. Absent an abuse of that discretion, no reversible error will be found. See id.

The time-line of when this inquiry as to the juror's status took place is relevant. The jury apparently when he filled out his questionnaire was unemployed. He became employed and apparently knew of the pending trial date. He was unconcerned about attending some seminars or workshops at Microsoft in September.

There was a pending motion for continuance by the defense at the time of the hearing. The continuance was granted and trial was held on November 11, 2013.

The decision to discharge a juror under article 36.29(a) lies within the trial court's discretion. However, the trial court's power to discharge a juror for a disability is limited to those instances where there exists some physical illness, mental condition, or emotional state which hinders the juror's ability to perform his duties. *Landrum v. State*, 788 S.W.2d 577, 579 (Tex. Crim. App. 1990); *Hughes v. State*, 787 S.W.2d 193, 195 (Tex. App.-Corpus Christi 190, pet. ref'd). A juror may not be discharged because of bias or prejudice against the defendant or against the law applicable to the case. *Landrum,*, 788 S.W.2d 579.

The trial court in the case at bar found that the juror was disabled due to an emotional problem involving employment. That conclusion is not supported by the statement of facts. The record contains no evidence that Juror Bigley was so emotionally distraught about being able to serve as a juror that his concern amounted to an emotion problem as in the case of *Freeman v. State*, 838 S.W. 2d 772 (Tex. App. Corpus Christi 1992).

A review of the testimony shows that defense counsel summarized his objection to the proposed dismissal of juror, Bigley as (RR: Vol. 56 p. 78-79):

68

. . .

MR. JOHNSON: I want to take a moment to address our Juror Number 6, Mr. Bigley, and some of his testimony that he gave to the Court yesterday.

The Court was kind enough to give us a transcript of his voir dire testimony. And on page 12 of that, that is where the issue of his schedule is addressed. And he tells us that he has a new job and that he is the channel manager for Microsoft. He's working for a new company.

And his big concern at that time, what he told us, was that he needed to be finished with our trial in time to take some seminars in early September with Microsoft.

He never said - - he basically told us yesterday that he told us all of these things about how, well - - that he was going to have all of this stuff afterwards and he was going to be concerned about.

All he said - - told us was that he was concerned about seminars with Microsoft in September. He's going to be able to do that.

And I will also point out to the Court, number one, based on his testimony and his cross-examination, or whatever you want to call it with Mr. – with Phillip Hayes yesterday, he indicated to the Court that, yes, he could still do this and that he could give his attention to this trial.

That he would have to work around it. And we think he is still capable of being a juror on this. I don't think that he got to the point where he would be excused.

And another big concern would be that, you know, it is going to leave us with just one alternate I we let him go.

And if we start having other jurors coming down here and start telling us, I'm just worried about the precedent this would set if we start letting these people off just because they say that they've got some issues with work, which are not legal issues to be excused from the jury at this point.

He is now a juror. He is not a prospective juror. He is a juror now, and I think the rules are a little different for him. And I just want to point out to the Court that what he told us yesterday is not consistent with what he said he told us at his interview.

Appellant submits that the trial court's inquiry into the emotional state of the juror in question did not go far enough to establish the fact that the juror was so emotionally unfit that it impaired his ability to continue. It is obvious from the initial inquiry that the juror was aware of the trial date when he became employed.

Appellant submits that there was no inquiry as to postponement of the proceeding if the continuance was granted; which would allow the juror to address his concerns. The issue is of constitutional dimension as to the right of the accused to have his case determined by the twelve people selected and to not have its jury selection strategy destroyed by a subsequent employment issue that was actually resolved with the granting of defendant's continuance. Therefore, the court abused its discretion in dismissing this juror without full development of the issue; an action which violated Appellant's constitutional right and was harmful to his right to a fair trial.

## APPELLANT'S ISSUE NO. 5

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO QUASH THE INDICTMENT

Appellant directs this Honorable court's attention to Reporter's Record Volume 58 at which a hearing was heard on Defendant's Motion to Quash the Indictment. See also Clerk's Record Volume 3 pp. 127-128. The trial court characterized the challenge to the indictment was that "the term "obstruction" in the indictment in and of itself is not sufficient to give you the required due process notice so that you can prepare an adequate defense." The motion was denied. (RR: Vol. 58 p. 6)

The indictment in this case states in relevant part as follows:

On or about the 6th day of September A.D. 2012 in the County of Dallas and said State, did unlawfully then and there intentionally cause the death of SHANIA GRAY, an individual, hereinafter called deceased by SHOOTING THE DECEASED WITH A FIREARM, A DEADLY with a FIREARM, a DEADLY WEAPON, AND BY ASPHYXIATING THE DECEASED, and the defendant was then and there in the course of committing and attempting to commit the offense of OBSTRUCTION.

V.T.P.C. Penal Code § 36.06 defines the offense of Obstruction or Retaliation

(a)   A person commits an offense if he intentionally or knowingly harms or threatens to harm another by an unlawful act:
 (1) in retaliation for or on account of the service or status of another as:
     (A) public servant, witness, prospective witness, or informant; or
     (B) person who has reported or who the actor knows intends to report the occurrence of a crime;
     or
 (2) to prevent or delay the service of another as a :
     (A) public servant, witness, prospective witness, or informant; or
     (B) person who has reported or who the actor know intends to report the occurrence of a crime.
     . . .

The Court of Criminal Appeals has pointed out that section 36.06(a)(1)(A) has

eight different elements, several of which have distinct alternatives that may or may

not be included in an indictment. *Cada v. State*, 334 S.W.3d 766, 770 (Tex. Crim.

App. 2011); *See also* TEX. Penal Code § 36.06(a)(1)(A).

Appellant argues that the indictment fails to allege an offense against Mr.

Davis with that degree of certainty that will give him notice of the particular offense

with which he is charged in violation of Art. 21.11 C.C.P.  and fails to inform

71

Defendant of the nature and cause of the accusation against him in violation of Art. 1, Sec. 10 of the Constitution of the State of Texas, and the Sixth Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution of the United States in that said indictment fails to specify the manner and means by which he allegedly committed the offense of obstruction with sufficient specificity to allow Defendant to defend himself.

The phrase "in the course of committing and attempting to commit the offense of OBSTRUCTION does not place this Defendant on notice of what part of Art. 36.06, TEX PENAL CODE he is supposed to have violated, who was obstructed, and why. Consequently, the indictment does not set forth in plain and intelligible language sufficient information to enable the accused to prepare his defense. A motion to quash should be granted where the language in the charging instrument concerning the defendant's conduct is so vague or indefinite as to deny him effective notice of the acts allegedly committed. *Haecker v. State,* 571 S.W.2d 920 (Tex. Crim.App 1978); *Adams v. State*, 707 S.W.2d 900 (Tex. Crim. App. 1986)

Therefore, Appellant was denied due process of law pursuant to the 14th Amendment of the United States Constitution because he was denied the proper notice of allegations to which he would be required to defend against. This denied him a fair trial. The only proper remedy is to grant him a new trial.

72

## APPELLANT'S ISSUE NO. 6

## THE TRIAL COURT ERRED AND ABUSED IT'S DISCRETION IN DENYING APPELLANT'S MOTION FOR CONTINUANCE FILED ON NOVEMBER 1, 2013

Appellant directs this Honorable Court's attention to Clerk's Record pp. 137-140 and Reporter's Record Volume 60 pp. at which Defense Counsel presented a motion for continuance to develop information that he had received in the afternoon of October 31, 2013 about an extensive history of sexual abuse perpetrated on the Defendant. Counsel argued that this category of information was very relevant and must be investigated for both the guilt/innocence and punishment stage of the trial.

The United States Supreme Court has repeatedly stated that any death penalty proceeding must fully consider the defendant's mental capacity, whether for the purpose of determining whether the defendant has adequate mental capacity to be tried, *e.g. Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996), or for full consideration by jurors as a mitigating factor, *e.g. Penry v. Johnson*, 532 U.S. 782, 796-797 (2001). The trial court denied the Defendant a fair and non prejudicial procedural process in order to show mitigating evidence of the defendant's extensive history of sexual abuse. The trial court erred and abused its discretion in overruling defendant's written sworn motion for continuance that informed the Court that the Defendant recently advised defense counsel of his extensive history of being sexually abused.

73

The Defense filed a sworn written Motion for Continuance on November 1, 2013. The trial court erred in denying the Defense the requested time for continuance. This error denied the Defendant fundamental due process of law and rendered the assistance of counsel on the issue of mitigation ineffective in violation of the 14th and 6th Amendment to the United States Constitution, which effectively denied Appellant a air punishment hearing on the issue of life in prison without parole or death as a punishment.

## APPELLANT'S ISSUE NO. 7

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF A SEARCH WARRANT SEEKING BUCCAL SWAB CONSTITUTING DNA EVIDENCE AND PHOTOGRAPHS**

## APPELLANT'S ISSUE NO. 8

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF A SEARCH WARRANT SEEKING ITEMS FROM A 2005 DODGE STRATUS BELONGING TO THE COMPLAINANT AND OR DEFENDANT**

## APPELLANT'S ISSUE NO. 9

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED ASA RESULT OF A SEARCH WARRANT SEEKING ITEMS FROM THE PREMISES LOCATED AT 10223 NORTH MACARTHUR BLVD. #254 CITY OF IRVING, TEXAS**

74

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF A SEARCH WARRANT SEEKING DIGITAL INFORMATION FROM A BLACK T-MOBILE MY TOUCH LG-E739 PHONE**

**(These items are grouped together for presentation as each involves the same or similar facts and law.)**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 57 pgs. 60-69 at which a pretrial hearing was conducted to hear the defendant's Motion to Suppress Evidence obtained from Clerk's Record Vol. 2 p. 164. The trial court issued an order denying the motion. Clerk's Record Vol. 3 p. 71, 82 and 97. During the guilt/innocence stage of trial defense counsel reurged this motion (RR: Vol. 60 p. 239-241)

Trial Counsel made the following argument:

MR. JOHNSON: Now, the affidavits in each those three search warrants are identical except for a little additional language in the affidavit for the search of the car.

Basically, let's start with the search warrant for the DNA, the buccal swab. The first problem that the State has with that search warrant is that it alleges no crime. It doesn't set out that the crime has been committed. There's some language that says that there's a missing person, but that is the extent of it. No crime - - no crime is alleged.

Then you go into the probable cause part of the search warrant, and the search warrant is based on the fact that they got exigent access to some phone records for Shania Gray. And when they got those, they saw that there was another phone number on there that has a 903 area code.

75

They saw that that 903 - - then they got exigent circumstances request for information on the 903 phone number, and saw that another person had been called from that phone.

And so they called that other phone number and spoke to a person that identified himself as Shamica Mosley. Now, obviously, this is just a phone call to somebody that answered th phone. They have no prior knowledge of this person.

This person said that they're - - who they are, and then they say that, yes. They got a phone call, and that they believe that that person could have been Frank Davis. And they base that on the fact that they have a - - this Shamica, this person they're talking to, has a girlfriend that is in a dating relationship with a person named Frank Davis.

And she claims that this person who talked to her said something that led her to believe that it was Frank Davis, but it doesn't allege what it was that they said. There's nothing about this person that would suggest that there's any reason to believe that this individual, Shamica Mosley, is credible or that what they tell them actually helps them in any way.

And then it goes on to say that the two phone numbers, the ones for Shania, and the one - - the 903 number that they now believe, based on Shamica Mosley saying it could have been Frank Davis, they find that those two phone numbers were in the same proximity. But we - - that is the only - -the word they used was proximity. Quite frankly, I'm not sure that that actually connects the in any way at all. All phones are in the same proximity, I guess, if they talk to each other.

The only other thing that they have in there is that they say they have become aware that the defendant, Franklin Davis, is - - is somebody that is accused of a sexual offense - - sexual assault offense of this- - this girl that is now a missing person.

The last problem that they have - - and I tell the Court - - I say the Court - - I submit to the Court that none of that reaches to the level of probable cause to begin with to be able to get a search warrant for the buccal swab to get the DNA evidence.

And the last problem is, is that they don't have anything to even compare the DNA evidence to. So it doesn't even say that there's any real basis for getting that evidence.

So - - in the totality of the four corners of that affidavit, it fails to reach the level of - - of a valid search warrant.

Now, we will move on to the next search warrant, which is going to the premises. And it is based on this same - - it is based on the same affidavit. Now, one difference in that search warrant is, is that at the beginning of that search warrant, they actually allege that they're investigating the offense of kidnapping,. But, again, there's

nothing in any of the documents to suggest that there was a kidnapping,

There's nothing other than the fact that the mother says that she went to pick up her daughter at the school and she wasn't there.

And there's no evidence to suggest that Shania was taken against her will, so there's no - - there's absolutely nothing in any of these search warrants that say otherwise to suggest that there was a kidnapping.

Then we go to the one for the car. It also alleges the kidnapping. And the only difference in it is, is that in that affidavit, they do put - -

THE COURT: Can I ask you a question, Mr. Johnson?

MR. JOHNSON: Yes, sir.

THE COURT: Did you say in the buccal swab search warrant that there was no crime alleged?

MR. JOHNSON: That is correct.

THE COURT: What about paragraph three of the affidavit.

MR. JOHNSON: Okay. They do actually allege kidnapping. But again, there's no - - I apologize to the Court.

That is in a different part of the search warrant where I saw the kidnapping in the other one. It is actually alleged earlier in the other one.

THE COURT: I'm not criticizing you.

MR. JOHNSON: Okay. Okay.

Anyway the problem is, is that there's no evidence that there was a kidnapping. There's nothing in any of these things that actually say that there was a kidnapping. And it certainly doesn't say that there's anything to compare the DNA to, which is essential for a search warrant for DNA.

Now, when we get on - - we'll continue on to the last search warrant, the third search warrant. And that is the one for the car. They do add an additional paragraph in the affidavit that says that - - that they did see Mr. Davis driving that vehicle, and that is the only thing that's different in the search warrant of those three search warrants.

Now, and that is our argument on all of those search warrants, Judge.

THE COURT: Okay.

MR. JOHNSON: Now, as to the fourth search warrant, that one was actually obtained at a later date.

. . .

There are four motions to suppress evidence found pursuant to search warrants.

The fourth is dated September 12, 2012. It is based on information obtained through

77

the searches conducted pursuant to the other three search warrants as well as conversations with the defendant after the other three search warrants were executed and those conversations pertained directly to some of the evidence obtained through the other three searches. The three initial search warrants are dated September 8, 2012 and have almost identical affidavits attached to them and will be addressed as one .

The search warrants at issue lay out a factual history about Shania Gray's disappearance and of the ongoing criminal case pending between Ms. Gray and Mr. Davis, but nothing to indicate that Mr. Davis is remotely related to Ms. Gray being missing. The only connection comes from an individual unknown to law enforcement that identified herself as Shakeema Morsley over the phone in a brief conversation with detectives.

Officers get phone records on a number with a 903 area code that appears on Ms. Grays phone records as someone she has communicated with. They randomly call numbers that are associated with that phone and a stranger answers one of those phone calls. She identifies herself as Shakeema Morsley and as a friend of Franklin Davis' girlfriend (Ms. Arrington). She goes on to say that she received a call from the 903 number and believes it was Franklin Davis based on "communications". It is interesting to note that she does not say the individual identified himself as Franklin

78

Davis but rather deduced it from "communications". It is also interesting that she claims to have a close relationship with Ms. Arrington but describes the relationship with Mr. Davis as a "dating relationship" in the search warrant, when according to Ms Arrington's own testimony she had been married to Franklin Davis since June 2011 (RR: Vol 65 p. 349) over a year before the search warrant was issued.

The information in the affidavit attributed to coming from Shakeema Morsley is the only nexus between Ms. Gray and Mr. Davis aside from the ongoing criminal case. Without that information probable cause can not be found to exist in the underlying affidavit for these search warrants. In order for probable cause to be predicated on this uncorroborated statement the must be some reason to believe the information is truthful or reliable, neither of which is possible in this case.

When probable cause is based upon information from an informant, "the veracity, reliability, and basis of knowledge are still relevant considerations in the totality of the circumstances analysis" *Carroll v. State* 911 SW.2d 210, 216. The situation before the court in this case involves someone with even more tenuous ties to law enforcement than an informant. The affiant of these three search warrants relied on the words of an individual that he met for the first time over the phone in the very phone call, the subject of which is the information in the search warrant.

When an anonymous tip is relied upon to furnish probable cause, the informer must assert personal knowledge or there must be additional facts showing reason to believe that the contraband sought will probably be where the information indicates it will be." *Rojas v. State*, 797 S.W.2d 41, 44 (Tex.Crim.App.1990) (citing *Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527; *Angulo v. State*, 727 S.W.2d 276 (Tex.Crim.App.1987)). The instant case is similar to an anonymous informant due to the fact that no one has any knowledge of who the person is that identifies themselves as Ms. Morsley. In addition, the proponent has also shown <u>not</u> to have reliable information in regard to Mr. Davis since she did not even know he had married her "coworker" over a year before this. Not only is there no indicia that the proponent of the information is truthful, accurate, or reliable, to the contrary the uncorroborated individual has shown to have false information.

For these reasons all three motions to suppress evidence from the search warrants should have been granted and all evidence suppressed. When these three are suppressed it leaves no legally obtained information to base the fourth search warrant on since most of the information found in the search warrant affidavit was based on the three searched done with invalid search warrants.

# TRIAL ISSUES IN GUILT/INNOCENCE

## APPELLANT'S ISSUE NO. 11

### THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S VERDICT THAT APPELLANT WAS GUILTY OF THE OFFENSE OF CAPITAL MURDER

### STATEMENT OF FACTS

The State attempted to present evidence in this case to show a murder was committed after an alleged abduction in order to prevent the victim from testifying against Defendant in an aggravated sexual assault case. The indictment states:

Franklin B. Davis on or about the 65th day of September, A.D., 2013 in the County of Dallas and said State, did unlawfully then and there intentionally cause the death of SHANIA GRAY, an individual, hereinafter called deceased, by SHOOTING THE DECEASED WITH A FIREARM, A DEADLY WEAPON, AND BY ASPHYXIATING THE DECEASED, and the defendant was then and there in the course of committing and attempting to commit the offense of OBSTRUCTION.

Appellant submits that the State failed to present evidence that he was in the "course of committing and attempting to commit the offense of obstruction." The State failed to prove beyond a reasonable doubt that Appellant's motive in murdering Shania Gray was to prevent her future testimony against him in his trial on the offenses of sexual assault. Appellant argues that he murdered Shania Gray because, as he had testified, she had ruined his life by lying about him. (RR: Vol. 65 p. 102)

The deceased had accused Appellant of four instances of sexual assault. Appellant vehemently denied these allegations and was prepared to take the case to trial. For over a year, Appellant implored the police and his legal counsel to investigate the case. Detective Brandon Snyder of the Mesquite Police Department, the detective that investigated the sexual allegation regarding Franklin Davis, did not investigate the case. The Detective did not investigate why, on the night before the outcry, Ms. Grey went to stay with her grandmother or what had occurred with her mother that preceded the outcry. (RR: Vol. 64 p. 40-41) He did not investigate the fact that one of the outcry witnesses wrote in their statement that Ms. Grey had changed her story. (RR: Vol. 64 p. 40) The detective testified that he became aware that there were other people present when the supposed sexual assaults occurred but he did not interview these people. (RR: Vol. 64 p. 43) He said Mr. Davis adamantly denied the allegations. (RR: Vol. 64 p. 44) He stated that he did not look at any other boys or men in connection with this case. (RR: Vol. 64 p. 52) The Detective said that after speaking to the outcry witnesses who told him that Shania had been kicked out of the house and had switched her story, he did not do any further investigation. (RR: Vol. 64 p. 53) He never spoke with the children she was babysitting when the alleged assaults occurred. (RR: Vol. 64 p. 55) He did not talk to the children's mother, Jennifer. (RR: Vol. 64 p. 55) He never went to the home or apartment where the

82

alleged assaults occurred. (RR: Vol. 64 p. 57) He did not consider asking Mr. Davis to take a polygraph examination. (RR:Vol. 64 p. 62) The witness testified that there were no witnesses to the alleged sexual assaults. (RR: Vol. 64 p. 64)

The Detective testified that he never spoke to Dezire, the daughter of the Defendant and the child that Shania was babysitting, to ask if she ever saw anything unusual between her father and Shania. (RR: Vol. 64 p. 103) Furthermore, the Detective stated that it was possible that Shania had a crush on Franklin Davis. (RR: Vol. 64 p. 114)

Appellant also had difficulty getting his counsel to investigate his case or to prepare for a trial. He testified that his first attorney was only interested in making a plea deal. (RR: Vol. 64 p. 154) He stated that he was innocent and did not want to take any deal. (RR: Vol. 64 p. 154) He paid a second attorney over $10,000 which included the title to his car, but when his unemployment ran out and he could no longer pay him, the attorney went before a judge and was dismissed from the case. (RR: Vol. 64 p. 169) He said Mr. Cox never filed any motions, never had him meet with an investigator or talk to him about the State's file. (RR: Vol. 64 p. 169) He told him that he wanted to take a polygraph test but was told that he would have to pay $800 or $900 to take it. (RR: Vol. 64 p. 169) Mr. Hugo Aguilar was then appointed

83

to take his case but he never saw him at his office and his calls were never returned. (RR: Vol. 64 p. 172)

At this point, Appellant began his own investigation by looking online about Shania's reputation. (RR: Vol. 65 p. 21-22) He bought a throw away phone for his investigation and sent a text to Shania, telling her he was someone else and that he wanted to get to know her. (RR: Vol. 65 p. 27) He made seven recordings of their conversations. (RR: Vol. 65 p. 30) He said that she spoke of the sexual assaults but her stories conflicted with the account she gave to CPS and the police. (RR: Vol. 65 p. 32) He said that these proved she kept changing her story. (RR: Vol. 65 p. 32) He played the recordings to his family to prove his innocence to them. (RR: Vol. 65 p. 33) Appellant was certain that if he went to trial, he would be found innocent and to this end he began his own preparation for trial. In addition to the recordings he made, he also sent Ms. Grey fake text messages, hoping this would help clear him of the charges. (RR: Vol. 65 p. 39)

Appellant argues that after the false allegations were made by Shania Grey, his settled, happy life fell apart. He wanted to go to trial, to prove his innocence and to have his life restored, but his trial was repeatedly postponed. He said his life was very happy until the allegations were made. (RR: Vol. 64 p. 144-145) Mr. Davis testified that Shania's lies changed his life and he lost his job when he was arrested.

84

(RR: Vol. 64 p. 145) He said he was in jail for 30 days after which he could not pass the background check at Dr. Pepper to be rehired because of the four sexual assault charges pending against him. (RR: Vol. 64 p. 146) His relationship with Jawanna, his wife, went downhill because of the allegations and the loss of his job. (RR: Vol. 64 p. 148) He stated that he could not find another job because of the background checks. (RR: Vol. 64 p. 14) He filed for unemployment. (RR: Vol. 64 p. 149) He said Jawanna started looking at him like he was less than a man. (RR: Vol. 64 p. 151) He said when they argued, she would throw it in his face that he wasn't working and not contributing. (RR: Vol. 64 p. 152) He couldn't provide for his family anymore. He had lost everything. The trauma of all he had been through and his frustration with the legal system led him to purchasing a gun in order to kill himself. (RR: Vol. 65 p. 41)

He said he began thinking about hurting Shania because she had ruined his life with her lies. (RR: Vol. 65 p. 47) Appellant's downward spiral ended with the murder of Shania Grey, not because she was going to testify against him, but because of the hatred he felt for her because she had ruined the life he had struggled so hard to make for himself. Appellant had been accused of sexual assault, a crime which to him was abhorrent because he and his mother had been victims of sexual abuse. His mother had been sexually assaulted before she was murdered.

85

Appellant submits that the State failed to prove beyond a reasonable doubt that he murdered Shania Grey to keep her from testifying against him. He never stated that was the reason he murdered her, even though all the detectives tried to get him to admit this. Appellant repeatedly told detectives that the reason he murdered Shania Grey was because "Fucked up everything. I couldn't take care of my kids, my household. Had to get rid of my car. I went from having diamond earrings and a nice job to being wiped out completely." Appellant murdered her out of revenge and anger, which is first degree murder, not capital murder.

Standard of Review

Capital Murder in relevant part is defined in §19.03 of the Texas Penal Code as:

. . . . .

(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat under Section 22.07 (a)(1), (3), (4), (5), or (6);

When an appellant questions the sufficiency of evidence, the Appellate Court reviews the evidence in the light most favorable to the verdict. The Court must determine whether any rational trier of fact could have found each element of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Butler v. State*, 769 S.W.2d 234, 239 (Tex.

86

Crim.App. 1989). This standard of review applies to circumstantial evidence cases as well as to direct evidence cases. *Houston v. State*, 663 S.W.2d 455, 456 (Tex. Crim. App.1984).

Texas law requires that the State establish:(1) the offense was actually committed; and (2) the accused was the person who either committed or participated in the crime. See *Johnson v. State*, 673 S.W.2d 190, 197 (Tex. Crim. App.1984). The State must prove more than just a plausible explanation of the crime. *Reeves v. State*, 806 S.W.2d 540, 543 (Tex. Crim. App.1990), cert. denied, 499 U.S. 984, 111 S.Ct. 641, 113 L.Ed.2d 736 (1991). While the trier of fact is the sole judge of the weight and credibility of the witnesses, *Coe v. State*, 683 S.W.2d 431, 438 (Tex.Crim.App.1984); *Williams v. State*, 692 S.W.2d 671, 676 (Tex.Crim.App.1984).

A review of the testimony shows that the record is insufficient to show Appellant committed the aggravating offense of obstruction to the primary offense of murder to make this case a capital murder rather than murder.

The state has failed to prove a necessary element in order to sustain a conviction for capital murder. The state has alleged that the underlying murder in the instant capital murder allegation was committed in order to further the offense of Obstruction (Tex. Penal Code 36.06 (2)). In a typical prosecution for murder the

prosecution is quick to point out that it is not necessary to prove a motive. This is not the case in this specific prosecution, the element that raises the instant murder case to a capital murder is the assertion that the motive is not only provable but to the extent that any other motive can be ruled out. Specifically, it must be proved that the motive for the murder was Obstruction and if any other motive is responsible then the case before us is not a capital murder but simply murder.

There are a number of underlying offenses that can raise a murder charge to a capital murder as long as the specific intent exists, however those underlying offenses are not interchangeable. The state can not allege a capital murder based on obstruction and prove it by putting forth evidence of retaliation any more than they could prove it by putting forth evidence of robbery. When obstruction is alleged it becomes incumbent on the state to prove obstruction, if the state can not or does not then a conviction for capital murder can not stand.

Obstruction and Retaliation are both enumerated offenses that can raise a murder to capital murder if properly alleged, indicted, and proven. They are also found in the same section of the penal code. They initially seem like similar offense but upon further reflection they are exact opposites. They are opposing sides of the same coin. Obstruction is triggered when the harm done is intended to prevent **future** behavior and that intention is proved beyond a reasonable doubt. Retaliation

88

on the other hand is triggered when the harm done is intended as revenge for **past** behavior and that intention is proved beyond a reasonable doubt

Obstruction requires in part that an actor "…*harms or threatens another by an unlawful act to prevent or delay the service of another as a…witness or prospective witness…or person who has reported or who the actor knows intends to report the occurrence of a crime."* (Texas Penal Code 36.06 (2)) There was no evidence presented at trial to support a theory of conviction under that section of the penal code. To the contrary all evidence as to motive followed along that that would be necessary to support the allegation of retaliation.

Mr. Davis not only testified at his trial, but he also gave multiple statements to law enforcement and gave four interviews to television media outlets. Mr. Davis initially denied involvement in the incident but when he gave a recorded confession about the murder to Detective Chevellier, he explained it was because the complainant has ruined his life with the allegation (See States Exhibit 57 and 57B). When he spoke with Detective Williams in a fourth interview, he went as far to say he had been trying to get it to court the whole time so he could get his life back (RR: Vol. 63 p. 60). He also explained that he thought the recordings he had surreptitiously made would help clear his name and was anxious to play them for a

jury (RR: Vol 65 pps. 104-105) and that his attorney felt that these recordings would be helpful at trial (RR: Vol. 63 p. 61).

Every interview he gave to the media (Defendant's Exhibits 4 and 5) he gave the same explanation for the murder, that she had ruined his life with the allegations. It was not until he saw his daughter with holes in her shoes that the full gravity of what the complainant had done to his life with her accusations and he started crying (RR: Vol. 65 p. 72). At that point he retaliated against her and committed this brutal murder.

The effort and optimism that Mr. Davis demonstrated are inconsistent with someone who did not want the complainant to testify—he was preparing for trial and was feeling good about his chances of acquittal. There is an abundance of evidence that Mr. Davis acted against Ms. Gray for the perceived wrong that she had caused him. His motive for the killing never waivered and is summed up best in his own testimony:

Q: Why did you hate her [the complainant] so much?
A: Because she lied. She ruined my life. She took everything from me. Everything that I worked so hard to get, she took it. (RR: Vol. 65 p. 102).

The state chose to indict this case as capital murder based on the extra element of Obstruction and presented no evidence to the jury as to that element. There is not a scintilla of evidence that indicates that Mr. Davis's actions had anything to do with

90

curbing future action by Ms. Gray and everything points that it was revenge for past actions attributed to her by Mr. Davis.

The jury was presented a clear motive by the defendant for his actions, in order to convict him the jury would have had to ignored all evidence of that motive and instead engage in utter guess work to come up with another one. When a motive is required to be proved as in this case that must be done with evidence and not mere conjecture.

## APPELLANT'S ISSUE NO. 12

## THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO STATE'S EXHIBIT NUMBERS 40 AN 41, PHOTOGRAPHS

Appellant directs this Honorable Court's attention to Reporter's Record Volume 61 p. 116 at which defense counsel objected to the prejudicial value outweighed any probative value of the photograph depicting. The court overruled the objection.

> We're going to offer 38-41
> (State's Exhibits 38 through 41 were offered.)
> THE COURT: Will there be objection?
> MR. HAYES: Your Honor, we have no objection to State's Exhibits 38 and 39. I believe that they do show the terrain which the State is attempting to get at.
> 40 and 41, we do object to. I don't - - they're pictures of the body floating in the river. I don't believe that there's a probative value added to the testimony at this time. I simply believe it's a prejudicial photograph and it doesn't really seem to add anything to the testimony, the terrain or the environment.

91

I'd ask the Court to take a look at them and do a 403 balancing test on 40 and 41, Your Honor.

MR. BIRMINGHAM: Response. Judge, this is the first offer that secured - -

THE COURT: Just let me see them.

MR. BIRMINGHAM: Yes, sir.

THE COURT: The Court concludes that the probative value of State's Exhibits 40 and 41 substantially outweighs the prejudicial affect. Objection is overruled.

Prior to the admission of the complained of photographs the Court must determine whether the photograph is relevant to any fact that the prosecution must prove. The Court must then determine whether any probative value that the picture may have is substantially outweighed by the danger of unfair prejudice under Tex. R. Evid. 403. *Reese v. State*, 33 S.W.3d. 238 (Tex. Crim. App. 2000). Prior to ruling on the admissibility of photographs, the court must determine, reasonably (1) how probative is the evidence, (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponents' need for the evidence. *Montgomery v. State*, 810 S.W.2d 372, 389-390 (Tex. Crim. App. 1990, op. on reh'g).

## ARGUMENT AND AUTHORITIES

Rule 403 of the Texas Rules of Evidence states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

92

misleading the jury or by consideration of undue delay, or needless presentation of cumulative evidence.

Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Montgomery v. State,* 810 S.W.2d 372, 376 (Tex. Crim. App.1990) (op. on original submission). A trial court's decision will not be disturbed on appeal unless it falls outside the zone of reasonable disagreement. *Jones v. State,* 944 S.W.2d 644, 651 (Tex. Crim. App.1996).

Many factors should be used in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include:

- the number of exhibits offered,
- the gruesomeness of the exhibits,
- the detail in the exhibits,
- size of the photographs,
- whether the photographs are in color or black and white,
- whether the photos are close-up, and
- whether the body depicted is clothed or naked.

The photographs of the victim floating in the water were extremely gruesome.

See *Wyatt v. State,* 23 S.W.3d 18, 29 (Tex. Crim. App.2000). The availability of other means of proof and the circumstances unique to each individual case should also be noted. *Id.*

Appellant asserts that the trial court erred in allowing the State to introduce the photographs in what appears to be an attempt by the prosecution to introduce

evidence meant to appeal to emotion rather than the fact finding process. Taken together, the prejudicial effect of the State's photographs far outweighed any possible probative value. *Wyatt v. State*, 23 S.W.3d at 29.

Appellant asks this Honorable Court to:

1. Review the photographs identified as objectionable by the Appellant;

2. determine if the content/subject matter of each of the photographs is relevant to a disputed issue that must be established by the State;

3. determine if the photograph possesses any probative value;

4. determine if any probative value is substantially outweighed by the prejudicial effect of the subject matter of the photograph;

5. consider the number, color, and prejudicial effect of the photograph(s) itself separate and apart from the prejudicial effect of the subject matter;

6. Find that the photographs identified by the Defendant were not admissible upon the trial of this case.

The unfairly prejudicial effect of the above listed photographs influenced the jury in a prejudicial manner and denied Appellant a fair trial especially in light of the fact that there was no controverted issue as to cause of death. There was no question for the jury as to how the victim died. The trial court judgement and sentence should be reversed and the case remanded. Appellant submits that the error raised in this issue affected the substantial right of Appellant to a fair trial absent prejudicial evidence (Rule. 44.2.(b) C.C.P.).

94

**THE TRIAL COURT ERRED IN SUSTAINING THE STATE'S OBJECTIONS TO DEFENSE EXHIBIT A, B, C, E, F, & G WHICH ARE RECORDINGS OF THE VICTIM**

**(Appellant submits these issues as combined separate issues each for the proffer by the defense of each separate defense exhibit; A,B,C, E,F &G as each involves separate parts of recordings of the victim on separate subjects. The Court made separate rulings as to each preferred exhibit. Each issue involves the same or similar legal issues regarding the trial court's denial of admissibility into evidence for the jury's consideration.) (Exhibit D is omitted as there was no objection.)**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 63 pp. 98-115 at which the defense proffered 7 separate audio recordings of the victim and the defendant. The State objected to each separately; which objections were each sustained by the trial court. The Reporter's Record shows the following:

. . .

These recordings are of Frank pretending to be somebody named "D" when he's talking to Shania; is that correct?
A. That's the way it appeared to me, yes.
MR. JOHNSON: We'd like to publish those recordings, Judge.
MR. BIRMINGHAM: Your Honor, I informed the Defense I had a motion before he did that. At least Mr. Wyatt. I would like the rulings from the Court before that happens.
. . .
The State had the following objections:

MR. BIRMINGHAM: The first -- one of -- the title one of the tapes is "First Time Having Sex," and that is Shania talking about the first time that she had sex. I don't see how that's relevant. I believe that it's protected under

412 as well.

THE COURT: Hold on. Response to that?

MR. WYATT: My response she says in the DCAC interview and to Detective Snyder the first time she ever had sex was with Franklin Davis.

MR. BIRMINGHAM: I actually dispute that.

MR. WYATT: Okay.

THE COURT: Because if it's another person, I'm going to sustain that.

. . .

MR. BIRMINGHAM: Yes. The first objection, Judge, there's, I believe, six recordings in addition to the one that we played in front of this jury.

Okay. I'll go through with each recording and make my objection if that's all right with the Court.

THE COURT: Go ahead.

MR. BIRMINGHAM: The first recording is literally a ten-second recording where Mr. Davis calls and he says, "Okay, I'm going to call her right now to prove my innocence."And the call never goes through. It goes straight to voice mail. So there is nothing from the complaining witness on that case.

So we object under 403 and under the hearsay rules that it's an out-of-court statement made to the truth of the matter asserted by the defendant.

THE COURT: I'm familiar.

MR. BIRMINGHAM: Yes, sir.

THE COURT: Okay. That's sustained.

MR. PARKS: Okay.

MR. BIRMINGHAM: No. 2 is entitled on the Exhibit 19 "incomplete." Actually, the second one on there -- I may be wrong about the title, but the substance is he's asking whether or not she has a boyfriend, has ever had a boyfriend. She goes into a story where basically she was caught with a guy, and apparently they were having sex when that happened.

Her mom expected her to be somewhere she was not.  So she leaves there with this guy to go to where her mother is, and they get pulled over by a police officer.  And that's when she apparently finds out he's 22 years old, and she had thought he was 20.

And that is basically the extent of that conversation.  It's about eight minutes long, I believe, maybe 12 minutes long.

Our objections there are relevance, the Rule 412, and also hearsay.

THE COURT: Response?

MR. PARKS: Judge, I think it probably -that it goes to the state of mind of the complainant, who I believe has led police to believe at least at one point that she -- that this assault was the first sexual encounter that she had ever had. And it just shows a general consistency with the defendant's theory of the case.

THE COURT: Okay.

MR. BIRMINGHAM: I -

THE COURT: You don't need to respond.

The objection is sustained on all of the grounds that you mentioned, but primarily 412.

MR. BIRMINGHAM: Thank you.

The next conversation is entitled "First time having sex." I will state that I believe that this is a partial recording and that there doesn't appear to be an obvious beginning to the conversation. Okay.

But there is about -- again, about eight minutes, I believe, on this one.

And it says -essentially, he is asking her the first time she had sex. They talk a little bit more about the conversation the Court just ruled inadmissible.

He says things like, You sound crazy. How many boyfriends have you had? How many have you had? How many times have you had sex in the past? How long -- basically how old were you the first time that you had sex in the past?

She talks about the first time that she had sex was with this guy that was in the Army that was 20 years old. She says -- he asks her, How many times or how many partners have you had?

And then they start talking about how, you know, who was doing most of the work. I'm assuming they're -- I don't want to speculate, but they're talking about during the sexual encounter, who's doing most of the work.

I would object under 403, 412, also under 803.

MR. PARKS: Judge, to the -

THE COURT: 803?

MR. BIRMINGHAM: Hearsay.

THE COURT: Respond.

MR. PARKS: To the previous objections, we would also add this would be impeachment testimony. This has already been admitted before the jury as to her prior inconsistent statements.

97

THE COURT: Has Detective Williams listened to these tapes y'all are talking about?

MR. BIRMINGHAM: Yes.

MR. PARKS: Yes.

MR. JOHNSON: She testified she did.

THE COURT: Okay. So y'all are going to try to offer these through her?

MR. PARKS: I believe, yes.

MR. JOHNSON: We've already made that offer.

MR. PARKS: He's already made the offer.

THE COURT: Response to what he just said on this particular -

MR. BIRMINGHAM: Judge, it does not directly contradict anything that she said in the video -- audiotape that is in evidence right now.

THE COURT: I'll sustain the objection to what I'm calling Recording C for the reasons you stated.

Next.

MR. BIRMINGHAM: There's a recording and the title of it is "AU 3." And it's basically five seconds and unintelligible, in my opinion. Could be Shania. There's nothing said on there. I don't see how there's relevant information in there at all.

THE COURT: Response.

MR. PARKS: No objection.

THE COURT: Sustained.

MR. BIRMINGHAM: The next one is audio 0007. They're talking about the fact that she's singing in church. She was on YouTube. He's asking her to "Tell me a big secret" and "I want a big secret from you." And she says, no, she's not going to tell him a big secret.

Talk about how she's built. And he mentioned 350 and she's small, five-two, that's where she got her name, "Average Height."

He talks about how he doesn't like to date females with children because there's too much drama that comes along with it. They talk about how this 20-year-old she was talking about before had a child and she knew that. He asks her if she ever snuck anyone through the window. She says no. She ever snuck out of the house. She says no. And then they start talking about the car that he's driving, which is an Impala.

So I would object under 403, and also self-serving hearsay. Also, I guess to tie back to the dude with the Army -- from the Army, that violates 412 as well.

98

THE COURT: Response.

MR. WYATT: That's already come in about the Army stuff, Your Honor, when Franklin Davis -- if I can have a moment.

(Off the record discussion.)

MR. WYATT: Judge, we'll lodge the same objections Mr. Parks has made, especially the impeachment, Your Honor.

THE COURT: You mean theory of admissibility; you don't mean the objections?

MR. WYATT: Excuse me, Your Honor?

THE COURT: You mean theory of admissibility, not objections.

MR. WYATT: Yes, I do, Your Honor. With the impeachment, Your Honor -- of all these recordings, even the ones that have already been ruled inadmissible, there are statements by Shania Gray. There are statements in the REACH Clinic reports. There are contradictions in the Mesquite Police Department report versus what she said on the DCAC interview, versus what she said in the recordings, Judge. And that's why we feel all of these need to come in together to give context to exactly what the theory of the defense is, is that Shania Gray is lying about the sexual assaults coming in; that Franklin Davis did not commit these sexual assaults.

Now, I think it's clear from the record we developed that theory very well up until this point, Your Honor. And having those recordings not come in to give context to exactly the veracity of Shania Gray or lack thereof of her veracity, handicaps the Defense to the point we don't feel we can put on a proper defense.

THE COURT: Response to that.

MR. BIRMINGHAM: Yes, sir. There has not been any evidence of a REACH exam on Shania Gray, nor has there been any evidence about what she has said to a DCAC interviewer yet.

And so -- as a matter of fact, Judge, they're the ones that brought up the DCAC interview during their cross-examination of other officers. We didn't bring that up. So they're trying to open their own door, in my opinion.

THE COURT: Response to that.

MR. WYATT: Also Your Honor, if we want to wait and put these in through Detective Snyder, they're going to call Detective Snyder, then we can do it through Detective Snyder. If he wants what's in his case report, what's in his case file when he's called, we'll talk about that too, Judge. So if we want to wait and have this hearing until after Detective Snyder

99

testifies to lay down a proper predicate to show about the veracity that we're talking about, or the lack thereof the veracity of Shania Gray, we can wait until then.

THE COURT: Okay. Do you care to respond to that?

MR. BIRMINGHAM: Yeah. The problem is I can't call Shania Gray as a witness to this case because she's been murdered by Franklin Davis.

THE COURT: The objection to recording E is sustained. F?

MR. BIRMINGHAM: Actually Russell has this one, Judge.

MR. WILSON: Judge, F is -- we lodge the same objection with the exception of 412. There's not actually discussion of sexual history in there, but it talks some about her baby-sitting her brother. He talks more about his car and what types of customizations he's trying to do to his car.

He talks about a completely made-up incident of somebody passing away who hit their head and asked her if she's ever lost somebody like that.

Then it gets into -- she mentioned some things about being annoyed about not being able to go to movies, the mall, or get a piercing.

She talks about church and some activities that she's getting ready to participate in where she might get a $400 shopping spree.

Again, 401, 402, 403 and 803, the discussions they had aren't relevant to issues in this case. I don't know how it bolsters anything that they're trying to do, which is, you know, to try to smear her name or anything like that. It doesn't do that.

Again, though, it's irrelevant and, you know, if we're going to move along expeditiously, we should focus on what does and doesn't prove the elements in the indictment. And the context -

THE COURT: That's enough, Mr. Wilson.

MR. WYATT: Judicial economy aside, trying to take Mr. Davis's life, you know, I'll defer to the Court on that issue. But when we're talking about the context the entire, the State put in one of the recordings. So this is a whole group of recordings. It's the whole set of recordings.

They're trying to make Mr. Davis out to be some kind of sneaky fiend by saying that he's doing all these surreptitious recordings and that's part of why he's a bad person. Okay?

He's doing his own investigation. They put in an hour-and-11-minute audio recording of him doing his own investigation. Well, let's put in the rest of the audio recordings about his investigation and what he uncovered during that investigation. And, really, it's all one set of facts. It's all one set of recordings. Under the rule of optional completeness, they should all come

in also.

THE COURT: The objection to recording F is sustained. 401, 402, 403 as well as 803.

Are there other tapes?

MR. BIRMINGHAM: This is the last one, Judge. It's entitled "Random One."

THE COURT: That's six? You told me six, now there's seven?

MR. BIRMINGHAM: Six that I did, Judge. Russell did one. The next one is entitled "Random One," and they're talking about how she can sing. She's got an upcoming audition. She actually sings to him.

She talks about how she wants a particular type of purse, that she used to go to Horn, and she was planning on going and moving to Carrollton. That's the extent of that one. We object under 401, '2, and '3, also under hearsay from the defendant.

THE COURT: Response.

MR. WYATT: Same.

MR. PARKS: We just re-urge on the objections previously made.

THE COURT: Thank you. I appreciate your defense on the case, and I want to make it clear none of these rulings are being made for judicial economy. That's not rationale.

The objection's sustained on the -- what we'll call G recording.

Anything else before we bring the jury back in?

MR. PARKS: Have those been -- I'm not sure, have they been offered for the record? We offer all the recordings -

(Defense Exhibits A-G offered.)

THE COURT: They're admitted for the record.

(Defense Exhibits A-G admitted.)

As to recording A dealing with a statement by the victim about her first time

of having sex in a child abuse interview concerning the allegation of sexual assault

by the Defendant before this case arose. The Court sustained the State's objection.

Appellant sought to introduce this recording as part of a compilation of recordings

of the victim to support his defense that he did not commit the aggravating offense

101

of obstruction to elevate this murder case to the potential death penalty punishment option. The item was not submitted for the truth of the matter asserted. It showed the victim's state of mind concerning her mindset as to its preoccupation with sexual activity and contributed to show how she fabricated the accusations of sexual misconduct against the defendant.

The "B" recording involves the complainant about being caught with a guy having sex. The "C" recording involves "first time having sex" (RR: Vol. 63 p. 106) and having boyfriends. The "D" recording was unintelligible and the defense did not object to its inadmissibility. The "E" recording involves singing in church and her physically and other conduct. The "F" recording involves general discussion of automobiles and personal relationships. The "G" recording involves a purse and moving to Carrollton. All of the objections were sustained.

In *Sanders v. State*, 687 S.W.2d 60 (Tex. App.-Dallas, 1985) it was stated that the excluded evidence constituted part of the circumstances surrounding the killing. This time of offense does not occur in a vacuum and all of the evidence of the surrounding facts may be properly admitted. The evidence of the words spoken during the events surrounding the killing was not offered to prove the matters asserted, but rather as proof that the statements were made. The statement was

explanatory of the circumstances surrounding the killing, and would enable the jury to evaluate the evidence. See Article 38.36 Texas Code of Criminal Procedure.

Art. 38.36 EVIDENCE IN PROSECUTIONS FOR MURDER. (a) In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

Therefore, the trial court reversibly erred in denying each proffered recording to be admitted into evidence; which would have affected his constitutional right to due process and a fair trial.

<u>**APPELLANT'S ISSUE NO. 19**</u>

**THE TRIAL COURT ERRED IN SUSTAINING THE STATE'S OBJECTION TO THE DEFENSE'S PROFFERED TESTIMONY OF PASTOR ARTY HAYES, THE BROTHER -IN-LAW OF THE DEFENDANT**

Appellant directs this Honorable Court's attention to Reporter Record Volume 65 p. 253-262 at which the defense proffered testimony of the defendant's brother in law concerning "what Franklin Davis did in the meantime after the sexual assaults arose but before the murder case and what he had done to counsel Frank" as prior consistent statements. The Court ruled that the proffer was not prior consistent

statements or undue influence and would not allow it. The proffered evidence was presented sub rosa (RR: Vol. 65 p. 259-262)

## APPELLANT'S ISSUE NO. 20

### THE TRIAL COURT ERRED IN SUSTAINING THE STATE'S OBJECTION TO WITNESS, ASHLEY SIMS, PROFFERED TESTIMONY

Appellant directs this Honorable Court's attention to Reporter's Record Volume 65 p. 280-283 at which the defense in a sub rosa hearing presented the proffered testimony of the witness Ashley Sims as a prior consistent statement.

## APPELLANT'S ISSUE NO. 21

### THE TRIAL COURT ERRED IN SUSTAINING THE STATE'S OBJECTION TO WITNESS, LAMAR LEGGITON, PROFFERED TESTIMONY

Appellant directs this Honorable Court's attention to Reporter's Record Volume 65 p. 283-287 at which the defense in a sub rosa hearing presented the proffered testimony of the witness Lamar Leggiton as a prior consistent statement.

**(These three issues are grouped together as they involve the same issues of law and similar facts.)**

Rule 801(e)(1)(B) gives substantive, non-hearsay status to prior consistent statements of a witness "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or notice." This rule mirrors that of Federal Rule 801(d)(1)(B) and thus federal decisions provide helpful

analysis.   The Supreme Court has explained the four requirements that must be met

for prior consistent statements to be admissible under Federal Rul 801(d)(1)(B):

       (1) the declarant must testify at trial and be subject to cross-examination;
       (2) there must be an express or implied charge of recent fabrication or
improper influence or motive of the declarant's testimony by the opponent;

       (3) the proponent must offer a prior statement that is consistent with the
declarant's challenged in-court testimony; and ,
       (4) the prior consistent statement must be made prior to the time that the
supposed motive to falsify arose;

       *See Tome v. United States*, 513 U.S. 150, 156-58, 115 S.Cyt. 696, 130

L.Ed.2d 574 (1995).

       Defense counsel made the following argument for admissibility of the

proffered testimony:

       MR. WYATT: Yes.  The witness that will be called is Pastor Arty
Hayes from Texarkana.   He is the brother-in-law of Franklin Davis.  The testimony
that we anticipate coming from Mr. Hayes is about what Franklin Davis did in the
meantime after the sexual assaults arose but before the murder case and what he
had done to counsel Frank, what he had talked about with Frank, but  - - and we
believe all that is absolutely admissible.
       But we wanted to bring to the State's attention that there are prior
consistent statements which will be asked of Mr. Hayes.  And we wanted to give
the State - - tell them exactly what was going to be - - what we anticipate the
testimony is going to be.
       THE COURT: How is the talking with the defendant not being offered
by the defendant and therefore subject to hearsay rule?
       MR. WYATT: We're not asking about hearsay, Your Honor. We're
asking about what happened.  Not specifically about what exactly was said, but
what exactly happened.
       We don't believe it's hearsay.  We don't believe it's hearsay because
it's his statements about exactly what he was going through firsthand from the

defendant, Your Honor. And under the rules, under 801(d)1(B), when we look at - - sorry. When we look at prior consistent statements, there's a four-prong test that must be adhered to.

Your Honor, under Hammons v. State, Court of Criminal Appeals 239 S.W.3d 798, 2000, Texas Court of Criminal Appeals case, Your Honor, and in that, we believe that the prongs of the prior consistent statement testimony have been met, Your Honor. Those prongs - - would you like me to - -

THE COURT: Are you referring to 801(e)1(B)?

MR. WYATT: I'm sorry, yes.

THE COURT: It's not the rule you cited.

MR. WYATT: Yes, I cited the federal rule that they had in this case, Your Honor, so I was mistaken in that.

The four-prong test that they have is the declarant must testify at trial and be subject to cross-examination, as Mr. Davis has done.

There must be an expressed or implied charge of recent fabrication or improper influential motive of the declarant's testimony by the opponent that's been taken care of by cross-examination of Mr. Davis.

The proponent must offer a prior state in-court testimony. That prong has also been adhered to or satisfied in this case.

And No. 4, the prior consistency statement must be made prior to the time that the supposed motive to falsify arose, which is the murder charge.

All four prongs of that have been met, Your Honor, and we believe that Franklin's prior consistent statements, since they have been put into question by the prosecution, that they can absolutely come in at this point in time that he did not have sex with Shania Gray.

That's been questioned by the State, asked by the Defense in the exhibits that have been put in, all the videotapes that have been put in. So - - and the recordings by the State that Franklin Davis made. All those things that have been put into evidence satisfy those four prongs. We believe that we can call witnesses to testify to prior consistent statements of Mr. Davis in the guilt/innocent phase of the trial.

. . . .

In this case, they have put in his mental state as an issue. In the indictment - - from all the way from the indictment up until the cross-examination of Mr. Davis by Mr. Birmingham. When they go into his medical records whether or not he's sought help at the hospital that day or back in May of 2010 or 2011, any of those times, they put that directly at issue by bringing that up. So we can absolutely bring up testimony and evidence to rebut that during guilt/innocence.

106

That's exactly what it's for, Your Honor.

THE COURT: Okay.  You may call the witness. You will not be allowed to put on any consistent statements. It is not a recent fabrication or improper influence, as Mr. Wilson correctly argued, but you may put the witness on for the other matters that you indicated.  Make sure you instruct him not to go into any prior consistent statements.  You understand that?

This Court has provided an in depth discussion of the use of the rule of evidence 801.(e)(1)(B) concerning prior consistent statements in *Hammons v. State*, 239 S.W.3d 798 (Tex. Crim. App. 2007) and *Klien v. State*, 273 S.W.3d 297) Tex. Crim. App. 2008).  Appellant submits that pursuant to trial counsel's proffer of the evidence of prior consistent statements in reference to statements made by Appellant to any of these three witnesses that the proffered evidence was admissible as non hearsay prior consistent statements.  The trial court abused its discretion in denying Appellant's evidentiary proffer.  This denied Appellant's right to due process of law and a fair trial in denying Appellant his right to defend the charge that he committed the offense of obstruction as alleged in the indictment.

## APPELLANT'S ISSUE NO. 22

**THE TRIAL COURT ERRED IN DENYING APPELLANT REQUEST FOR A CHARGE ON ANTI-SPECULATION DURING THE GUILT/INNOCENCE STAGE OF THE TRIAL**

Appellant directs this Court's attention to Reporter's Record Volume 66 pp. 19-20 at which defense counsel requested a charge to the jury that they must render

a verdict based solely on the evidence that they heard and not upon speculation. The trial court denied the request. Appellant's requested charge to the jury not to base their verdict on speculation was a correct statement of the law and should have been given to accurately guide the jury in its deliberations. In *King v. State*, 254 S.W.3d 579 (Tex. App.-Amarillo, 2008) it was held in relevant part that:

Juries are not permitted to reach conclusions based on mere speculation or factually unsupported inferences or presumptions. In *Hooper,* the Court of Criminal Appeals further distinguished inferences from speculation, defining an inference as "a conclusion reached by considering other facts and deducing a logical consequence from them" and speculation as "mere theorizing or guessing about the possible meaning of facts and evidence presented." The court noted that "[a] conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Hooper*, 214 S.W.3d 9 (Texas Crim. App. 2007)

It would be a denial of due process for any defendant to be convicted or punished on speculation by the jury. It is true that jury, sitting as the trier of facts, may accept or reject any or all of the testimony adduced. *Ables v. State,* 519 S.W.2d 464, 465 (Tex. Cr. App. 1973); *Esquivel v. State*, 506 S.W.2d 613, 615 (Tex. Cr. App. 1974). See also *Reese v. State*, 653 S.W.2d 550 (Tex. App.-

Beaumont-1983). A jury, however, may not reach a verdict based on speculation.

*Reese v. State*, supra.

It was reasonable and an accurate statement of the law for the defense to request an instruction to the jury not to speculate. (See by example, *Thomas v. State*, 2006 WL 2022404 Tex. App. Dallas, 2006).

Appellant submits that he was denied due process of law in violation of the 14th Amendment to the United States Constitution by the trial court denying his requested instruction which would have properly instructed the jury as to how to deliberate and consider the evidence adduced at trial.

## APPELLANT'S ISSUE NO. 23

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO STATE COUNSEL'S JURY ARGUMENT CLAIMING IT IMPROPERLY STRIKING AT THE DEFENDANT OVER COUNSEL'S SHOULDER AND SHIFTS THE BURDEN**

Appellant directs this Court's attention to Reporter's Record Volume 66 pp. 68-69 at which appears the complained of argument

. . . He wants you to give him credit and find him guilty of the lesser included offense of murder. They keep bringing up the punishment range. They want you to think about the punishment range. Make you feel better about doing something that's not supported by what Franklin says.
MR. HAYES: Judge, now I have to object. I think that's properly striking at the defendant over counsel's should and it shifts the burden.
THE COURT: Fair reply. Overruled.
Ten minutes.
MR. BIRMINGHAM: That's why they do that. They want you to

look everywhere but what happened on the shores of the Trinity River.

. . .

Permissible jury argument generally falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement. *Davis v. State*, 329 S.W.3d 798, 821 (Tex. Crim. App. 2010, *cert denied* - - U.S. - - , 132 S.Ct. 128, 181 L.Ed.2d 50 (2011); *Cannady v. State*, 11 S.W.3d 205, 213 (Tex. Crim. App.) *cert denied* 531 U.S. 850, 121 S.Ct. 12148 L.Ed.2d 80 (2000). When a prosecutor makes uninvited and unsubstantiated accusations of improper conduct directed toward a defendant's attorney, in an attempt to prejudice the jury against the defendant, courts refer to this as striking a defendant over the shoulders of his counsel. *Phillips v. State*, 130 S.W.3d 343, 355 (Tex. App.-Houston [14th Dist.] 2004, pet. ref'd) (op. on reh'g), *aff'd at* 193 S.W.3d 904 (Tex. Crim. App. 2006).

The Court of Criminal Appeals has consistently held that argument that strikes at a defendant over the shoulders of defense counsel is improper. *Gallo v. State*, 239 S.W.3d 757, 767 (Tex. Crim. App. 2007), *cert filed,* #07-9590, February 29, 2008. "It is axiomatic that the state may not strike at a defendant over the shoulders of his counsel or accuse defense counsel of bad faith and insincerity." *Fuentes v. State*, 664 S.W. 2d 333, 335 (Tex. Crim. App. 1984). This Court has

"long recognized that prosecutors' arguments which attack the personal morals or trustworthiness of defense counsel are manifestly improper because they undermine the adversarial system by unfairly prejudicing the jury against the defendant's attorney." *Fuentes v. State*, 991 S.W.2d 267, 274 (Tex. Crim. App. 1999). The impact of improper closing jury arguments should be noted because they are the last thing the jury hears before deliberations and that an instruction to disregard may be insufficient to remove the prejudice of some such arguments. *Norris v. State*, 902 S.W.2d 428, 443 (Tex. Rim. Ap. 1995). In the instant case, the prosecutor's challenged comments were made during the second closing argument and were thus part of the last thing the jury heard before deliberations.

"A prosecutor runs a risk of improperly striking at a defendant over the shoulder of counsel when the argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character." *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim.App. 1998). In the instant case, the prosecutor referred to defense counsel's alleged attempt to direct the jury away from the guilt/innocent stage of the trial. Thus in the instant case, the prosecutor did improperly strike at appellant over the shoulder of his trial counsel. The prosecutor's arguments that Appellants trial attorney was misleading the jury

111

brought into question veracity and credibility-important issues for the jury to resolve.

It is appropriate to object to defense jury argument if the state believes the argument is attempting to mislead the jury regarding applicable principles of law; the trial court can then rule on such an objection. However it is inappropriate to fail to object to such a defense jury argument and then respond by arguing that defense counsel is attempting to mislead the jury. Such an attack is a classic example of striking at the defendant over the shoulders of defense counsel.

In *Fuentes v. State*, 664 S.W.2d 333 (Tex. Crim.App. 1984), it was held that a prosecutor's comments that defense counsel was acting "in bad faith like usual" and that evidence which defense counsel was seeking to elicit was "garbage," were manifestly improper, harmful, and prejudicial, and thus constituted reversible error. In *Gomez v. State*, 704 S.W.2d 770, 771-72 (Tex. Crim.App. 1985), the Court held that a prosecutor's juror argument accusing defense counsel of manufacturing evidence was not cured by an instruction to disregard and was thus reversible error.

In this case, the state's jury arguments attacking defense counsel were manifestly improper, harmful, and prejudicial and were compounded by the trial court's overruling of the objection.

**THE EVIDENCE IS LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT THE JURY'S ANSWER TO SPECIAL ISSUE NO. 1 IN THE PUNISHMENT STAGE OF THE TRIAL**

Appellant argues that there was insufficient evidence of future dangerousness because he had no prior violent offense convictions and the defense witnesses testified that he essentially was a low risk for future dangerousness.

In the case of *Huffman v. State*, 746 S.W.2d 212 (Tex. Crim. App. 1988) it was held that:

"In *Roney v. State,* 632 S.W.2d 598,603 (Tex. Cr. App. 1982), this court wrote:

"Although this was a senseless murder, that fact is true of every murder in the course of a robbery. The facts of this offense, standing alone, do not carry the marks of a 'calculated and cold-blooded crime,' such as appeared in *O'Bryan v. State*, 591 S.W.2s 464, 480 (Tex. Cr. Ap. 1979), where the defendant for months planned the candy poisoning of his own child to collect life insurance. To support a 'yes' answer to the second punishment issue, the evidence must show beyond a reasonable doubt that there is a probability appellant would commit criminal acts of violence that would constitute a *continuing* threat to society. To hold that the facts of *this* offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition. *Jurek v. State,* 522 S.W.2d

934 (Tex. Cr. App. 1975); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)."

*Benz v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007). This Court should reform the judgement to life imprisonment. *Holberg v. State* 38 S.W.3d 137, 139 (Tex. Crim. App. 2000) and Art. 44.251 (a).

According to the State's evidence in the instant murder case the murder was clearly senseless and unnecessary. Given the circumstances of the offense, as brutal and uncalled for as they were, this Court should hold that there was sufficient evidence to support the affirmative finding in question standing alone.

The punishment evidence shows that the Defendant had children that he cared and provided for. Labrena Henderson, a former girlfriend and mother of the Defendant's son testified that he always sent child support and visited until he was incarcerated on the current charge. (RR: Vol. 66 p. 125-126) She described Frank as being slow to anger and told defense counsel in an interview that "He was pretty easy going and never really saw him get mad." (RR: Vol. 66 p. 131) Latrice Brown, the mother of the Defendant's daughter, Kurstyne, testified that when she was arrested, Frank stepped in and cared for Kurstyne for three years.(RR: Vol. 68 p. 109-110) She said Frank continued to support Kurstyne and her other children. (RR: Vol. 68 p. 112)

114

Mr. Davis was never convicted of a violent offense. Margaret Brown-Lewis, a detective with the Dallas County Sheriff's Department in the identification section testified that the Defendant was convicted for theft $1,500 but less than $2,000, revoked and punishment set at 15 months in State jail; evading arrest February 26, 2001; failure to identify on February 26, 2001 and the misdemeanor offense of fleeing or attempting to elude a police officer on October 1, 2007.

The State presented evidence that Mr. Davis escaped from Parkland Hospital in 2012. Deputy Steven Underwood testified that while removing Mr. Davis' handcuffs so he could shower, Mr. Davis told him "Sorry, man", took his gun and ran out of the hospital room. During this episode Mr. Davis knocked on the door of Mary Cassio but did not enter, threaten her or show the gun when she would not let him into the house. (RR: Vol. 66 p. 196) He left the gun he had taken from the deputy wrapped in his sock in the front yard of Ms. Cassio. (RR: Vol. 66 p. 189) Mr. Davis was arrested a short time later without incident. (RR: Vol. 67 p. 67) Appellant submits that in his escape attempt, Mr. Davis was not violent.

Ed Chattaway of the Texarkana Police Department testified that Mr. Davis gave him information about a pending armed robbery and Mr. Davis helped the police take his uncle off the streets. (RR: Vol. 67 p. 196-197) Mr. Davis grew up in a very violent neighborhood in St. Louis Missouri and at a young age his mother

115

was shot in the head point blank with a 12-gauge shotgun after she had been raped and sodomized. (RR: Vol. 67 p. 168)

Rose McGill, a foster mother, testified that she cared for Frank Davis when he was 15 years old and he was well behaved during the year he lived in her home. (RR: Vol. 67 p. 227) Brenda Griffin testified that when Frank was in the Youth Home in Little Rock, Arkansas he was never a discipline problem. (RR: Vol. 68 p. 28) Pat Gill, a counselor, also testified that while Frank was in the Youth Home, he was always respectful, polite and got along with everybody. (RR: Vol. 68 p. 34)

Appellant submits that the evidence was insufficient to support the jury's affirmative answer to Special Issue No. 1. *See also Beltran v. State of Texas*, 728 S.W. 2d 382 (Tex. Crim. App. 1987), *Ellason v. State*, 815 S.W.2d 656 (Tex. Crim.App. 1991) and cases cited therein, *Benz v. State*, 233 S.W.3d 847 (Tex.Crim. App. 2007)

**DEFENSE REQUESTED PUNISHMENT INSTRUCTIONS**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 3 p. 174-189 and to Defense's Pretrial Motions objection to the charge in punishment.(Clerk's Record Vol. 2 pp. 120-138)  Trial counsel filed two sets of objections and/or motions either objecting to the statutory charge in Art. 37.071 C.C.P. or requesting that the issues and instructions that were to be submitted be altered to provide definitions in greater specificity in the special issues for the jury. The Court overruled or denied all the Defense's objections or requested instructions.

Appellant's counsel on appeal believes this Court has addressed the issues raised by objection or requested instructions on appeal previously over an extended period of time. Appellant is submitting each objection or requested instruction as a separate issue on appeal.  Even though this Court has previously overruled the issues raised in a same or similar context previously, trial counsel raised them in written pretrial motions. Appellant's appellate counsel seeks to preserve each sub-issue without waiver for any potential Federal review of the issues in the future. Additionally, Appellant moves this Court to reconsider prior rulings on each requested jury charge instruction on objection as it applies to the case at bar.

**APPELLANT'S ISSUE NO. 25**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S OBJECTION TO CERTAIN LANGUAGE IN THE BODY OF THE COURT'S INSTRUCTIONS TO THE JURY IN THE PUNISHMENT STAGE**

Appellant directs this Honorable Court's attention to Reporter's  Record

Vol. 3 pp. 174-189 at which the following objections to the punishment charge

were made.  Appellant made the following objection to the language used in the

punishment charge:

## OBJECTIONS TO LANGUAGE IN THE BODY OF THE INSTRUCTIONS

### APPELLANT'S ISSUE NO. 25 (1)

1. The Defendant objects to the Court's use of the language "In order for the Court to assess proper punishment...". This language minimizes each juror's role and diminishes their sense of responsibility for the ultimate sentence in the case, particularly a death sentence. This failure violates the protections afforded to the Defendant under the 8th ,11[th] and 14th Amendments to the United States Constitution. *Caldwell v. Mississippi,* 472 U.S. 320 (1985).

### APPELLANT'S ISSUE NO. 25 (2)

2. The Defendant objects to the Court's instructing each juror as if it he/she were one decision making body. The jurors are individuals, each of them is making an individual decision, not a group decision. It only takes one to return a life verdict. *Wiggins v. Smith,* 123 S.Ct. -252,7 (2003).

### APPELLANT'S ISSUE NO. 25 (3)

3. The Defendant objects to the Court's instructing each juror that he or she is to "determine" or "shall answer" and using language such as "arriving at the answers to" any of the Special Issues. Tex.C.Crim. P. Art. 37.071 does not require that each juror agree on answers to any of the Special Issues. If there is a failure to agree, a life sentence results. Jurors should be instructed using some form of the

word "consider" rather than "determine" or "answer" and in no event should they be instructed that they "shall" answer any Special Issue.

**APPELLANT'S ISSUE NO. 25 (4)**

4. The Defendant objects to the Court instructing the jurors that "The mandatory punishment for the offense of capital murder" is death or life imprisonment. Death is not a mandatory punishment. Tex.P.C.§,12.31. When the penalties of life imprisonment and death are used together, they should be referred to as "mandatory options".

**APPELLANT'S ISSUE NO. 25 (5)**

5. The Defendant objects to the Court instructing each juror that in considering the Special Issues that each is to consider "...all evidence submitted to them in the whole trial." This incorrectly assumes that all evidence that has been offered during the culpability phase of the trial is relevant to the individual jurors' consideration of the individual Special Issues. This language encourages each juror to return a general verdict of death that may be totally unrelated to the specific questions contained in the Special Issues.

**APPELLANT'S ISSUE NO. 25 (6)**

6. Subject to objections raised herein to the court's use of the phrase "all of the evidence", the Defendant objects to the failure of the Court to instruct the jury

119

that its directive to consider "all of the evidence" set forth in the special issue regarding mitigation, controls over the definition of "mitigating evidence" set forth elsewhere in the charge.

## APPELLANT'S ISSUE NO. 25 (7)

7. The Defendant objects, on multiple grounds, to the Court instructing each juror that he or she is to consider evidence that "militates for or mitigates against the imposition of the death penalty.

(a) The language of Tex.C.Crim.P. Art. 37.071 Sec.2 limits sentencing phase evidence of character, background and circumstances of the offense to that which "mitigates against the imposition of the death penalty". The statute does not say that this evidence can be used to militate in favor of the death penalty. It is inappropriate to instruct the jury (although elsewhere the statute requires it) when such instruction is inconsistent with express language of Art. 37.071 as to what is admissible in the sentencing phase of the trial.

(b)Each juror will be instructed to consider specific Special Issues, not to return a general verdict of life or death. This instruction encourages them to disregard the specific questions embodied in the Special Issues and return a general verdict based on the view of whether the Defendant deserves the death penalty.

120

(c) Tex.C.Crim.P.Art. 37.071 mandates that each juror be instructed with this language only with respect to Special Issue #1 (future danger issue) and Special Issue #2 (and-parties i when applicable. It is not appropriate for juror's consideration of Special Issue #3 (the mitigation issue) and the Court has not made this clear.

(d) The Defendant objects to the proposed charge, at page____, inasmuch as it instructs the jury to "consider all evidence ... that militates for ... the imposition of the death penalty." There is no basis in law for this instruction, which lies outside the special issues and obviates the constitutionally mandated requirement that specific, statutorily sanctioned aggravators—and only such aggravators—be used to distinguish capital Defendants for whom the death penalty is appropriate from those for whom it is not.

## APPELLANT'S ISSUE NO. 25 (8)

8. Without waiving the foregoing objections, the Defendant objects to the Court's failure to define the word "militates" as used in the instructions on page   of the charge so that the Defendant's age, race, sex, national origin, religion, political viewpoints, sexual orientation or other irrational factors may not be used to support a death sentence.

**APPELLANT'S ISSUE NO. 25 (9)**

9. The Defendant objects to the proposed instruction, on page ___, apparently derived from CCP Art. 37.071 Sec. 2(d)(1), to the extent that it charges the jury that, in deliberating upon the special issue on "future dangerousness," it "... shall consider the evidence of the Defendant's background or character or the circumstances of the offense ...". This instruction permits and encourages each juror to nullify the terms and elements of the future dangerousness special issue, (by using or even substituting background, character and the facts of the offense as aggravators) and to return an affirmative finding on that issue, which is not based on a juror's honest assessment of the future threat posed by the Defendant.

**APPELLANT'S ISSUE NO. 25 (10)**

10. The Defendant objects to the Court wording the instructions so that the "death option" is always listed first, such as when reference is made to the sentencing options of life or death or the possible answers "YES" or "NO" that would lead to a life or death sentence. There is no presumption that death is the appropriate punishment. In fact, life is presumed and the law is always satisfied with a life verdict. Tex.P.C. § 12.31 "Capital Felony" provides that a Defendant in a capital case where death is sought "shall be punished by imprisonment in the institutional division for life or by death". If the punishment phase were stopped at

122

any time prior to a "NO" answer to the mitigation issue, the mandatory verdict would be life. These instructions erroneously imply that death is the "preferred" or "default" punishment.

## APPELLANT'S ISSUE NO. 25 (11)

11. The Defendant objects to the Court instructing jurors that "You may not answer Special Issue No. 1 "NO", (that the Defendant is NOT a future danger) unless ten (10) or more jurors agree. This statement (although contained in Art. 37.071) is not truthful. If the jurors cannot agree to the answer on any special issue, the Defendant is automatically sentenced to life. There is nothing significant to ten (10) jurors other than the arbitrarily high number chosen by the legislature to mislead each juror, to discourage and effect the intimidation of minority holdout jurors so that the number of death verdicts returned in the state are maximized.

## APPELLANT'S ISSUE NO. 25 (12)

12. As noted in the Preamble to these Objections, studies of jury instructions have found that each juror rarely understands them. This is in part because of confusing language chosen by the legislature and the Courts. The Defendant objects to the following language used in the proposed charge: "Members of the jury need not agree on what particular evidence supports a negative answer to Special Issue No. 1". Each juror should be more clearly instructed that "None of

123

you have to agree on why you vote "NO" on Special Issue No. 1 or why you vote "YES" on Issue No. 2 (the mitigation issue). The Defendant objects to the Court's failure to so charge each juror in this case.

## APPELLANT'S ISSUE NO. 25 (13)

13.The Defendant objects to the Court instructing each juror that the State's proof must only exclude "all reasonable doubt".

(a) Art. 37.071, as well as the 8th Amendment jurisprudence, *(see Apprendi, Ring* and *Blakely* cited herein) requires the State to prove "future dangerousness" and "antiparties" issues beyond a reasonable doubt, meaning that less than a reasonable doubt remains in the jurors mind before the burden is established. The Court's instruction negates the important meaning of the word "beyond".

(b) This is an attempt by the court to define what is a reasonable doubt is in violation of *Paulson v. State,* 28 S.W.3d 570 (Tex.Crim. App. 2000).

## APPELLANT'S ISSUE NO. 25 (14)

14. The Defendant objects to the Court failing to instruct each juror that each of them, individually, is to determine what "a reasonable doubt" means to them. The Defendant requests the Court to provide this instruction.

124

## APPELLANT'S ISSUE NO. 25 (15)

15. The Defendant objects to the Court's failure, to require the State to negate, beyond a reasonable doubt, the existence of a circumstance, that would justify a sentence of life rather than death. See *Ring v. Arizona,* 121 S.Ct. 1263 (2002); *Apprendi v. New Jersey,* 530 U.S. 466 (2000) and *Blakely v. Washington,* 124 S.Ct. 2783 (2004).

## APPELLANT'S ISSUE NO. 25 (16)

16. The Defendant objects to the Court's limitation on the scope of mitigating evidence to that which a juror might regard as "reducing the Defendant's moral blameworthiness". *Tennard v. Dretke,* 124 S.Ct. 2562 (2004), *Lockett v. Ohio,* 438 -U.S. 586 (1978), *Eddings v. Oklahoma,* 455 U.S. 104(1982) and *Hitchcock v. Dugger,* 481 U.S. 393 (1987).

## APPELLANT'S ISSUE NO. 25 (17)

17. The Defendant objects to the Court instructing each juror that he or she is not to be "-swayed by mere sentiment, conjecture or sympathy..." when referring to the jurors consideration of the mitigation issue. While this limiting admonition is certainly appropriate when addressing the jurors consideration of any victim impact evidence (and this Defendant specifically requests the Court to so instruct each juror), this limiting admonition unlawfully and unconstitutionally limits the scope

125

of mitigating evidence and or circumstances that a juror may consider in returning

a life sentence.

## APPELLANT'S ISSUE NO. 25 (18)

18. The Defendant objects to the Court's failure to instruct each juror that:

The opinion of each juror is to be respected. No juror shall bully, harass or intimidate another juror for any reason. Should any juror feel that he or she is being bullied or intimidated, he or she is to inform the court by passing a note to the bailiff who will immediately deliver such note to the court." The person chosen as foreperson is charged with the responsibility to ensure that the opinion of each juror is to be respected and that no juror is bullied, harassed or intimidated.

## APPELLANT'S ISSUE NOS. 26-34

## THE TRIAL COURT ERRED IN DENYING THE ENUMERATED DEFENDANT'S OBJECTION TO THE PUNISHMENT VERDICT FORM

Appellant directs this Honorable Court's attention to Clerk's Record Volume

pp. 180-189 at which the following objections to the punishment charge verdict

form were made. Appellant made the following objections to the verdict form:

. . . .

The Defendant hereby requests the Court to include this language in the

charge to each of the jurors.

Appellant argues that he should have been given these requested instructions

and or his objections to the punishment charge should have been granted as

requested by trial counsel contrary to the cases of *Threadgill v. State*, 146 S.W.3d

126

654 (Tex. Crim.App. 2009); *Escamilla v. State*, 143 S.W.3d 814 (Tex. Crim.App.-2004), *Russeau v. State*, 291 S.W.3d 426 (Tex. Crim.App. 2009); *Murphy v. State*, 112 S.W.3d 592 (Tex. Crim.App. 2003); *McCarthy v. State,* 2006 WL 1096924; *Mendoza v. State*, 2008WL4803471.  Appellant moves this Honorable Court to reconsider its prior holdings as to each requested instruction and or objection. *Jackson v. State*, 33 S.W.2d 8 (Tex. Crim.App.2008); *Rayme v. State*, 178 S.W.3d 222(Tex.Crim.App. 2005); *Mayes v. State*, 318 S.W.3d 368 (Tex. Crim.App. 2010).

## DEFENDANT'S OBJECTION TO THE VERDICT FORMS

## APPELLANT'S ISSUE NO. 27

## "FUTURE DANGER" ISSUE

1.The Defendant objects to the Court instructing the jury on the issue of future dangerousness as the indictment returned against the Defendant did not allege that there was a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society. See *Jones v. U.S.*, 526 U.S. 227 (1999). *Ring v. Arizona*, 121 S.Ct. 1263 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v, Washington*, 124 S.Ct. 2783 (2004).

**(The following are combined for presentation as each involves the same issue of law and is a variant of each other.)**

## FAILURE TO DEFINE TERMS IN FUTURE DANGER ISSUE "PROBABILITY"

### APPELLANT'S ISSUE NO. 28 (1)

1. The Defendant objects to the failure of the Court to instruct each juror that the word "probability" as used in the first special issue, inquiring into future dangerousness, means a high probability, at least 95%, and to make a proper application of such law to the facts.

### APPELLANT'S ISSUE NO. 28 (2)

2. If the Court overrules this objection, the Defendant then objects to the failure of the Court to instruct each juror that the word "probability" as used in the first special issue, inquiring into future dangerousness, means a high probability, at least 90%, and to make a proper application of such law to the facts.

### APPELLANT'S ISSUE NO. 28 (3)

3. If the Court overrules this objection, the Defendant then objects to the failure of the Court to instruct each juror that the word "probability" as used in the first special issue inquiring into future dangerousness, means a high probability, at least 85%, and to make a proper application of such law to the facts.

128

## APPELLANT'S ISSUE NO. 28 (4)

4. If the Court overrules this objection, the Defendant then objects to the failure of the Court to instruct each juror that the word "probability" as used in the first special issue, inquiring into future dangerousness, means a high probability, at least 80%, and to make a proper application of such law to the facts.

## APPELLANT'S ISSUE NO. 28 (5)

5. If the Court overrules this objection, the Defendant objects to the failure of the Court to instruct each juror that the word "probability" as used in the first special issue, inquiring into future dangerousness, means a high probability, at least 75%, and to make a proper application of such law to the facts.

## APPELLANT'S ISSUE NO. 28 (6)

6. In the event the Court shall overrule the above objection, the Defendant objects to the failure of the Court to instruct each juror that the word "probability" as used in the first special issue, inquiring into future dangerousness, means a high probability, at least 70%, and to make a proper application of such law to the facts.

## APPELLANT'S ISSUE NO. 28 (7)

7. If the Court overrules this objection, the Defendant objects to the failure of the Court to instruct each juror that the word "probability" as used in the first

special issue, inquiring into future dangerousness, means a high probability, at least 65%, and to make a proper application of such law to the facts.

**APPELLANT'S ISSUE NO. 28 (8)**

8. If the Court overrules the above objections, the Defendant objects to the failure of the Court to instruct each juror that the word "probability" as used in the first special issue, inquiring into future dangerousness, means a high probability, at least 60%, and to make a proper application of such law to the facts.

**APPELLANT'S ISSUE NO. 28 (9)**

9. If the Court overrules the above objections, the Defendant objects to the failure of the Court to instruct each juror that the word "probability" as used in the first special issue, inquiring into future dangerousness, means a high probability, at least 55%, and to make a proper application of such law to the facts.

**APPELLANT'S ISSUE NO. 28 (10)**

10. If the Court overrules the above objections, the Defendant objects to the failure of the Court to instruct each juror that the word "probability" as used in the first special issue, inquiring into future dangerousness, means a high probability, at least a standard of "more likely than not", and to make a proper application of such law to the facts.

## APPELLANT'S ISSUE NO. 28 (11)

11. Without intending to waive his above objections, but still insisting thereon, the Defendant objects to the failure of the Court to instruct each juror that the word "probability" as used in the first special issue, inquiring into future dangerousness, means "more likely than not".

## "CRIMINAL ACTS OF VIOLENCE"

## APPELLANT'S ISSUE NO. 29 (1)

12. The Defendant objects to the failure of the Court to instruct each juror that the phrase "criminal acts of violence" as used in the first special issue, inquiring into future dangerousness, DOES MEAN serious criminal activity, causing serious bodily injury or death; not trivial, accidental, reckless, or highly provoked acts and to make a proper application of such law to the facts.

## APPELLANT'S ISSUE NO. 29 (2)

13. The Defendant objects to the failure of the Court to instruct each juror that the phrase "criminal acts of violence" as used in the first special issue, inquiring into future dangerousness, DOES NOT MEAN mere property crimes, not in conjunction or combination with crimes causing serious bodily injury or death, and to make a proper application of such law to the facts.

## "CONTINUING THREAT TO SOCIETY"

## APPELLANT'S ISSUE NO. 30 (1)

14. The Defendant objects to the Court's failure to instruct each juror that "continuing threat to society" does not mean "any threat of harm or death, no matter how minor or remote, that might hypothetically be posed, in any place, in or out of prison, for any length of time after the jury verdict, no matter how short," but instead means "a clear and present threat of serious bodily injury or death to others while in prison, if serving a life sentence."

## APPELLANT'S ISSUE NO. 30 (2)

15. The Defendant objects to the Court's failure to instruct each juror that "continuing threat to society" does not mean "any threat of harm or death, no matter how minor or remote, that might hypothetically be posed, in any place, in or out of prison, for any length of time after the jury verdict, no matter how short," but instead means that the Defendant will be so incorrigible that his acts of violence will continue throughout his life."

## APPELLANT'S ISSUE NO. 30 (3)

16. The Defendant objects to the Court's failure to submit a definitional instruction to each of the jurors defining "continuing threat to society" so as to select only the "worst of the worst" for the death penalty.

132

## APPELLANT'S ISSUE NO. 30 (4)

17. The Defendant objects to the Court's failure to define these terms because the term "probability" without proper explanation, may mean to a juror no more than a bare chance, criminal acts of violence may mean no more than traffic violations, "threat" no more than minor property damage or loss, and "continuing" may similarly mean only for a very short time. The failure to define such important terms may well be regarded by jurors as strategic in that it implies that death is the preferred sentence and amounts to a subtle comment on the weight of the evidence to be considered under both special issues. Consideration of mitigating circumstances may then become conditional upon, and perhaps related to, a "future dangerousness" finding far too easily made. Given such an invitation to trivialize the process as this language affords, jurors may well fail to give serious consideration to any of the mitigating evidence before them.

## "VICTIM IMPACT  EVIDENCE"

## APPELLANT'S ISSUE NO. 31 (1)

18. The Defendant objects to the Court's failure to limit each juror's consideration of victim impact evidence such that it is not to be considered in connection with the future dangerousness special issue.

## APPELLANT'S ISSUE NO. 31 (2)

19. The Defendant objects to the Court's failure to instruct each juror that victim character or impact evidence does not meet or relieve the State of its burden to prove the continuing threat issue beyond a reasonable doubt.

## APPELLANT'S ISSUE NO. 31 (3)

20. The Defendant objects to the Court's failure to instruct each juror he or she is not to use the victim evidence to make any comparative worth analysis which would include victim's worth to the community, or to his family, as compared to other members of society, or victim's worth compared to worth of the Defendant.

## APPELLANT'S ISSUE NO. 31 (4)

21. The Defendant objects to the Court's failure to instruct each juror to disregard victim impact evidence that was not shown to be within the knowledge or reasonable expectation of the Defendant. *See also Will v. State*, 2004 WL 3093238 (2004) and *Espada v. State*, 2008 WL 4809235 (2008).

## MITIGATION ISSUE

## APPELLANT'S ISSUE NO. 32 (1)

22. The Defendant objects to the Court's failure, to require the State to negate, beyond a reasonable doubt, the existence of a circumstance, that would justify a sentence of life rather than death. See *Ring v. Arizona*, 121 S.Ct. 1263

134

(2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v. Washington*, 124 S.Ct. 2783 (2004).

## APPELLANT'S ISSUE NO. 32 (2)

22A. (Renumbered) The Defendant objects to the failure of the Court's instructions to explain to each juror that his or her finding of guilt in the first phase of the trial does not foreclose consideration of evidence which they believe could serve as a basis for a sentence less than death.

## APPELLANT'S ISSUE NO. 32 (3)

23. The Defendant objects to the Court instructing each juror that he or she is to consider whether there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of imprisonment rather than a death sentence be imposed. This is unnecessarily confusing to a juror because if "one circumstance" is enough, why is each juror instructed to consider circumstances (plural)?

## APPELLANT'S ISSUE NO. 32 (4)

24. The Defendant objects to the Court instructing each juror to consider if a circumstance or circumstances is sufficient to "warrant that a sentence of life imprisonment rather than a death sentence be imposed". This instruction erroneously implies to each juror that a "YES" answer on the mitigation issue is requited to rescue the Defendant from a death verdict that is already in place. This

135

is an inaccurate and misleading statement of the law. If there is anything but a "NO" answer on the mitigation issue, the mandatory verdict is LIFE.

## APPELLANT'S ISSUE NO. 32 (5)

25. The Defendant objects to the failure of the Court to provide a rational sentencing process in that the punishment charge fails to inform the jury whether the phrase "personal moral culpability," used in the special issue regarding mitigation, has the same meaning as the phrase "moral blameworthiness" in the definition of mitigating evidence related to that special issue.

The mitigation issue instructs the jurors to consider the Defendant's "personal moral culpability" in determining if there is a sufficient "mitigating circumstance" that would justify a sentence of life. They are then told that "mitigating evidence" is evidence that a juror might regard as reducing the defendant's "moral blameworthiness". The term "mitigating evidence" is not used in the definition. The failure to define terms and the confusing way in which terms (and terms similar to terms) denies to the Defendant, and to each juror, the benefits of a constitutionally mandated sentencing process.

26. Omitted

## APPELLANT'S ISSUE NO. 32 (6)

27. The Defendant objects to the Court's failure to provide a reasoned and rational moral process for the consideration and giving of effect to mitigating circumstances. (i.e., no burden of proof, no standard of proof, no guidance as to the nature and strength of the presumption in favor of death that may arise, if at all, from the future dangerousness finding, etc.).

## APPELLANT'S ISSUE NO. 33 (7)

28. The Defendant objects to the failure of the Court to provide a rational sentencing process in that the punishment charge fails to inform the jury of any difference in the meaning of the phrase "personal moral culpability," used in the special issue regarding mitigation, and the phrase "moral blameworthiness" in the definition of mitigating evidence related to that special issue.

## APPELLANT'S ISSUE NO. 32 (8)

29. The Defendant objects to the failure of the Court to provide a clear, understandable and rational sentencing process which does not require the jury to nullify or ignore one part of the charge in order to follow another. The court's directive to consider "all of the evidence" set forth in Special Issue No. 2 regarding mitigation, conflicts with the definition of "mitigating evidence" set forth elsewhere, at page   in the charge, resulting in an irrational process which interferes

137

with the jury's ability to make a reasoned moral response to the evidence before them. *Penry v. Lynaugh*, 492 U.S. 302 (1989)*(Penry I)*; *Penry v. Johnson*, 121 S. Ct. 1910 (2001)*(Penry II)*

## APPELLANT'S ISSUE NO. 32 (9)

30. The Defendant objects to the punishment charge as a whole because it fails to permit a discretionary grant of mercy based on mitigating circumstances unburdened by the jurors' perhaps strong desire to deter others from committing similar crimes or unbound by the unconstitutional requirement that there be a nexus between the mitigating evidence and the Defendant's "moral blameworthiness" for the commission of the offense.

## APPELLANT'S ISSUE NO. 33 (1)

## MISLEADING JURORS

31.The Defendant objects to the failure of the Court's charge to inform each juror that if he or she does not unanimously agree on any special issue that a life verdict is the automatic sentence. This failure to inform the jury of all their options provided by our law renders our capital sentencing process irrational and unreliable under the Eighth and Fourteenth Amendments and allows for a wanton and freakish application of the death penalty. The making of such a material omission of applicable law in the charge to the jury denies the jurors the equal protection of the

138

law and due process of law in that it subverts and distorts their right to freely participate in the criminal justice system. The judge, the prosecutors, the defense counsel, even the bailiff, likely know the effect of a holdout juror; the jurors themselves deserve, and through the undersigned counsel, demand fair and equal treatment under the law. Since the jurors are not in a position to assert their rights in this regard, the Defendant may do so. See *Batson v. Kentucky*, 476 U.S. 79 (1986).

The Supreme Court granted relief in *Penry v. Johnson*, 532 U.S. 782 (2001) because the jurors were requited to give false answers in their verdict in order to give effect to mitigating circumstances. The Court's proposed instruction may likely give jurors cause to give a false answer only because a juror would feel it impossible to convince nine (9) other jurors to vote with them. This charge also violates C.C.P. Art. 36.14, which requires the Court to give a charge that "distinctly" sets forth the "law applicable to the case." Art. 36.14 simply carries out and gives effect to the Texas "due course of law" clause of the Texas Constitution and the-Due Process Clause of the United States Constitution; it must control over Art. 37.071, Sec. 3(3)(i), which seeks to suppress and conceal important information from the jurors. *See also Simmons v. South Carolina*, 512 U.S. 154 (1994), requiting truth in capital sentencing.

32. The Defendant objects to the failure of the Court's charge to inform the jury that no mistrial will result from their deliberations according to the instructions given them by the Court.

**APPELLANT'S ISSUE NO. 34 (1)**

***JONES, APPRENDI, RING AND BLAKELY***

33. The Defendant objects to the punishment charge as a whole because the Court has failed to include a verbatim copy of the indictment to the charge, and failed to instruct the jury to disregard any facts militating toward death, but not alleged in the indictment.

**APPELLANT'S ISSUE NO. 34 (2)**

34. The Defendant further objects to the submission of Special Issue Number One as there is no allegation in the indictment that the grand jury found that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society.

**APPELLANT'S ISSUE NO. 35**

**PRESUMPTION OF LIFE**

35. The Defendant objects to the Court's failure to instruct each juror that there is no presumption in favor of death, even if they find the Defendant to be a

"future danger" in answer to Special Issue Number One. The Defendant requests the Court to instruct each juror that the law presumes life, that state law is always satisfied with a life verdict.

## APPELLANT'S ISSUE NO. 36 AND NO. 37

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUESTED INSTRUCTION DEFINING EVIDENCE THAT REDUCES "MORAL BLAMEWORTHINESS"

### (This issues are presented together as they involve the same issues of law and are similar in nature.)

Defendant's trial counsel filed three separate motions entitled "defense's requested Charge Defining Evidence That Reduces "Moral Blameworthiness: (Clerk's Record Vol. 2 pp. 120,126,132 respectively. The argument and authorities cited therein are incorporated herein by reference as if set out verbatim.

The first motion pp. 132-136 attacks Article 37.071 sec. 2(f)(4) as limiting the jury's consideration of mitigating evidence to factors that reduce the defendant's moral blameworthiness and creates an unacceptable risk that the death penalty would be imposed despite the existence of evidence that would infer the basis for a sentence less than death. The instruction is unconstitutional and narrows the jury's discretion to factors that only concern moral blameworthiness.

The second motion found at Clerk's Record 2 pp. 126-130 further attacks the laws limiting the jury's consideration in violation of the U.S. Supreme Court's holding that relevant mitigation evidence is "evidence which tends logically to prove or disprove same fact or circumstance which a fact finder could reasonably deem to have mitigating value." *Tennard v. Drecke*, 159 L.Ed.2d 384, 124 S.Ct. 2567, 2570 (2004).

The State's response to the motions is found at Clerk's Record Vol. 2 pp. 138-140 which further clarifies the state of the law on the issue. The State informed the court that these issues were decided adversely to the Defendant's position in *Roberts v. State*, 220 S.W.3d 521 (Tex. Crim. App. 2007) *See also Coble v. State*, 330 S.W.3d 253 (Tex. Crim.App. 2010) and *Mays v. State*, 318 S.W.3d 368 (Tex. Crim. App. 2010).

Appellant requests that this Honorable Court review these issues again and reverse its position.

# FEDERAL CONSTITUTIONAL ISSUES

***(The following Constitutional Issues have been previously submitted to this Honorable Court; which previously has overruled the issues raised. See Saldano v. State, 232 S.W.3d 77 (Tex. Crim.App. 2007) Appellant submits these issues in this case not to cause unnecessary litigation but to invite this Court to review any prior stand on any issue and more importantly to preserve each issue for further review in the Federal Court system; which has final constitutional power of review.)***

Trial Counsel filed ten pretrial motions attacking the constitutionality of the Texas death penalty scheme (See Index Clerk's Record Volume 1 pp. 82-84 and Clerk's Record Volume 2 pp. 88-108, pp. 216-219)) These motions were presented to the trial court an denied. (Reporter's Record Vol. 52 pp. 1-41)

Appellant's constitutional issues' legal arguments and authorities are incorporated herein by reference as if set out verbatim. The constitutional challenges are numbered and summarized as follows. (See also Index of Motions Clerk's Record Vol.1pp.80-84)

## APPELLANT'S ISSUE NO. 38

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION REQUESTING THE COURT TO FIND TEX. CODE. CRIM. PROC. ART. 37.071 SECTION 2(f)(4) TO BE UNCONSTITUTIONAL"**

**APPELLANT'S ISSUE NO. 39**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO DECLARE THE "10-12 RULE" UNCONSTITUTIONAL"**

**APPELLANT'S ISSUE NO. 40**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION FOR COURT TO FIND ART. 37.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE UNCONSTITUTIONAL AS APPLIED TO THIS DEFENDANT"**

**APPELLANT'S ISSUE NO. 41**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO DECLARE THE CAPITAL SENTENCING STATUTE UNCONSTITUTIONAL BECAUSE IT ALLOWS JURIES TO DECIDE FUTURE DANGEROUSNESS BASED SOLELY ON THE FACTORS OF THE CASE"**

**APPELLANT'S ISSUE NO. 42**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO PRECLUDE DEATH AS A SENTENCING OPTION AND TO DECLARE TEXAS DEATH PENALTY STATUTE UNCONSTITUTIONAL BECAUSE OF JUROR'S INABILITY TO PREDICT FUTURE DANGEROUSNESS"**

**APPELLANT'S ISSUE NO. 43**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO DECLARE THE CAPITAL SENTENCING STATUTE UNCONSTITUTIONAL BECAUSE IT HAS BECOME A *DE FACTO* MANDATORY DEATH PENALTY STATUTE"**

**APPELLANT'S ISSUE NO. 44**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO FIND THAT THE DEATH PENALTY IN THE STATE OF TEXAS IS UNCONSTITUTIONAL ON THE GROUND THAT ITS CAPITAL SENTENCING PROCEDURE FAILS TO MEET MINIMUM REQUIREMENTS SET FORTH IN *FURMAN V. GEORGIA* AND ITS PROGENY, AS EVINCED BY THE FINDINGS OF THE CAPITAL JURY PROJECT AND OTHER RESEARCH"**

**APPELLANT'S ISSUE NO. 45**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO DECLARE ARTICLE 37.071, §2 (a) OF THE CODE OF CRIMINAL PROCEDURE UNCONSTITUTIONAL ON ITS FACE UNDER DUE COURSE OF LAW AND DUE PROCESS"**

**APPELLANT'S ISSUE NO. 46**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO DECLARE ARTICLE 37.071 § 2(a) OF THE CODE OF CRIMINAL PROCEDURE UNCONSTITUTIONAL ON ITS FACE FOR LACK OF STANDARDS"**

**APPELLANT'S ISSUE NO. 47**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO HOLD STATUTORY DEFINITION OF MITIGATING EVIDENCE UNCONSTITUTIONAL, AS APPLIED TO IMPOSE A "NEXUS" LIMITATION, AND TO GRANT DEFENDANT'S REQUESTED CLARIFYING VOIR DIRE, INSTRUCTION, ARGUMENT AND MOTION IN LIMINE"**

145

**APPELLANT'S ISSUE NO. 48**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S PRETRIAL CONSTITUTIONAL MOTION ENTITLED "MOTION TO PRECLUDE THE DEATH PENALTY AS SENTENCING OPTION (DENIAL OF EQUAL PROTECTION )**

These issues have been previously litigated numerous times and have been rejected by this Honorable Court. *See Saldano v. State, supra, Mendoza v. State, supra. Roderick Harris v. State*, 2014 WL 2155395.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, there being reversible error appearing in the record of the trial of the case, Appellant prays this Honorable Court reverse the judgment of the trial court and remand for a new trial.

Respectfully submitted,

    /s/  John Tatum

John Tatum
Counsel for Appellant

## CERTIFICATE OF SERVICE

I, JOHN TATUM, do hereby certify that a true and correct copy of the foregoing Brief for Appellant was delivered to Craig Watkins, Criminal District Attorney, Appellate Section, 11th floor, Frank Crowley Criminal Courts Building, Dallas, Texas 75207, on this 27th day of February 27, 2015.

      /s/  John Tatum
      John Tatum

## CERTIFICATE OF SERVICE

The undersigned attorney for Appellant certifies that a true and correct copy of the foregoing brief was mailed , postage prepaid, to Franklin Davis TDCJ #00999585 at the Polunsky Unit 3872 FM 350 South, Livingston, Texas 77351, by U.S. Mail this the 27th day of February, 2015.

      /s/  John Tatum
      JOHN TATUM

**CERTIFICATE OF COMPLIANCE OF WORD COUNT PURSUANT TO APPELLATE RULE OF PROCEDURE 9.4**

I certify that this document has 37,292 words pursuant to the definitions of length and content in Rule 9.4.

    A. Case Name: Franklin Davis
    B. The Court of Criminal Appeals Case Number: No. AP-77,031
    C. The Type of Document: Appellate Brief
    D. Party for whom the document is being submitted: Applicant
    E. The Word Processing Software and Version Used to Prepare the Brief:
       Word Perfect X7

Copies have been sent to all parties associated with this case.


    /s/ John Tatum                  02/27/15
(Signature of filing party and date)

John Tatum
990 South Sherman St.
Richardson, Texas 75081
(972) 705-9200
SBOT# 19672500